# Exhibit B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

* * * * * * * * * * * * * * * *
UNITED STATES OF AMERICA,          ) Criminal Action
                                   ) No. 19-395
vs.                                )
                                   )
LARRY DEAN HARMON,                 ) March 13, 2020
                                   ) 9:23 a.m.
                Defendant.         ) Washington, D.C.
* * * * * * * * * * * * * * * *


TRANSCRIPT OF HEARING
BEFORE THE HONORABLE BERYL A. HOWELL,
UNITED STATES DISTRICT COURT CHIEF JUDGE

**<u>APPEARANCES</u>**:

FOR THE UNITED STATES:    CHRISTOPHER B. BROWN
                          S. RIANE HARPER
                          C. ALDEN PELKER
                          U.S. Attorney's Office
                          For the District of Columbia
                          555 Fourth Street, NW
                          Washington, DC 20530
                          (202) 252-7153
                          Email: christopher.brown6@usdoj.gov


FOR THE DEFENDANT:        CHARLES FLOOD
                          FLOOD & FLOOD
                          914 Preston Street
                          Suite 800
                          Houston, TX 77002
                          (713) 223-8877
                          Email: charles@floodandflood.com


ALSO PRESENT:             TAKEYSHA ROBINSON, Pretrial Services
                          CHRISTINE SCHUCK, Pretrial Services

Court Reporter:           Elizabeth SaintLoth, RPR, FCRR
                          Official Court Reporter


Proceedings reported by machine shorthand, transcript
produced by computer-aided transcription.

1    phrase or something like that?

2         MR. BROWN:  That's right; that's the second point.

3         THE COURT:  I thought you found that.

4         MR. BROWN:  So we found some seed phrase.  We have

5    only been able to reconstitute one very small wallet from

6    those seed phrases.

7         The way that seed phrases work is it's a 12- to

8    24-word mnemonic that you basically plug into a set

9    algorithm.  If you have a Trezor device, you can use that

10   Trezor device -- even a brand new one -- using your seed

11   phrase that you set up in the original Trezor device and it

12   will reconstitute that private key information that will

13   allow you to access that bitcoin.  So simply because we have

14   a Trezor device in our possession doesn't mean that

15   Mr. Harmon either has a memorized 24-word phrase or has

16   other places where he's hidden these phrases.

17         And, by the way, we found Trezor devices, ledger

18   devices, seed keys in at least --

19         THE COURT:  And the Trezor device is just a big

20   storage device?

21         MR. FLOOD:  Yes.  And there is a picture of it in

22   the detention exhibit, I think Detention Exhibit 15, where

23   he actually had it taped to the underside of a desk.  So

24   it's like a thumb drive, basically -- a glorified thumb

25   drive where you can store this information.  But, like I

1    said, he could reconstitute those wallets from anywhere in

2    the world potentially from memory.

3              And the third salient issue is the --

4              THE COURT:  I know that's a salient issue,

5    Mr. Brown.  But, you know, you have made a point that his --

6    he is operating this digital-related company now.  You have

7    said that his family members -- some of his family members

8    work in that company, so he is not the only one in his

9    family, perhaps, with technological expertise.

10             So to the extent that you're concerned that people

11   with technical expertise, including him, might be able to

12   access these seed phrase and access this cryptocurrency, why

13   couldn't his wife be doing that right now?

14             MR. BROWN:  Well, his wife --

15             THE COURT:  And is that a reason to hold -- detain

16   Mr. Harmon?

17             MR. BROWN:  Yes.  Because if Mr. Harmon -- if his

18   wife accesses that cryptocurrency now and Mr. Harmon is

19   detained, he cannot flee because he's detained.

20             If his wife accesses that cryptocurrency now and

21   he's released, he can flee; he can finance his entire

22   family's flight to another country.

23             The third salient characteristic is we know that

24   he is very well aware of the most sophisticated security

25   precautions for these devices, this pass phrase feature.  In

1    fact, he wrote about it in his own blog, about creating

2    secret wallets within the wallets; and that's exactly what

3    we have seen in our examination of these devices.

4            So there is virtually -- we have an evidentiary

5    basis -- in Agent Haynie's testimony, in the exhibits that

6    have been submitted before the magistrate in Ohio, in this

7    court -- that he has potentially tens of millions of dollars

8    in cryptocurrency assets that he generated.

9            These are illegal proceeds from Helix, and we have

10   not been able to secure those assets.  Until we can secure

11   them and transfer them to a government wallet, those are

12   available for him or his family members to transfer them

13   and --

14           THE COURT:  Well, you cite *Bikundi* throughout this

15   case, and that's a case with which both of us are very

16   familiar.

17           MR. BROWN:  Yes, Your Honor.

18           THE COURT:  And in that case, it wasn't just the

19   financial resources that might have been hidden, it was a

20   number of other factors that led to detention in that case;

21   it was huge contacts and family members abroad, prior fraud

22   convictions -- it was a number of different things that led

23   to detention in that case, and not just the potential hidden

24   assets.  Isn't that right?

25           MR. BROWN:  Yes, Your Honor.

```
1    that he used to communicate with the public, anonymously

2    hiding behind the internet, about his illegal services.

3              THE COURT:  How much of the defendant's bitcoin

4    has the government seized?

5              MR. BROWN:  So from, essentially, a bank account,

6    a Block5 account, we seized approximately 65 --

7              THE COURT:  What kind of account?

8              MR. BROWN:  It's a company called Block5 --

9              THE COURT:  Block5.

10             MR. BROWN:  -- which is a bitcoin savings company;

11   it's like a bank account, but savings account.  We have

12   seized approximately $3.2 million.  From his Trezor devices

13   and seed recovery keys, we've seized approximately $20,000

14   of bitcoin, which is just a fraction of the 10s -- 50,

15   $47 million in cryptocurrency that we believe he has.

16             Moreover, in both the phone evidence and the

17   account spreadsheet --

18             THE COURT:  But having seized all of his computer

19   equipment, does that slow down, at least, if not block the

20   ability to access more bitcoin even if you have the seed

21   phrase?

22             MR. BROWN:  Your Honor, we have some seed phrases.

23             As we have shown in our exhibits, he actually

24   wrote about hiding seed phrases; they can be hidden

25   anywhere.  They can be buried underground, they can be
```

1    hidden in an electrical guitar, anywhere.  We don't know --

2              THE COURT:  That was a clever story.

3              MR. BROWN:  We don't know what we don't have.

4              And the second point, Your Honor, is -- so, first

5    of all, simply possessing the drive essentially that has,

6    you know, the analogy is your email password; that doesn't

7    mean that if you can recreate that email password elsewhere

8    you can't access your email.

9              So we have physical custody of certain computer

10   and electronic devices, but we don't -- we know he uses seed

11   phrase to recreate bitcoin.  We know we found those in

12   multiple locations -- and these are just the locations that

13   are in his own name.

14             THE COURT:  So one of the government's arguments

15   is that he has got these strong ties to Belize where he had

16   a leased out -- clearly spent eight months of his life, at

17   least, and has vacationed.  Does the government have an

18   extradition treaty with Belize?

19             MR. BROWN:  Your Honor, I don't know off the top

20   of my head.  I believe we would, given the degree of

21   cooperation that we have with Belize.

22             I would say it is -- well, first of all, he paid

23   $2,000 a month -- that was in Agent Haynie's testimony --

24   $2,000 a month in cash to rent a vacation home that he

25   claims he only spent a month in per year.