UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| v. | : | Criminal No. 21-cr-433 (BAH) |
| | : | |
| **GARY JAMES HARMON,** | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S REPLY**
**IN SUPPORT OF PRETRIAL DETENTION**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, hereby submits this Reply In Support of Pretrial Detention in the above-captioned case.

**ARGUMENT**

The defendant does not dispute the basic elements of the government's case for pretrial detention. Remarkably, the defendant does not deny that he took the approximately 712.6 BTC from the SUBJECT WALLETS stored on TREZOR ONE after the government had seized that device pursuant to a lawful search warrant. He does not dispute that the 712.6 BTC was derived from his brother's bitcoin mixer service, Helix. He does not actually dispute any of the government's proffered evidence—underscoring the strength of the government's case—but only hints at the existence of "reasonable defenses," ECF No. 14, at 10, without fully explaining what those defenses may be. He does not dispute that he lied to government agents about the missing bitcoin, or that he told them that he flushed a USB drive containing partial seed words for his brother's bitcoin wallets down the toilet at his gym. And he does not address the most significant fact of all: that the majority of the missing 712.6 BTC, worth tens of millions of dollars, remains unaccounted for. The defendant's significant criminal exposure and the strength of the

government's evidence—as well as the absence of any real community ties—give the defendant an overwhelming incentive to flee prosecution or obstruct justice in his case. The defendant's facility with the darknet and demonstrated ability to remotely access cryptocurrency worth tens of millions of dollars show that he has the resources to flee prosecution indefinitely rather than face the consequences of his actions.

### A. The Defendant Lacks Substantial Ties to the Community

The defendant's lead argument (at 5-6, 10-11) is that the Court can entrust him to the supervision of a girlfriend of 5 months, her parents, and a handful of other friends the defendant made following his recent transformation into a bitcoin millionaire as a result of the criminal conduct in this case. First, none of these personal references has had any meaningful relationship with the defendant for longer than a year. All of them represent either new relationships or older college acquaintances who became reacquainted with the defendant after he moved to Cleveland in 2021 and began lavishly spending his newfound illicit wealth. *See* ECF No. 14-1, at 2 (college acquaintance of the defendant who "reconnected this year when he moved to Cleveland, Ohio," developed a relationship, and intends to move into the defendant's luxury condominium); 4 (girlfriend's mother with no independent relationship with the defendant); 5 (college acquaintance of the defendant through "Greek Life" who has "grown closer" after the defendant moved to Cleveland, Ohio); 6 ("Gary and myself became friends within the past six or so months").

Second, not a single family member has come forward to support the defendant. The defendant attempts to discount reports of the rupture with his family as "unsourced gossip" (at 6), but the government's evidence is based on multiple witness accounts. According to text messages provided by the defendant's sister-in-law, on or about June 4, 2020—slightly more than

2

a month after he took the 712.6 BTC—the defendant sent a defiant text message to her stating, "Once you guys file charges against me please let me know so I can send over to lawyer."



**Figure 1: Text Message from the Defendant**

The defendant's sister-in-law confirmed that she and the rest of the defendant's family cut off all contact with the defendant starting in or about the summer of 2020. That was corroborated by the defendant's own statements to a third-party witness, S.B., who was interviewed by federal agents on October 7, 2020. S.B. told agents that he last saw the defendant in May or June 2020. At that time, the defendant told S.B. that his family was no longer speaking to him because they believed he had stolen money from Larry Harmon.

The defendant has long had a troubled relationship with his family, in particular with his older brother, Larry Harmon. The defendant's sister-in-law recounted a violent incident in 2016 or 2017 arising from a dispute over money between the defendant and his brother, Larry Harmon.

The defendant had been conducting peer-to-peer sales of bitcoin for cash on behalf of Larry Harmon. The defendant demanded a higher percentage fee, but Larry Harmon refused. In response, defendant physically attacked Larry Harmon, pinned him against the wall, and choked him. Two other witnesses, S.B. and A.L. (the latter interviewed by federal law enforcement on November 12, 2020), independently confirmed the same incident in which the defendant choked Larry Harmon. The witness A.L. described the defendant as the "Tasmanian Devil" when he has been drinking.

To be sure, community ties can include more than just biological family. The defendant, however, has no significant ties of any kind. He has no established career, no legitimate financial resources to speak of, no long-term friends or family to vouch for him, and he has resided at his current residence in Cleveland—a luxury condominium he purchased in June 2021 with the proceeds of his illegal conduct—for less than 6 months. In short, the defendant has shallow roots in his community and every incentive to flee.

### B. The Weight of the Evidence and the Nature and Circumstances of the Offense Weigh In Favor of Detention

The defendant does not dispute any of the government's proffered evidence—including evidence that he attended Larry Harmon's detention hearings and heard testimony and argument about the SUBJECT WALLETS stored on TREZOR ONE and the government's inability to secure the Helix-derived bitcoin; that he received automated messages from Trezor.io corresponding to the illicit transactions out of TREZOR ONE in April 2020; that the illicit transactions stopped as soon as the government filed its motion for an emergency status hearing in Larry Harmon's criminal case; that the missing 712.6 BTC was laundered through bitcoin mixers; or that the defendant went from collecting unemployment to spending millions of dollars in unexplained

bitcoin wealth—traceable to the same mixers—beginning in late 2020.   *See* ECF No. 10, at 4-14. The defendant does not dispute that the government executed search warrants on his residences and recovered two Trezor-brand cryptocurrency storage devices and approximately 50 sets of seed words from the defendant's residences, reflecting familiarity with the instrumentalities used to commit the underlying offenses in this case—as well as a way to conceal the fruits of the offense in the form of "hidden wallets" on the Trezor devices.   *See id.* at 3-4, 15.

The defendant hints (at 10) that he has "reasonable defenses" to the charges, but barely elaborates on what those defenses may be.   The defendant suggests (at 7) that he did not understand the 712.6 BTC was subject to forfeiture.   Yet the defendant offers no response to the government's point that the defendant's knowledge of the forfeitability is irrelevant to the money laundering counts, or that the defendant's knowledge—to the extent required for Counts Nine and Ten—can be inferred from his attendance at Larry Harmon's detention hearings.   *See* ECF 10, at 20-21.

If the defendant intends to argue that he sincerely believed he was entitled to the 712.6 BTC that he removed from the SUBJECT WALLETS stored on TREZOR ONE, he cannot explain why he went to such elaborate lengths to conceal and cover up his conduct.   Why did he falsely deny taking the bitcoin during the voluntary interview with FBI and IRS-CI agents on July 15, 2020?   Why did he launder the 712.6 BTC through two bitcoin mixers, Wasabi Wallet and ChipMixer.com?   Why did he conceal the true source of his bitcoin wealth from his new friends, neighbors, and romantic partner after beginning a new life in Cleveland?   The defendant's secrecy and deception speak volumes about his consciousness of guilt.

The defendant also argues (at 8) that his case is "connected to the results of his brother's case." But Larry Harmon entered a guilty plea in his case, and Larry Harmon's sworn Statement of Offense is, by itself, strong evidence that the missing 712.6 BTC represents the proceeds of specified unlawful activity, to wit, operation of the Helix bitcoin mixer in violation of 18 U.S.C. § 1956(h) (money laundering conspiracy) and 18 U.S.C. § 1960(a) (operation of an unlicensed money transmitting business). The defendant quotes a government filing dated February 20, 2020, anticipating "issues of first impression" in the prosecution of Larry Harmon, *see* No. 19-cr-395, ECF No. 11, at 6—but fails to acknowledge that those issues were litigated and resolved in a series of published decisions by this Court. *See United States v. Harmon*, 474 F. Supp. 3d 76 (D.D.C. 2020); *United States v. Harmon*, 514 F. Supp. 3d 47 (D.D.C. 2020); *United States v. Harmon*, 2021 WL 1518344 (D.D.C. Apr. 16, 2021).

The defendant also quibbles (at 8-9) with the government's estimate of the applicable Sentencing Guidelines range and points out that the Guidelines are not binding on the Court. To be sure, the defendant may have persuasive arguments to raise at sentencing, and the Court may depart or vary from the applicable Guidelines range, but the realistic prospect (not certainty) of a Guidelines sentence of up to 19 years after trial provides the defendant with a substantial incentive to flee. Combined with the significant financial penalties in this case, including fines and forfeiture, the defendant has every reason to flee for his personal liberty and future access to tens of millions of dollars in illicit cryptocurrency assets.[1]

---

[1] In the unlikely event the defendant is acquitted after trial, the government intends to file a civil forfeiture action to forfeit the 712.6 BTC representing the proceeds and property involved in his offenses, and any other properties traceable thereto—including the defendant's luxury condominium in Cleveland, Ohio; vehicles, and other cryptocurrency and financial accounts acquired using the proceeds of the 712.6 BTC.

### C. The Defendant Poses a Risk of Future Obstruction and Cannot Be Trusted To Abide by Conditions of Release Imposed by this Court

The defendant does not deny that the offenses in this case involves obstructive conduct, that he lied to federal agents investigating the disappearance of the 712.6 BTC from the SUBJECT WALLETS, or that he told agents that he flushed a USB drive containing relevant evidence down the toilet at his gym (which reflects either destruction of evidence, if true, or else a further deception aimed at obstructing the investigation into his conduct). In *DeGrave*, a U.S. Capitol insurrection case arising from the events of January 6, 2021, Judge Friedman found that the defendant posed a risk of future obstruction based on his deletion of social media messages related to January 6, asking others "to delete and 'untag' their posts involving him," his use of encrypted messaging, allowing another January 6 rioter to stay at his home at a time he believed law enforcement was seeking the other rioter, and lying to the FBI about his actions on January 6, 2021. *United States v. DeGrave*, 2021 WL 1940536, at *15 (D.D.C. May 14, 2021). Significantly, the analysis did not depend on the defendant engaging in physical intimidation or witness tampering beyond simply requesting that his friends delete electronic evidence. *See id.* Here, the defendant has asserted that he destroyed electronic evidence, he used an encrypted email service, he retained the missing 712.6 BTC at a time when he was aware law enforcement was seeking to recover it, and he lied to FBI and IRS-CI agents about his involvement in taking the 712.6 BTC. To be sure, the defendant in *DeGrave* posed other risks, including a risk of future

political violence, *see id.* at *16-17, but that does not detract from the analysis as to risk of obstructive conduct.[2]

Even if the Court does not find by clear and convincing evidence that the defendant must be detained to prevent future acts of obstruction, his obstructive activity is still relevant to whether he can be trusted to abide by any condition or combination of conditions of release that the Court might impose. *See DeGrave*, 2021 WL 1940536, at *16.

### D. No Condition or Combination of Conditions Will Reasonably Assure the Defendant's Appearance or the Safety of the Community from Future Acts of Obstruction

The defendant fails to acknowledge that the majority of the missing 712.6 BTC remains unaccounted for, let alone offer any assurances to the Court regarding his access to this vast fortune in illicitly obtained cryptocurrency. As the offense conduct in this case demonstrates, the defendant is perfectly capable of remotely accessing this bitcoin from anywhere in the world with an Internet connection. The defendant has used TapJets, a private charter jet company that

---

[2] The defendant correctly notes that Judge Collar-Kotelly reconsidered the detention decision in *United States v. Gamble*, 2019 WL 6877755 (D.D.C. Dec. 17, 2019), and the government regrets the omission of this subsequent history in its detention memorandum. The defendant, however, overstates the significance of the further proceedings in that case. The D.C. Circuit did not actually reverse the decision in *Gamble* or hold that pretrial detention was inappropriate as a matter of law. *See United States v. Gamble*, 810 Fed. App'x 7, 8 (D.C. Cir. Apr. 10, 2020) (unpublished). The Circuit merely found that the district court had failed to "adequately explain" its decision as it related to the framework governing the rebuttable presumption of dangerousness in that case, and vacated and remanded for further proceedings. *Id.* On remand, the district court considered new arguments and evidence— including evidence that the defendant was "especially at risk of being adversely affected by COVID-19" as cases surged at D.C. Jail in March and April of 2020—and found that "the balance has changed and that fourth factor does not weigh in favor of detention." *United States v. Gamble*, 2020 WL 3581632, at *4 (D.D.C. Apr. 13, 2020).

accepts bitcoin as payment.    And the defendant's knowledge of the darknet would give him easy access to illicit markets where false identity documents can be purchased.

The defendant argues (at 9-10) that his experience is limited to the virtual world, not the "real world."    But the defendant's adoption of sophisticated operational security measures—including use of encrypted communications and laundering the 712.6 BTC through bitcoin mixers—shows that he has the willingness and ability to take whatever steps are needed to cover his tracks.[3]

No condition or combination of conditions can reasonably address the risks that the defendant will attempt to flee from prosecution or engage in obstructive conduct in this case.    The proposed third-party custodian, the defendant's girlfriend of 5 months, has a full-time job and cannot be relied upon to monitor the defendant at all hours of the day.    The defendant's access to the missing cryptocurrency requires only an Internet-connected device; it is unrealistic to assume the defendant will be able to resist this immense temptation, given the lengths to which he went to obtain the cryptocurrency in the first place and the costs—including broken family relationships—he has been willing to accept as the price of his illicit wealth.

The defendant argues (at 15-16) that he should be subject to the same conditions of release as Larry Harmon or the defendant in *United States v. Lokesh Naik*, No. 19-cr-373 (TSC).    Unlike Larry Harmon, however, the defendant has no family support and no significant ties to the

---

[3] The defendant relies on *United States v. Friedman*, 837 F.2d 48 (2d Cir. 1988), to argue that the government must proffer evidence such as "skill in avoiding surveillance, prior flight from law enforcement, and use of aliases."    ECF No. 14, at 9.    Of course, *Friedman* did not purport to set forth an exhaustive list of factors that are necessary to establish risk of flight, but only an illustrative list of factors that may be sufficient for such a showing.    *See* 837 F.2d at 50.    It is also telling that the defendant deliberately omits the last item from *Friedman*'s list—whether a defendant has "hidden assets."    *Id*.    Here, the defendant has hidden cryptocurrency assets worth tens of millions of dollars, which have not been secured by the government and cannot be secured without the defendant's private credentials.

community. Further, the defendant has been charged with obstructive conduct—brazenly removing property that he knew was seized by law enforcement pursuant a lawful search warrant and was subject to an ongoing criminal proceeding. Finally, the Court in Larry Harmon's case also granted the government's motion for a restraining order requiring Larry Harmon to provide the government with access to any and all cryptocurrency within his possession, including by disclosing seed recovery keys, access to hidden wallets, and other keys needed to transfer cryptocurrency. *See* 19-cr-395, ECF No. 26. As long as the 712.6 BTC remains unsecured in this case, the defendant poses an unreasonable risk of flight.

Meanwhile, the defendant's reliance on the *Naik* case is puzzling; the only similarity appears to be that both defendants posed some risk of flight. The defendant in *Naik* was charged with serious sexual assault offenses, but the evidence of a nonconsensual encounter was hotly contested and the defense raised questions about the victim's "inconsistent statements" which, the defense argued, damaged her "credibility or reliability." *See* 19-cr-373, ECF No. 10, at 7-8. The defendant in *Naik* was a foreign national, but he was also "indigent" and "d[id] not have the means to leave the United States." *Id.* at 8. *Naik* is hardly comparable to this case, where the defendant engaged in obstructive conduct, is facing a Guidelines sentence of up to 19 years in prison and millions of dollars in financial penalties, has already turned his back on his family and lacks any significant community ties, and has the ability to remotely access tens of millions of dollars in illicit cryptocurrency assets.

## **CONCLUSION**

For the foregoing reasons and the record in this case, the government respectfully requests that the Court grant the government's motion to detain the defendant pending trial in this case.

        Respectfully submitted,
        CHANNING D. PHILLIPS
        ACTING UNITED STATES ATTORNEY
        D.C. Bar No. 415793

BY:   */s/ Christopher B. Brown*
        Christopher B. Brown, D.C. Bar No. 1008763
        Assistant United States Attorney
        U.S. Attorney's Office for the District of Columbia
        555 4th Street, N.W.
        Washington, D.C. 20530
        (202) 252-7153
        Christopher.Brown6@usdoj.gov

        */s/ C. Alden Pelker*
        C. Alden Pelker, Maryland Bar
        Trial Attorney, U.S. Department of Justice
        1301 New York Ave., N.W., Suite 600
        Washington, D.C. 20005
        (202) 616-5007
        Catherine.Pelker@usdoj.gov