```
                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA

   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
UNITED STATES OF AMERICA,           )  Criminal Action
                                    )  No. 21-433
vs.                                 )
                                    )
GARY JAMES HARMON,                  )  September 10, 2021
                                    )  2:02 p.m.
              Defendant.            )  Washington, D.C.
   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

**TRANSCRIPT OF HEARING**
**BEFORE THE HONORABLE BERYL A. HOWELL,**
**UNITED STATES DISTRICT COURT CHIEF JUDGE**

**(All parties appearing via video and/or teleconference.)**

**APPEARANCES:**

```
FOR THE UNITED STATES:    CHRISTOPHER B. BROWN
                          C. ALDEN PELKER
                          U.S. Attorney's Office
                          For the District of Columbia
                          555 Fourth Street, NW
                          Washington, DC 20530
                          (202) 252-7153
                          Email: christopher.brown6@usdoj.gov

FOR THE DEFENDANT:        SABRINA SHROFF
                          Office of the Federal Public Defender
                          625 Indiana Avenue, NW
                          Washington, DC 20004
                          (202) 208-7500
                          Email: Sabrina_Shroff@fd.org

ALSO PRESENT:             CHRISTINE SCHUCK, Pretrial Services

Court Reporter:           Elizabeth SaintLoth, RPR, FCRR
                          Official Court Reporter
```

```
          This hearing was held via videoconference and
    telephonically and is, therefore, subject to the limitations
  associated with the use of technology, static interference, etc.

        Proceedings reported by machine shorthand, transcript
              produced by computer-aided transcription.
```

1                     **P R O C E E D I N G S**

2              THE COURTROOM DEPUTY:  Matter before the Court,

3     Criminal Case No. 21-433, United States of America versus

4     Gary James Harmon.

5              Counsel, please state your names for the record,

6     starting with the government.

7              MR. BROWN:  Good afternoon, Your Honor.

8     AUSA Christopher Brown for the government.

9              THE COURT:  Good afternoon, Mr. Brown.

10             MS. PELKER:  Good afternoon, Your Honor.

11    Alden Pelker for the United States.

12             THE COURT:  Good afternoon, Ms. Pelker.

13             And for the defense?

14             MS. SHROFF:  Good afternoon, Your Honor.

15             On behalf of Gary Harmon who is appearing by

16    video, Sabrina Shroff for the Federal Public Defender for

17    the District of Columbia.

18             THE COURT:  And good afternoon, Ms. Shroff.

19             And, Mr. Harmon, are you having any difficulty

20    hearing or seeing us?

21             THE DEFENDANT:  No.  It's working fine.  Thank

22    you, Your Honor.

23             THE COURT:  Good.  All right.

24             Mr. Harmon, this hearing is being conducted

25    remotely.  And have you -- after consultation with counsel,

1    do you agree to participate using the videoconference

2    technology rather than being present here physically in the

3    courtroom?

4              THE DEFENDANT:  Yes, Your Honor.

5              THE COURT:  All right.  Thank you.

6              Mr. Harmon, if you could just mute your machine so

7    we don't get a lot of feedback from where you are, that

8    would be helpful.  And if we need to hear from you, we'll

9    tell you so, and you can unmute.

10             All right.  So pending before the Court is the

11   government's motion for pretrial detention that was docketed

12   at ECF 10.  And in connection with this hearing, I have

13   reviewed that memorandum.  I have also reviewed the

14   defendant's opposition, which is docketed at ECF 14, along

15   with four different letters submitted on behalf of

16   Mr. Harmon.

17             Let's see.  One of those letters are from his

18   girlfriend, Alyssa Pisani; Ms. Pisani's mother; and one from

19   a college friend; and from another person who says he is

20   also Mr. Harmon's friend.

21             I have also reviewed the government's reply,

22   docketed at ECF 15.  And I have also reviewed other parts of

23   the record in the case, including the indictment and the

24   pretrial services report.

25             I want to begin with a document that was submitted

1      to the Court by Mr. Harmon dated August 19th, 2021, that I

2      docketed after it reached my chambers.  And in that letter

3      Mr. Harmon expresses concern that he may have given away

4      rights that he didn't intend to, and that he wants to

5      exercise his rights to a speedier trial.  And he also says:

6      Please do not take this letter as an indication of no

7      confidence in my current representation.

8              So I'm sort of left wondering, Ms. Shroff, what,

9      if anything, should I do about this letter?

10             MS. SHROFF:  I do apologize, Your Honor.  I did

11     not get a copy --

12             THE COURT:  Ms. Shroff, I can't hear you.

13             Has that letter not been docketed yet?

14             MS. SHROFF:  I'm sorry, Your Honor.  If it has, I

15     did not see it, so I do apologize to the Court.

16             THE COURT:  Okay.  Because it was supposed to be

17     docketed a couple of days ago.

18             All right.  Well, that's unfortunate.  And I am

19     going to ask my courtroom deputy to find out from the

20     clerk's office what the delay is in docketing something that

21     I wanted to be docketed as of September 8th when I received

22     it.  But, Ms. Shroff, I have pretty much summarized what's

23     in the letter.  It's a single -- one-page letter.

24             And do you want to have a moment to talk to

25     Mr. Harmon before we proceed, because if he has a specific

1    request we may as well take care of it here.  So we can put

2    you both in a separate room to have a conversation; and he

3    can communicate to you what his concerns are, if any, so

4    that you can bring it to my attention.

5            MS. SHROFF:  Certainly, Your Honor.  I just

6    checked the docket, and I am glad I didn't miss anything.

7            If the Court wants me to answer on the letter, I

8    would appreciate a brief moment to speak to him.

9            THE COURT:  Yes.

10           Could you please put Ms. Shroff and Mr. Harmon in

11   a private room, please?

12           THE COURTROOM DEPUTY:  Yes.

13           (Whereupon, counsel and the defendant confer.)

14           THE COURT:  Ms. Shroff, we're just waiting for

15   Mr. Harmon to reappear on the screen.

16           Was that sufficient time, Ms. Shroff?

17           MS. SHROFF:  It was, Your Honor.  Thank you.

18           THE COURT:  Okay.  We're just waiting for him to

19   reappear.

20           (Whereupon, the court and staff confer.)

21           THE COURT:  And there he is.

22           So I apologize that this did not get on the

23   docket.  I thought in 48 hours it would have been on the

24   docket, so I didn't mean to catch you by surprise,

25   Ms. Shroff.

1          So after having had a conversation with Mr. Harmon

2     about the concerns he expressed in his letter I summarized

3     for you, essentially, is there anything that you want to

4     raise with the Court?

5          MS. SHROFF:  Your Honor, I did discuss very

6     briefly how the speedy trial clock works with Mr. Harmon

7     again today and only -- today's discussion has been brief.

8          But I do note, for the record, that on August 24

9     of 2021, the government filed a motion seeking detention.

10    Under the Speedy Trial Act, the motion tolled the speedy

11    trial clock, and the clock has been tolled from August 24th

12    until today.

13         In light of that, whatever concern Mr. Harmon may

14    have had about the speedy trial clock, I was able to answer

15    by simply saying that the motion -- his desire to get bail

16    in this case would have tolled the Speedy Trial Act anyway.

17         Going forward from today onward, Your Honor,

18    should Mr. Harmon have any additional speedy trial concerns,

19    I will immediately contact the Court and seek a trial date

20    within the 70 days that the speedy trial clock allows.

21         Of course, had I -- if I haven't had a

22    sufficiently detailed conversation with Mr. Harmon about

23    speedy trial, I will endeavor to do better and have another

24    conversation with him.

25         THE COURT:  All right.  Thank you, Ms. Shroff.

1              Okay.  So let's move on to the detention hearing

2       component of this hearing.  It is the government's motion,

3       so I am going to begin with Mr. Brown and Ms. Pelker.

4              Who is going to be speaking for the government in

5       connection with the motion, Mr. Brown?

6              MR. BROWN:  I am, Your Honor.

7              THE COURT:  Okay.  So I appreciate that the

8       government is moving for detention on two statutory bases,

9       under 3142(f)(2)(A), because there is a serious risk of

10      flight and, also, under 3142(f)(2)(B), due to a serious risk

11      that the defendant will obstruct or attempt to obstruct

12      justice.

13              Is the risk of obstruction -- and I want to be

14      clear -- I know this is a defendant charged with

15      obstruction.  But I just want to be clear about what the

16      future risk of obstruction will be since the obstruction of

17      his brother's case, Larry Harmon's case -- since

18      Mr. Harmon's case has ended with a plea, I am not sure that

19      that's the risk of obstruction anymore here.

20              So could you just explain precisely what the

21      current serious risk of obstruction is given the posture of

22      the Larry Harmon case?

23              MR. BROWN:  Yes, Your Honor.

24              I think that we would look at three possible areas

25      of possible future obstruction by the defendant.

 1             Number one would be destruction of electronic

 2     evidence in general.  And the basis for that is, number one,

 3     the defendant did -- we know he opened up a new ProtonMail

 4     account.  We know he created numerous cryptocurrency

 5     accounts, the Bittrex account, the BlockFi account; those

 6     were registered using his ProtonMail account.

 7             There may be other online accounts, whether

 8     electronic communications accounts, social media accounts or

 9     cryptocurrency accounts that he opened using that encrypted

10     ProtonMail account.

11             As we laid out in our pleading, ProtonMail does

12     not retain any customer records, and so they're not amenable

13     to the USSG process; so that is number one, just general

14     destruction of electronic evidence.  And I think the

15     basis for that --

16             THE COURT:  It is not destruction -- it is not

17     destruction necessarily of electronic evidence but use of,

18     say, sophisticated means to avoiding discovery, concealing

19     electronic evidence?

20             MR. BROWN:  Yes, Your Honor, concealing.  Or if he

21     has other online accounts that we don't yet know about, he

22     could delete those or close those accounts before the

23     government can discover those accounts.  And we have seen in

24     the past that he has, number one, when interviewed -- when

25     interviewed by FBI and IRS law enforcement agents -- number

1   one, he lied to them about his knowledge of the missing

2   bitcoin; and, number two, he told them the story that he had

3   a USB drive that he received from his brother, Larry Harmon,

4   that he said contained partial seed words for Larry Harmon's

5   bitcoin, among other records.  And when the agents asked

6   about that, he said he no longer has it because he flushed

7   it down the toilet at his gym.

8          Now, we don't know if that story is true or false.

9   If it's true, then he was confessing to destroying evidence

10  in a criminal case.  If it's false, then it's a false story

11  that he floated to these agents in an effort to, sort of,

12  get them off the scent.

13         There are two other areas where we have concerns;

14  number two is simply that missing bitcoin itself.  The 712

15  bitcoin that went missing from Gary Harmon's criminal case

16  that we believe Gary Harmon took; he spent some of it.  But

17  our very broad ballpark estimate is maybe 500 of that

18  bitcoin or more remains unaccounted for.

19         Now, if he were to spend that bitcoin or move it

20  beyond the Canons of the Court or move it outside the

21  Court's reach or the government's reach -- or simply further

22  launder it -- that does two things; number one, it is

23  removal of evidence.  If we can confirm that that bitcoin --

24  the stolen bitcoin was stored on one of the cryptocurrency

25  storage devices -- one of these Trezors that was seized from

1   Gary Harmon's residences -- that is evidence of his guilt in

2   this case.  And if he removes that bitcoin, it is also

3   bitcoin property that is subject to forfeiture -- subject to

4   forfeiture in two cases -- in this case as the proceeds of

5   his offenses and the property involved and Gary Harmon's

6   money laundering offenses.  It is also still subject to

7   forfeiture in Larry Harmon's case.  And at this point if the

8   defendant argues that he didn't know it was subject to

9   forfeiture before, he does now.  So that would be another

10  area of obstruction.

11          And finally, Your Honor, although it's not our

12  lead argument, we do have some concerns about possible

13  witness intimidation; and that is borne out by this story

14  that has now been told to us by three different individuals,

15  including Gary Harmon's sister-in-law.  Where there came a

16  point where Gary Harmon and Larry Harmon had a disagreement

17  about money and Gary Harmon ended up choking Larry Harmon

18  and breaking his phone.  And of course, in this case,

19  that -- the nature and the way that this case intersects

20  with Larry Harmon's case creates -- you know, automatically

21  sets up a certain sense of conflict between those two

22  brothers.  And so we do have some concerns that if released

23  Gary Harmon could pose possibly physical danger or at least

24  a danger of witness intimidation towards Larry Harmon,

25  towards his sister-in-law, and possibly towards other family

1       members who are witnesses in this case.

2               THE COURT:  And this alleged assault that three

3       witnesses have talked about, Gary against Larry, didn't that

4       happen, like, four or five years ago, like 2017; isn't that

5       really old?

6               MR. BROWN:  Yes, it is, Your Honor.  It's really

7       old.  The account -- it is from 2016.

8               The account was that, following this assault, Gary

9       and Larry had a falling out, and they didn't speak to each

10      other for about a year.  Eventually they reconciled, and

11      Gary went to work as a wage earner in his older brother's

12      company; but there is certainly lingering mistrust.

13              There is evidently a long history between these

14      two brothers and a complex family dynamic.  But certainly

15      the stresses of the current situation where Gary -- what is

16      not really old is the fact that the rest of Gary's family

17      has stopped speaking to him because of his actions in this

18      case; that happened back in the summer of 2020.

19              (Overlapping speakers.)

20              THE COURT:  Yes, because it was because of that --

21      the loss of that bitcoin that Larry Harmon almost had his

22      pretrial release revoked.

23              MR. BROWN:  Yes, Your Honor.

24              THE COURT:  So I can imagine that created some

25      consternation within the family.

1          MR. BROWN:  And that appears to be the case, Your

2     Honor, yes.

3          THE COURT:  All right.  So the government has now

4     seized, from what your papers say, two Trezor devices, a

5     whole bunch of passphrases, seed recovery words for

6     cryptocurrency.  So, with that seizure, what precisely is

7     the ongoing risk that if Gary Harmon is released that he

8     would still be able to have access to any part of the

9     missing or stolen 712.6 bitcoin since you have the

10    passwords, you have the recovery seeds, you have got phrases

11    or words, you have got the Trezor drives.

12         So what -- is it the government's suspicion that

13    he might have those passphrases or seed recovery words to

14    recreate this bitcoin someplace else, too, that you

15    didn't -- that you weren't able to seize?

16         MR. BROWN:  Your Honor, our concern is that were

17    this defendant to do in the future exactly what the grand

18    jury found that he did with respect to the Larry Harmon

19    stored bitcoin, and that is that the bitcoin -- by the way,

20    we have not been able to locate that stolen 712.  We have

21    recovered about $6,000 worth of bitcoin out of tens of

22    millions of dollars of missing bitcoin.

23         So a possibility -- a strong possibility is that

24    Gary Harmon has a hidden wallet set up within one or both of

25    those Trezor devices.  This is exactly what happened with

1    Larry Harmon's Trezor device, where the hidden wallet can be

2    accessed using a combination of seed recovery phrases and an

3    additional passcode or passphrase that goes on top of the

4    seed recovery phrase.  And without knowing -- that would

5    essentially be the 24th password out of -- 25th password out

6    of 24.  There could be more seed recovery passwords, and an

7    additional password or passphrase on top of that; and just,

8    through brute force, the government really can't crack that

9    cryptography.  We can't guess that 25-word sequence to

10    determine even if there are hidden wallets stored on the

11    Trezor device.

12         What Gary Harmon is charged with the indictment

13    is -- there was a Trezor device that was within the physical

14    custody and control of the government; it was in an evidence

15    locker in Washington, D.C., and that held bitcoin wallets.

16    Those wallets were able to be re-created by means of seed

17    recovery phrases --

18         THE COURT:  Mr. Brown, you are freezing.

19         MR. BROWN:  -- and somehow Gary Harmon got hold

20    of -- and he was able to remotely recreate those wallets and

21    transfer the funds into new bitcoin wallets under his

22    custody and control; that's exactly what he could do today

23    if, indeed, that bitcoin is --

24         (Videoconference feed drops.)

25         THE COURT:  Okay.  We have just lost everybody.

1          Okay.  Let's call John.

2          Did the connection just drop completely?

3          (Whereupon, counsel and staff confer.)

4          THE COURT:  Okay.  So we see Ms. Pelker.

5          Okay.  There we go.

6          (Proceeding pauses to address technical

7    difficulties.)

8          THE COURT:  I'm sorry, everybody.  Apparently,

9    every ongoing hearing in the courthouse is having some

10   problems with Zoom this afternoon, so Zoom is intermittently

11   locking us out.  I don't know whether you can continue

12   seeing each other, but we apparently dropped off.  So I

13   apologize for, you know, this frustrating experience.

14          Mr. Brown, I can't remember where we were.  But I

15   think you were saying that the government's concern is that

16   if Mr. Harmon is released he will be able to do precisely

17   what he did for his alleged -- or was accused to have done

18   with the 712 bitcoin stolen in the Larry Harmon case by

19   recreating wallets with that missing bitcoin in it.

20          Do I basically have the theme of your comment?

21          MR. BROWN:  Yes, Your Honor.

22          THE COURT:  All right.  So in the Larry Harmon

23   case not only did I have a pretrial condition that Larry

24   Harmon not engage in any crypto virtual currency

25   transactions at all while on pretrial release, in addition

1    to not having any internet connected devices which, during

2    the pandemic, had to be modified so he could communicate

3    with his counsel and the Court.  But we also had an order

4    that Larry Harmon had to turn over to the government all

5    passwords, all seed recovery phrases, all access tools to

6    the bitcoin in his possession.  If those requirements -- and

7    he complied, he complied.

8          So if all of those requirements were imposed in

9    this case, would that mitigate the government's concern

10   about, one, further obstructive conduct by concealing or

11   destroying electronic evidence; and, two, would that also

12   mitigate the government's concern about flight because of

13   lack of access to cryptocurrency resources?

14         And if not, tell me why.

15         MR. BROWN:  Your Honor, if we could secure the

16   entire amount and account for that entire 712.6 bitcoin that

17   would certainly go very far in addressing the government's

18   concerns.

19         I think with respect to obstruction we still have

20   those other concerns, that there may be other electronic

21   evidence that he could destroy, and he may engage in witness

22   intimidation conduct.  But obviously if all of that bitcoin

23   were recovered, that would -- as the Court points out, that

24   would address the concern with destruction of that evidence

25   and destruction of that property subject to forfeiture, as

1    well as his means to flee; so that would go very, very far

2    in addressing the government's concerns.

3              THE COURT:  And have you discussed those terms for

4    pretrial relief with Ms. Shroff?

5              MR. BROWN:  Your Honor, we have not discussed them

6    in so -- in so many words.

7              I think we would want to -- as I said, Your Honor,

8    we still have concerns about obstruction, especially because

9    he's charged with obstructive conduct in this case, and that

10   casts a lot of doubt on his ability to comply with

11   conditions of release.  But if he is willing to return all

12   of that property and we can verify all of that property and

13   have it seized or restrained in some manner, then I think we

14   would still ask the Court to consider pretrial detention

15   based on risk of future obstruction -- as the Court points

16   out, it would mitigate the risks.

17             THE COURT:  So this thumb drive that Mr. Harmon

18   told the FBI he flushed down a toilet at his gym; what am I

19   supposed to make of this thumb drive?

20             I mean -- I think the government didn't know

21   anything about this thumb drive before Gary Harmon mentioned

22   it.  All we know about what was on the thumb drive is what

23   Gary Harmon said purportedly to the law enforcement agents,

24   that there were some seed words or credentials or

25   passphrases on that USB drive to assist in the theft of the

1    712.6 stolen bitcoin.

2         But is there any other evidence about, one, what

3    was on that thumb drive or -- anything about that thumb

4    drive, including from Larry Harmon?

5         MR. BROWN:  Your Honor, what we understand about

6    that thumb drive is the ostensible purpose for -- based on

7    both what Gary has told us, as well as statements from Larry

8    Harmon and his family -- is that the thumb drive was

9    intended -- the idea was that the thumb drive had some

10   information relevant to the Coin Ninja business which was

11   Larry Harmon's, sort of, ostensibly legitimate business that

12   he was operating post Helix.  And the idea was that Gary

13   Harmon would be able to access records, and so forth,

14   related to Coin Ninja.

15        What appears to have happened is that the thumb

16   drive had other information including, in Gary Harmon's

17   telling, partial seed words; there may be a grain of truth

18   in that.  That may be 100 percent true; I don't know.  Those

19   may have been partial seed words; those may have been

20   complete seed words.  They may have been seed words and

21   passwords; we are not sure.  We don't have any independent

22   evidence of that.

23        So we don't know exactly what was on the thumb

24   drive, and we certainly don't know where that thumb drive

25   ultimately ended up; whether, as Gary Harmon puts it, he

1    flushed it down the toilet, or if it's hidden somewhere --

2    somewhere not in his old residence in Akron, or in his new

3    luxury condominium in Cleveland that was searched by law

4    enforcement.  We just don't know.

5            THE COURT:  All right.  And so is there any

6    evidence that Gary Harmon was involved in the operations of

7    Helix?  I mean, I think we had argument -- there was

8    argument with Larry Harmon in 2016 which was when, I think,

9    Helix was operational.

10           But is there any other evidence -- I don't think I

11   saw any in your briefing -- that Gary Harmon was involved in

12   the operation of Helix or the laundering of proceeds

13   resulting from illegal activities on the dark net as part of

14   the Helix operations; am I understanding that correctly?

15           MR. BROWN:  Basically, Your Honor, yes.

16           We don't believe that Gary Harmon was involved in

17   running Helix.  What Gary Harmon was involved in -- one of

18   the problems that Larry Harmon faced when running Helix was

19   he made a lot of illegal profits in the form of bitcoin; and

20   it's difficult to spend bitcoin on ordinary -- on your

21   groceries or vacations or cars or houses.

22           And so one of the ways that Larry Harmon

23   self-laundered his own illegal proceeds was engaging in

24   peer-to-peer sales of bitcoin for cash.  And this could be

25   through local bitcoins.com or other meet-up services, or

1   just through people that Larry Harmon knew or were in the

2   same circles where Larry Harmon would sell bitcoin and he

3   would just get bundles of cash.

4         Multiple witnesses have identified Gary Harmon as

5   somebody who was involved in that bitcoin-for-cash

6   self-laundering scheme; that Gary Harmon would essentially

7   be the messenger.  He would go out to meet the customer.

8   The bitcoin transaction would be executed, and Gary Harmon

9   would collect the cash and return it to his brother.

10        We do believe that Gary Harmon was aware of his

11  brother's activities -- maybe not at the very beginning, but

12  certainly by the end of the operation of Helix in 2017, Gary

13  was knowledgeable that Larry Harmon ran his illegal mixer on

14  the dark net.  But, no, Your Honor, he wasn't directly

15  involved in -- that we know of -- in the operation of the

16  mixer.

17        THE COURT:  And none of the charge -- the

18  ten counts in the indictment are related to this

19  bitcoin-for-cash arrangement for Helix; is that right?

20        MR. BROWN:  That is correct, Your Honor.

21        THE COURT:  Okay.  So he is not charged with a

22  bitcoin-for-cash arrangement that the proceeds from Helix

23  laundered?

24        MR. BROWN:  No, not by our office.

25        THE COURT:  Okay.  So the defendant has proffered

1   the girlfriend and the girlfriend's parents as third-party

2   custodians here.  I think, when he was originally arrested

3   in Ohio -- I have looked -- I don't see that those

4   individuals were interviewed; they haven't been put forward

5   for interviews by pretrial services for the reliability and

6   so on forth, being third-party custodians.

7           Before they're used as third-party custodians in

8   this case would the government like an opportunity to

9   examine them?

10          MR. BROWN:  Yes, Your Honor.

11          We would certainly want to at least talk to and

12  look into this girlfriend, and -- I mean, just a few

13  thoughts about the girlfriend.  This is a relationship that

14  is, at most, five months old.  This is not somebody that

15  Gary knew from before his criminal activity.

16          And without doubting the sincerity of the

17  girlfriend's affection for him, we do have serious doubts

18  about -- I mean, this is a five-month-old-relationship.

19  We're going to put his girlfriend who has a full-time job --

20  essentially give her the responsibility of being responsible

21  for this person that she barely knows.  She barely knows

22  what he was before he became a bitcoin millionaire.  She

23  barely knows what else he does in his time with his bitcoin

24  while she is at her full-time job.  You know, what if they

25  break up?  It's a five-month-old relationship.

1     In a way, it would be unfair to her and in a way

2  we simply -- we don't know much about her.  But we also

3  just -- the depth of this relationship is not something that

4  is really a strong tie, and it's not something that we would

5  really trust, having her take on all this responsibility to

6  live in his luxury condominium with him.  You know, we just

7  don't -- it doesn't seem like a workable solution to us,

8  Your Honor.

9     THE COURT:  And I think I read in a footnote in

10  the government's brief that the condominium that Mr. Harmon

11  has suggested he might live in is one that the government is

12  ultimately going to seek forfeiture on if he's convicted of

13  the crimes in the indictment?

14     MR. BROWN:  Oh, yes, Your Honor.  It is listed in

15  the indictment as property subject to forfeiture; there is a

16  lis pendens on it.

17     The defendant purchased it outright directly using

18  the proceeds of his BlockFi account which he obtained with

19  65 bitcoin traceable to ChipMixer, which was traceable to

20  the facts of this case.  So that is -- there is a direct

21  line between his criminal conduct in this case and him using

22  the proceeds of that offense conduct to purchase this luxury

23  condominium.

24     THE COURT:  All right.  And one of the things that

25  the government has asserted -- before I turn to

1        Ms. Shroff -- is that Mr. Harmon -- I think you said

2        Mr. Harmon has very few community ties to Cleveland, Ohio, I

3        think where the luxury condominium is.  But didn't he grow

4        up in Ohio?  And isn't that where -- I mean, his family is

5        in, I guess, Akron, maybe another city in Ohio.  But doesn't

6        he have -- isn't that the state where he has the most ties

7        of any state in the country?

8              MR. BROWN:  Well, it is a state where he grew up.

9        I mean, Akron is not Cleveland.  So our concerns are there

10       is a complete rupture between him and his family.  There are

11       no older friends, colleagues.  It doesn't have to be family,

12       but somebody from his community -- an old college professor,

13       anybody, an old coworker -- anybody who can come forward and

14       vouch for him, except for his new friends that he made after

15       he re-created his life by moving to the big city in

16       Cleveland as a bitcoin millionaire and getting to know -- I

17       mean, certainly he was acquainted with some of these

18       individuals from college.  But all of them -- I mean, one of

19       the references says in his letter:  I met Gary six months

20       ago.  The girlfriend was acquainted with him in college and

21       then embarked on a relationship five months ago.  The Greek

22       life brother also was only reacquainted with Gary after he

23       moved to Cleveland.

24              Basically, Your Honor, what the defendant did was

25       he stole the bitcoin, he had this falling out with his

1   family.  The family also told us that he moved for a period

2   of time to Arizona.  He came back to Cleveland -- he came

3   back to Ohio, but went to Cleveland, not Akron.

4            In Cleveland he formed this whole new life that

5   isn't connected to his old life.  So it is geographically

6   close to where he grew up, but there is nothing connecting

7   his new life as a bitcoin millionaire with how he grew up or

8   his family or his coworkers or his colleagues, or members of

9   his community.

10            THE COURT:  Okay.  All right.  So is there

11   anything else you want to add -- I will come back to you at

12   the end, Mr. Brown -- before I turn to Ms. Shroff?

13            MR. BROWN:  No, Your Honor.  We submit on our

14   papers.

15            THE COURT:  Okay.  So, Ms. Shroff, you know in

16   Larry Harmon's case I entered an order directing the

17   defendant to provide directly to representatives of the

18   U.S. Marshals Service access to any and all cryptocurrency

19   within the defendant's possession, custody, and control,

20   including by disclosing seed recovery keys, access to hidden

21   wallets, and other keys needed in order to transfer

22   cryptocurrency currency given that defendant's as well as

23   this defendant's -- I mean, he has got the same skill set --

24   highly-skilled expertise in bitcoin cryptocurrency, hiding

25   it, concealing it, and so on.

1           Anyway, would the defendant have any objection to

2   issuance of a similar order in this case?

3           MS. SHROFF:  Thank you, Your Honor.

4           While I have not discussed that issue with him,

5   Your Honor, I am assuming that Mr. Harmon would not have an

6   objection.

7           THE COURT:  I see -- I'm sorry.

8           MS. SHROFF:  I am going to stop and wait for you

9   to ask questions -- I am going to stop and simply answer

10  your question so I don't interrupt your thought.

11          THE COURT:  Could you repeat that?

12          And I know it's hard because I'm wearing a mask so

13  you can't tell when I am talking.  I know it's difficult.

14          But could you -- did I hear you correctly that you

15  would like an opportunity to talk to Mr. Harmon before you

16  respond to that question?

17          MS. SHROFF:  All I meant to say is that I am

18  assuming Mr. Harmon, Gary Harmon, would not have an

19  objection to the same conditions that the Court set in the

20  Larry Harmon case.

21          I am not -- I obviously am not privy to any

22  happenings or goings-on in Larry Harmon's case; and I am

23  unclear if that was entered after Larry Harmon had started

24  cooperating or before --

25          THE COURT:  It was not entered -- it was entered

1    before any cooperation.

2          MS. SHROFF:  Right.  Right.  So then obviously --

3    as an officer of the Court, I would not personally have an

4    objection to the same conditions being issued here.

5          THE COURT:  All right.  So you have also -- am I

6    reading your papers correctly that given the sensitivity

7    about -- due to the nature of this case dealing with virtual

8    cryptocurrency -- and I think you even propose that he would

9    be restricted from using the internet or having access to

10   internet-connected devices and -- in order to assure the

11   Court that he would comply with such a condition, as I

12   understand the defense's proposed way to give assurance

13   about compliance is that there would be these proposed

14   third-party custodians, his girlfriend and her parents, to

15   help ensure his compliance with release conditions.

16          Do I understand that correctly, Ms. Shroff?

17          MS. SHROFF:  You do, Your Honor.  And I am happy

18   to just expound on the relationship between Mr. Harmon and

19   his girlfriend if the Court wishes for me to do so.

20          THE COURT:  Well, I think what typically happens,

21   when there is a third-party custodian proffered is that

22   pretrial services is given access to interview the

23   third-party custodian, either here or wherever that person

24   lives, in order to provide assurance that that person

25   understands what the responsibilities and obligations are of

1    a third-party custodian; that that third-party custodian

2    makes a promise to the Court under oath about understanding

3    what those responsibilities and obligations are; provides

4    information to pretrial services to ensure that that person

5    doesn't have a felony conviction him or herself; so they

6    need some personal identifiable information about the person

7    to run a law enforcement -- prior arrest and conviction

8    record.

9            And so I -- when -- as soon as I saw in your

10   papers, Ms. Shroff, that you were proposing three

11   third-party custodians, I asked pretrial services have you

12   done the interview?  What's the result?  Are they reliable

13   checked out third-party custodians?  And the answer is no

14   information about them.

15           Do you have those three people available now to

16   answer a series of questions that the Court has about

17   whether they understand responsibilities as a third-party

18   custodian as proposed by defense and the government has an

19   opportunity to examine them also?

20           So are they available at this hearing for me to

21   review and have them swear that they're willing to be

22   third-party custodians?

23           MS. SHROFF:  Your Honor, Mr. Harmon's girlfriend

24   is on the line.  I just texted her, and she replied that she

25   is on the line.  And she texted me back and said that her

1    mother is also on the line.

2              And I do apologize.  I apologize, but my -- the

3    district where I grew up does not have this rule in place,

4    and I slipped.  I did not get her name and the information

5    to pretrial; but I did discuss with the government the

6    possibility that the girlfriend could be a third-party

7    custodian.  And I was told by the government that they

8    considered her to be a drug addict, and they did not think

9    that she would be suitable.

10             I also did want to note, Your Honor, that I am

11   more than willing to have her and anyone else interviewed by

12   pretrial.  I have not been in a situation where the

13   government has had the opportunity to interview these

14   people; and I think that they would be concerned if a

15   prosecutor wanted to speak to them and ask them any

16   questions beyond the essential pedigree information and

17   nothing more.  I am assuming --

18             THE COURT:  Well, can you put them on the screen

19   and I will do the interview?

20             MS. SHROFF:  I did not send them the Zoom

21   screen -- the Zoom link, Your Honor, because they're

22   spectators, so I had them call in.  But I am happy to send

23   them the Zoom link and have them join, if that would be

24   appropriate with the Court, to have them call --

25             THE COURT:  Yes.  Yes, please do that.

1        And just for your information, the next time

2   around when you proffer people as third-party custodians you

3   need to have this done -- performed by pretrial services.

4        MS. SHROFF:  I do apologize, Your Honor.

5        MR. BROWN:  Your Honor, may I address the drug

6   issue?

7        THE COURT:  Yes.

8        MR. BROWN:  When the agents executed a search

9   warrant on the defendant's luxury condominium in Cleveland,

10  they found several ounces of marijuana, a bong on the

11  kitchen counter.  And in the upstairs loft there was a small

12  line of white powder that the agents viewed, based on their

13  training and experience, as cocaine.  The powder was in a

14  line; it was next to a rolled up dollar bill and a BitPay

15  debit card with powder -- white powder residue on it -- was

16  next to the line of white powder.  So our concerns about

17  drug use in that apartment and drug use by the defendant and

18  any of his associates is well-founded.

19       MS. SHROFF:  Your Honor, I'm sorry.  But I don't

20  think that one can be viewed -- the girlfriend -- as a drug

21  abuser in the apartment.  It could have been anyone in the

22  apartment.  It could have been several parties in the

23  apartment.  It could have been someone who was staying

24  there.

25       But the concerning factor is that the third-party

1    custodian's letter sets out that only her romantic

2    relationship with Gary Harmon is five months-old.  She

3    clearly stated for the government's review, and that of the

4    Court, that she knew Gary Harmon from his college days.  She

5    sets out how she knew him.  She sets out they went to

6    college together, they had mutual friends, and that they had

7    known each other over a period of time.

8            THE COURT:  Yes.  And you know what that means to

9    me, is that she has enormous loyalty to Gary Harmon; and

10   that, as a third-party custodian, she would be very

11   reluctant -- should Gary Harmon either ask her to do things

12   on his behalf or she sees Gary Harmon doing things on his

13   behalf along the lines that he is charged with or that the

14   government has expressed a risk about -- that she will

15   misunderstand that, as a third-party custodian, she is

16   required to tell me --

17           MS. SHROFF:  And I did inform her of --

18           THE COURT:  -- the Court, and alert law

19   enforcement about it.

20           MS. SHROFF:  And I clarified that for her in great

21   detail when I discussed with her the concern and the

22   reaction of the United States, that they thought of her as

23   merely a drug user.

24           I believe she's waiting to be admitted, Your

25   Honor.  She sent me a text.

```
 1              THE COURT:  All right.  Let's put her on.

 2              All right.  Can you please identify yourself for

 3      the record.

 4              MS. PISANI:  Alyssa Pisani.

 5              THE COURT:  Can you spell your name, please.

 6              MS. PISANI:  A-L-Y-S-S-A.  Last name is

 7      P-I-S-A-N-I.

 8              THE COURT:  And I am Chief Judge Beryl Howell here

 9      in the District of Columbia.

10              Your name has been put before this Court as a

11      potential third-party custodian for a defendant in a

12      criminal case pending before me, Gary Harmon, as a potential

13      person to serve as a third-party custodian with the

14      responsibility and obligation to ensure that Mr. Gary Harmon

15      complies with any conditions of pretrial release.

16              Do you understand that's the context in which you

17      are appearing here?

18              MS. PISANI:  Yes, Your Honor.

19              THE COURT:  Okay.  I am going to ask my courtroom

20      deputy to administer the oath to you, please.

21              Please raise your right hand.

22              (Whereupon, ALYSSA PISANI was sworn.)

23              MS. PISANI:  Yes.

24              THE COURTROOM DEPUTY:  Thank you.

25              THE COURT:  All right.  Do you understand that if
```

1    you are appointed to be a third-party custodian in this

2    case, it will be your duty to call the pretrial services

3    office and immediately report any violation of the

4    conditions of release that are set by the Court?

5              MS. PISANI:  Yes, Your Honor.

6              THE COURT:  And would you have any hesitation to

7    call and report any violation even if it meant that

8    Mr. Harmon could be immediately arrested and detained

9    pretrial?

10             MS. PISANI:  No, Your Honor.

11             THE COURT:  And I understand from the letter

12   submitted to the Court that you have known Mr. Harmon since

13   college; is that correct?

14             MS. PISANI:  Yes, Your Honor.

15             THE COURT:  And how long ago was that?

16             MS. PISANI:  That was in 2013.

17             THE COURT:  And since 2013 have you been in

18   frequent contact with Mr. Harmon, or did that --

19             MS. PISANI:  No, Your Honor.

20             THE COURT:  -- frequent contact only occur

21   starting in May of 2021?

22             MS. PISANI:  Correct.

23             THE COURT:  So between 2013 and May of 2021 how

24   often were you in contact with Mr. Harmon?

25             MS. PISANI:  We were not in contact.

1      THE COURT:  So you only resumed having contact

2  with Mr. Harmon in May of 2021; is that correct?

3      MS. PISANI:  Correct.

4      THE COURT:  And before his arrest you were not

5  living together; is that correct?

6      MS. PISANI:  Correct.

7      THE COURT:  And were you living with your family

8  before his arrest?

9      MS. PISANI:  Yes, Your Honor.

10     THE COURT:  So is your decision indicated in your

11  letter that you planned to move in with him, is that in

12  order to serve as a third-party custodian for Mr. Harmon.

13     MS. PISANI:  Yes, Your Honor.

14     THE COURT:  And do you know whether Mr. Harmon has

15  any firearms or other weapons in his apartment?

16     MS. PISANI:  No.

17     THE COURT:  And do you own or possess any firearms

18  or weapons?

19     MS. PISANI:  No.

20     THE COURT:  Do you know whether there is a

21  landline telephone in the apartment where you plan to live

22  with Mr. Harmon?

23     MS. PISANI:  No, Your Honor.

24     THE COURT:  And if he is released it would be with

25  electronic monitoring.  So do you understand that a hardline

1     telephone would have to be installed in that apartment?

2              MS. PISANI:  Yes, Your Honor.

3              THE COURT:  And do you understand that a condition

4     of release, if he is released, would be that he not be

5     permitted to have access to any computers or other devices

6     with an internet connection except --

7              MS. PISANI:  Yes, Your Honor.

8              THE COURT:  -- in order to consult with his

9     counsel.  Do you understand that?

10             MS. PISANI:  Yes.

11             THE COURT:  So do you have internet-connected

12    devices that you possess and use?

13             MS. PISANI:  Yes.

14             THE COURT:  So if he asked to borrow one of your

15    devices, either a phone or your computer, what would you

16    say?

17             MS. PISANI:  I would say no, that he is not

18    permitted to.

19             THE COURT:  All right.  Do you have any prior

20    arrests?

21             MS. PISANI:  No.

22             THE COURT:  So you also have no prior convictions

23    of any kind?

24             MS. PISANI:  Correct.

25             THE COURT:  All right.  Ms. Shrom, is there

1    anything further?  Ms. Shroff, sorry.

2            MS. SHROFF:  That's okay, Your Honor.  I am just

3    trying to -- I was just trying to unmute my audio.

4            I do believe that Ms. Pisani would tell the Court

5    that it was her plan to move in with Mr. Harmon before this

6    arrest happened, and they were in the process of actually

7    moving in together when he was arrested.  I just wanted to

8    clarify that.

9            THE COURT:  Yes.  That was not the impression that

10   I was getting.

11           MS. SHROFF:  Maybe the Court can clarify.  That

12   was the impression I was given.

13           THE COURT:  Yes.  So, Ms. Pisani, were you

14   planning on moving in with Mr. Harmon -- were you planning

15   on doing that before his arrest?

16           MS. PISANI:  We had discussions about it prior to

17   his arrest, but we did not physically start the process.

18   Upon his release I would be moving in with him.

19           THE COURT:  And that's primarily, in your view, in

20   order to provide this extra service of being a third-party

21   custodian?

22           MS. PISANI:  Yes.

23           THE COURT:  And are you aware of the charges

24   against Mr. Harmon?

25           MS. PISANI:  Yes.

```
 1                    THE COURT:  All right.  Does the government have

 2        any further questions?

 3                    MR. BROWN:  Yes, Your Honor.

 4                    Just a few.  Should I address them to the witness,

 5        or should I --

 6                    THE COURT:  No.  You can address them to

 7        Ms. Pisani.

 8                         DIRECT EXAMINATION

 9        BY MR. BROWN:

10        Q.  Good afternoon, Ms. Pisani.

11        A.  Good afternoon.

12        Q.  My name is AUSA Brown.  I am going to ask you a few

13        questions.

14                    Ms. Pisani, do you have a full-time job?

15        A.  Yes.

16        Q.  What are your work hours?

17        A.  I work -- I have a flexible schedule where I work eight

18        hours a day; and I have the option to be in-person or

19        remote.

20        Q.  And that's eight hours a day, Monday through Friday; is

21        that correct?

22        A.  Correct.

23        Q.  And, typically, how often do you work remotely?

24        A.  It depends on the given week and what my schedule is.

25        But there are times where I work one to two days a week from
```

1   home.

2   Q.  And during the rest of the week you'd be required to go

3   into your office, right?

4   A.  Correct.

5   Q.  Does Gary Harmon have a job?

6   A.  No.

7   Q.  For your work are you required to take home computers or

8   internet-connected devices?

9   A.  Yes.  I have a company-issued laptop.

10  Q.  And is that password protected?

11  A.  Yes.

12  Q.  Is it also -- is there multifactor authentication?  In

13  other words, do you have to enter a key or a card, something

14  like that?

15  A.  No.  Just a password.

16  Q.  And do you possess -- what kind of phone do you possess?

17  A.  iPhone.

18  Q.  And that's connected to the internet, right?

19  A.  Correct.

20  Q.  Do you have a work-issued phone as well?

21  A.  No.

22  Q.  Ms. Pisani, have you moved into Gary Harmon's luxury

23  condominium yet?

24  A.  No, I have not.

25  Q.  Do you have access to that condominium?

1   A.  Yes.

2   Q.  Have you seen drug paraphernalia at that condominium?

3   A.  I'm sorry.  Your system is cutting out.

4   Q.  Oh.  Sorry.  I will try to go slow.

5          Have you seen drug paraphernalia at Gary Harmon's

6   condominium?

7   A.  Yes.

8   Q.  Who -- what have you seen at Gary Harmon's condominium?

9   A.  I have seen --

10          MS. SHROFF:  Your Honor, I would object -- I would

11   object to this line of questioning on Ms. Pisani.  It has

12   nothing to do with whether or not she -- if she has used

13   drugs, that's different -- if you want to ask her about

14   herself; but she is the third-party custodian, right?  If

15   there's been drugs at Gary Harmon's home because he had a

16   party, that's not on her.

17          The question is whether she is a drug user or a

18   drug addict and whether that would get in the way of her

19   being a responsible third-party custodian.

20          THE COURT:  I think that objection is well placed.

21          So, Ms. Pisani, do you use drugs at that apartment

22   or in other places?

23          MS. PISANI:  No, Your Honor.  No.

24          THE COURT:  Any further questions?

25          MR. BROWN:  Ms. Pisani, have you ever used

1   cocaine?

2           MS. PISANI:  No, Your Honor.

3           MS. SHROFF:  Objection.

4           MR. BROWN:  Okay.

5           THE COURT:  Mr. Brown, any further questions?

6           MR. BROWN:  No, Your Honor.

7           THE COURT:  All right.  Ms. Shroff, do you have

8   any other questions?

9           MS. SHROFF:  No, Your Honor.  Thank you.

10           THE COURT:  All right.  Without finalizing the

11   issue of whether or not Mr. Harmon will be released today,

12   let me just ask Ms. Pisani whether she solemnly swears to

13   well and truly discharge her responsibilities as a

14   third-party custodian and to advise the Court, through

15   pretrial services, if the defendant violates the terms and

16   conditions of any release, so help you God?

17           Ms. Pisani.

18           Ms. Pisani, please unmute.

19           MS. PISANI:  I'm sorry.  Your connection cut out.

20   I was unable to hear you.

21           THE COURT:  Yes.  Without resolving the issue of

22   whether Mr. Harmon will be released on pretrial conditions,

23   do you solemnly swear to well and truly discharge any

24   responsibility you are given as a third-party custodian to

25   advise the Court if the defendant, Gary Harmon, violates the

1    terms and conditions of release, so help you God?

2           MS. PISANI:  Yes.

3           THE COURT:  All right.  Okay.  You are excused.

4    You can leave the Zoom meeting.

5           (Whereupon, Ms. Pisani exits the videoconference.)

6           THE COURT:  All right.  So, Ms. Shroff, you also

7    proposed -- in addition to Alyssa Pisani, you also proposed

8    Ms. Pisani's parents; but they don't even live in Akron, do

9    they, or Cleveland where Mr. Harmon lives; is that right?

10          MS. SHROFF:  They do not, Your Honor.  But I

11   wasn't sure how many the Court would require.  I am hoping

12   that the Court finds one third-party custodian sufficient.

13   But if not -- if the Court is not intending to rule today, I

14   can certainly have them interviewed and serve as people of

15   persuasion on the bond if they can't be third-party

16   custodians.

17          THE COURT:  Well, I think it's going to be

18   difficult for me to rule today since you need to talk to

19   Mr. Harmon about potential conditions of release that were

20   imposed on Larry Harmon which would involve both a pretrial

21   release condition of not engaging in any cryptocurrency

22   transaction at all and to produce to the government as was

23   required in the Larry Harmon case -- which you think he will

24   have no objection to -- but you need to figure that out by

25   talking to him -- that he would provide all access, seed

1    words, et cetera, as was required in Larry Harmon's case.

2            So I think that that's something that you need to

3    consult with him about.  And that order was in the Larry

4    Harmon case at 19-CR-395, docketed at ECF No. 26.

5            So those are -- given the very real risks of

6    further obstruction along the lines that Mr. Harmon is

7    charged with and, in the government's view and the evidence

8    is fairly -- the strong circumstantial evidence that he was

9    able to remotely -- with bitcoin stored on devices in secure

10   storage with law enforcement -- able to recreate those

11   wallets and take 712.6 bitcoins -- those are, sort of,

12   minimal conditions of pretrial release.

13           So what I am going to do is I am going to give

14   you, Ms. Shroff, an opportunity to talk to Mr. Harmon about

15   that order and whether he would be willing to agree to such

16   an order; understanding that, if he violates a pretrial

17   release condition -- including terms along the lines that I

18   have discussed -- he would be returned to jail.  And I will

19   give the government and Ms. Shroff an opportunity to discuss

20   what the terms of that order looked like, as occurred in the

21   Larry Harmon case.

22           And I think we will resume this with you-all

23   having an opportunity to discuss those terms and the order

24   by next -- I am going to set this down for --

25           (Whereupon, the Court and staff confer.)

1           THE COURT:  -- at 12:00 p.m. on Tuesday.

2           So, Ms. Pelker, Mr. Brown, and, Ms. Shroff, I

3    expect you to confer about what all those terms are so that

4    I can have a much more complete picture of whether there are

5    pretrial release conditions that can mitigate the very real

6    risks that the government has set out and are reflected in

7    the charges in this case and the evidence supporting those

8    charges.

9           Mr. Harmon, you have a high hurdle to avoid

10   pretrial detention in a case that charges obstruction in

11   another criminal case.  So any terms of pretrial release are

12   going to be quite stringent.  You have an uphill battle

13   here.

14          But before I even see what terms will be

15   agreeable, it's -- you know, I am going to withhold a ruling

16   until the parties have an opportunity to see what they can

17   come up with.

18          Are you all available, Ms. Shroff, Mr. Brown,

19   Ms. Pelker -- are you available on Tuesday at noon?

20          What's that date?  Is that the 14th?

21          THE COURTROOM DEPUTY:  The 14th.

22          THE COURT:  The 14th.

23          MR. BROWN:  Yes, Your Honor.

24          THE COURT:  And, Ms. Shroff?

25          MS. SHROFF:  Yes, Your Honor.  Thank you.

1          THE COURT:  And if, by working diligently between

2     now and then, the parties come up with the pretrial release

3     terms and what needs to be satisfied to complete those terms

4     before pretrial release is effectuated, you-all can let me

5     know even before noon next Tuesday.

6          MS. SHROFF:  Yes, Your Honor.

7          THE COURT:  So that if the government can check on

8     where that 712 missing -- 712 missing bitcoins are, that

9     will go a far way.

10          MR. BROWN:  Yes, Your Honor.  And it would be the

11     712 bitcoin, and any of the other property he purchased with

12     it, like the Dogecoin vehicles, or anything else.  We'd want

13     a full accounting.

14          MS. SHROFF:  Your Honor, I'm sorry.

15          Perhaps I misunderstood.  When is -- I mean, the

16     government has alleged that Mr. Harmon has the bitcoin --

17          THE COURT:  I know, but --

18          MS. SHROFF:  Okay.

19          THE COURT:  And I appreciate that.  And Mr. Brown

20     may be getting a little bit ahead of himself --

21          MS. SHROFF:  Right.

22          THE COURT:  -- but what I want is a satisfaction

23     that Mr. Harmon is going to comply with pretrial release

24     conditions of producing, in his possession, seeds --

25     recovery seeds, and everything associated with virtual

1    currency to assure that he does not engage in virtual

2    currency transactions during the pendency of this case until

3    it is resolved.

4              MS. SHROFF:  Right.  But I hear Mr. Brown saying

5    that he must --

6              THE COURT:  I heard that too.  But you-all will

7    have that conversation given the fact that Mr. Harmon is

8    presumed innocent until proven guilty; although there is

9    very strong circumstantial evidence here supporting the

10   charges.

11             All right.  Is there any further today until I see

12   you all on Tuesday?

13             Mr. Brown, for the government?

14             MR. BROWN:  Nothing further from the government,

15   Your Honor.

16             THE COURT:  Ms. Shroff?

17             MS. SHROFF:  No, Your Honor.  Thank you.

18             THE COURT:  All right.  You are excused.

19             (Whereupon, the proceeding concludes, 3:19 p.m.)

20                          * * * * *

21                          I-N-D-E-X

22   WITNESS

23   Alyssa Pisani                          31, 36

24

25

## CERTIFICATE

I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby certify that the foregoing constitutes a true and accurate transcript of my stenographic notes, and is a full, true, and complete transcript of the proceedings to the best of my ability.

PLEASE NOTE:  This hearing was held via videoconference and/or telephonically in compliance with the COVID-19 pandemic stay-safer-at-home recommendations and is therefore subject to the limitations associated with the use of technology, including but not limited to telephone signal interference, static, signal interruptions, and other restrictions and limitations associated with remote court reporting via telephone, speakerphone, and/or videoconferencing capabilities.

This certificate shall be considered null and void if the transcript is disassembled and/or photocopied in any manner by any party without authorization of the signatory below.

Dated this 29th day of September, 2021.

/s/ Elizabeth Saint-Loth, RPR, FCRR
Official Court Reporter