```
                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA

   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
UNITED STATES OF AMERICA,        )  Criminal Action
                                 )  No. 21-433
vs.                              )
                                 )
GARY JAMES HARMON,               )  September 24, 2021
                                 )  10:58 a.m.
              Defendant.         )  Washington, D.C.
   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

**TRANSCRIPT OF HEARING**
**BEFORE THE HONORABLE BERYL A. HOWELL,**
**UNITED STATES DISTRICT COURT CHIEF JUDGE**

*(All parties appearing via video and/or teleconference.)*

**APPEARANCES:**

```
FOR THE UNITED STATES:   CHRISTOPHER B. BROWN
                         C. ALDEN PELKER
                         U.S. Attorney's Office
                         For the District of Columbia
                         555 Fourth Street, NW
                         Washington, DC 20530
                         (202) 252-7153
                         Email: christopher.brown6@usdoj.gov

FOR THE DEFENDANT:       SABRINA SHROFF
                         Office of the Federal Public Defender
                         625 Indiana Avenue, NW
                         Washington, DC 20004
                         (202) 208-7500
                         Email: sabrina_shroff@fd.org

ALSO PRESENT:            JOHN COPES, Pretrial Services

Court Reporter:          Elizabeth SaintLoth, RPR, FCRR
                         Official Court Reporter
```

```
          This hearing was held via videoconference and
    telephonically and is, therefore, subject to the limitations
  associated with the use of technology, static interference, etc.

        Proceedings reported by machine shorthand, transcript
              produced by computer-aided transcription.
```

1                    **P R O C E E D I N G S**

2              THE COURTROOM DEPUTY:  Matter before the Court,

3     Criminal Case No. 21-433, United States of America versus

4     Gary James Harmon.

5              Your Honor, pretrial agent John Copes is appearing

6     by telephone.

7              Counsel, please state your names for the record,

8     starting with the government.

9              MR. BROWN:  Good morning, Chief Judge.

10    AUSA Chris Brown for the government.

11             THE COURT:  Good morning, Mr. Brown.

12             MS. PELKER:  Good morning, Your Honor.

13    Alden Pelker for the United States.

14             THE COURT:  Good morning.

15             MS. SHROFF:  Good morning, Your Honor.

16    On behalf of Mr. Gary Harmon, Sabrina Shroff for the Office

17    of the Federal Public Defender.

18             THE COURT:  Good morning.

19             Mr. Harmon, do you have any difficulty hearing us?

20             THE DEFENDANT:  Good morning, Your Honor.

21             No, I am not.  I can hear you guys just fine.

22    Thank you.

23             THE COURT:  Thank you.

24             And do you agree, Mr. Harmon, after consultation

25    with counsel, to participate in today's detention hearing

1      using video conferencing rather than being present here in

2      the courtroom?

3              THE DEFENDANT:  Yes, Your Honor.

4              THE COURT:  All right.  And so we're here because

5      after our last detention hearing I understand that the

6      parties were unable to reach any kind of agreement on the

7      conditions of supervision or conditions of pretrial release.

8      So, Ms. Shroff, do you want to just summarize the situation?

9              MS. SHROFF:  Certainly, Your Honor.

10             As I noted in my application to the Court -- or

11     the second briefing to the Court, the government has

12     asserted the conditions of release suggested by the Court --

13     by this Court as essentially requiring Mr. Harmon to plead

14     guilty and to actually transfer what they believe he has,

15     which is the cryptocurrency requiring him -- first, I just

16     want to point out that --

17             THE COURT:  Ms. Shroff, you're going in and out,

18     so your voice is very choppy.  We're only capturing -- we're

19     only hearing -- and my court reporter -- is only hearing

20     parts of words.  So either move the microphone closer to you

21     or -- see if that will help.

22             MS. SHROFF:  Your Honor, would it be okay if I

23     turned off my video?

24             THE COURT:  Yes.  Yes, it would.

25             MS. SHROFF:  Thank you.

1              THE COURT:  Yes.

2              MS. SHROFF:  So perhaps this will be better for

3      the Court and the court reporter to hear.

4              THE COURT:  It's already better.  Thank you,

5      Ms. Shroff.

6              MS. SHROFF:  Okay.  So, Your Honor, as I noted in

7      docket entry No. 19-1, the condition proposed by the

8      government -- or the conditions suggested by the Court, and

9      then interpreted by the government, would call for Mr. Gary

10     Harmon essentially to plead guilty.  Case law makes clear

11     that such a condition would not be proper under the Bail

12     Reform Act.  This is especially the case when the charging

13     instrument is one that has the presumption under the Bail

14     Reform Act as a presumption of release and not a presumption

15     of detention.

16              For those reasons, Mr. Harmon is unable to accept

17     the suggestion of the Court that he agree to the same

18     condition that was imposed in the Larry Harmon case.

19              I do note in the Larry Harmon case that

20     Mr. Harmon -- Mr. Larry Harmon was initially released on

21     simply what I would call regular bail conditions.  No such

22     condition of having to turn in cryptocurrency passwords or

23     seed words was required of him.

24              THE COURT:  But do you understand -- I am going to

25     interrupt you, Ms. Halverson (sic).

1          But you understand in the Larry Harmon case the
2    government had seized the Trezor devices, the seed recovery
3    keys -- they thought they had seized everything that would
4    protect the seized bitcoin assets.

5          And I think -- Mr. Brown can speak to this.  But I
6    think no one was more surprised than law enforcement to see
7    that even with the seizure of all of the items and
8    electronic storage devices that they had taken from
9    Mr. Harmon that that bitcoin could be stolen literally from
10   under their noses while they were watching remotely; and so
11   they're not going to make that same mistake twice.

12         So I think, you know, saying that Larry Harmon was
13   initially released, he was almost -- closely -- came very
14   close to being put back into pretrial detention except that
15   he agreed to all of these conditions; and the bitcoin was
16   gone at that point, and the government couldn't establish
17   that he was the one who was able to remotely
18   surreptitiously, under the noses of law enforcement, take
19   the bitcoin.

20         We're faced here with a very different situation;
21   now we know it can happen.  And we're in a situation where
22   the circumstantial evidence is extremely strong; that
23   Mr. Gary Harmon has access and control over millions of
24   dollars of bitcoin.  So you can talk about Larry Harmon's
25   situation, but it is not at all similar given the

1    revelations of what occurred in that case leading up to this

2    case.

3              MS. SHROFF:  Well, Your Honor, I understand what

4    the Court is saying.  But to be candid with the Court -- and

5    I do not mean to be disrespectful at all, has -- the

6    government not being able to protect whatever currency it

7    forfeited in the Larry Harmon case would not, in any event,

8    have any impact on the question before the Court right now

9    whether Gary Harmon is bailable.  Just because the

10   government cannot manage to keep up with its technology,

11   that is not the defendant's problem.

12             The defendant's problem is that the government's

13   condition essentially violates his constitutional Sixth

14   Amendment right to not confess to a crime.

15             If the government wants to take different steps,

16   if the government wants to hire better technology, that's up

17   to the government.  The government's problems are not Gary

18   Harmon's problems.  The government can find --

19             THE COURT:  Ms. Halverson.  Ms. Halverson -- not

20   Ms. Halverson.  Ms. Shroff.

21             MS. SHROFF:  Your Honor --

22             THE COURT:  Ms. Shroff, I am going to interrupt

23   you for a second.

24             I actually -- I mean, I appreciate your point, and

25   that's why I asked you a couple of times last week whether

1    you were agreeing to the same conditions that were imposed

2    in the Larry Harmon case; and so I am glad you have checked

3    with your client and your position is slightly different now

4    than it was at the last detention hearing about the same --

5    agreeing to the same conditions that were imposed on Larry

6    Harmon.

7              What I am confronted with under the Bail Reform

8    Act is to decide whether this defendant poses a risk of

9    flight.  Does he have the resources to have risk of flight

10   given the amount of resources and bitcoin that may be

11   available to him?  And does he also pose a risk of further

12   obstructive conduct and dissolution of assets that had been

13   and were subject -- had been seized by the government and

14   were subject to forfeiture by the government in a case where

15   he's already been charged with obstruction?

16             So, you know, this is not -- this is not a

17   situation where he can only be released -- the release

18   conditions proposed by the government may violate his Fifth

19   Amendment privileges.  So that being said, fine; you are not

20   going to agree to them, I get it.

21             But now I am basically just under the standard

22   Bail Reform Act, looking at his resources, looking at risk

23   of flight, looking at the risk of obstructive conduct for a

24   defendant who has been charged with obstruction; so, you

25   know, I hear you.

1              I understand your -- the reasoning that you are

2       putting forth about active production and the Fifth

3       Amendment privilege which is, frankly, part of the reason

4       why I kept asking you if you really would agree to the same

5       conditions that Larry Harmon had agreed to.  And the answer

6       that you are giving today is no surprise to me -- no

7       surprise to me, given the strong circumstantial evidence

8       that the government has laid out.

9              That being said, I now have to just look at the

10      factors under the Bail Reform Act.

11             Okay.  Anything further on that, Ms. Shroff?

12             MS. SHROFF:  Yes, Your Honor.  If I just may

13      address a couple of points.

14             When we were last before the Court I had, I hope,

15      made clear to the Court that I would have to consult with my

16      client before responding, and that I personally didn't know

17      what position I would take; and the case law has guided

18      obviously where I came out on the issue raised by the Court.

19             As to the Bail Reform Act and under its

20      traditional factors, I would like to note a couple of facts:

21      One, as this Court recognized at the last bail appearance,

22      Mr. Gary Harmon is accused of obstructing on one particular

23      point.  As this very Court noted, and as you questioned the

24      government, Mr. Harmon has engaged in no other obstructive

25      conduct.

1          In fact, the conversations between the Harmon

2     family members and Mr. Gary Harmon makes clear that

3     Mr. Harmon literally tells the person involved:  Well, let

4     me know when I am going to get arrested, and I will get

5     myself a lawyer.

6          As to risk of flight, he clearly anticipates the

7     government coming after him.  He knows the government is

8     investigating him, and he does not flee.  He remains exactly

9     where he was to the great consternation of the

10    United States.

11         Under the Bail Reform Act, the question before the

12    Court is whether or not there can be conditions that can be

13    set to reasonably assure his return to Court.  Mr. Harmon

14    can have a condition that he is to have no internet access

15    at all.  Such a condition would enable him to be subject to

16    the scrutiny of the Court and pretrial services, assure his

17    return to Court because he would be on GPS, and ensure that

18    he does not, in fact, access a website that he is not

19    entitled to access.

20         But to say that Mr. Harmon should be detained

21    because the United States does not know how to protect what

22    it considers its own property would be improper.  And I ask

23    the Court under the traditional Bail Reform Act -- given the

24    fact that the presumption is for release -- to release

25    Mr. Gary Harmon under the conditions that we have proposed,

1    including home confinement, GPS monitoring, and no internet

2    access.

3              Thank you, Your Honor.

4              THE COURT:  All right.

5              Mr. Brown, do you want to respond?

6              MR. BROWN:  Just briefly, Your Honor.

7              Just to point out -- with respect to the Fifth

8    Amendment issue, we tried to work with the defendant.  We

9    tried to offer an accommodation that would address the

10   defendant's concerns without putting the government in a

11   materially worse position than what it otherwise --

12             THE COURT:  You are referring to a limited -- a

13   limited use agreement?

14             MR. BROWN:  Yes, Your Honor.

15             But at the end of the day, that arrangement simply

16   wouldn't work unless the defendant wants to make it work.

17   But we tried to meet him halfway and give him a path to

18   address the government's concerns with respect to risk of

19   flight and obstruction.

20             On the Bail Reform Act factors, Your Honor has

21   reviewed the government's papers.  I am happy to answer

22   specific questions, but I don't have anything further to

23   add.

24             THE COURT:  Okay.  So Ms. Shroff says that the

25   government just needs to do better technology-wise to make

1     sure assets that it thought it had seized and were subject

2     to forfeiture were actually secure.  So you now have two

3     Trezor cryptocurrency bit storage devices seized from Gary

4     Harmon; you have, based on your papers, seed recovery keys

5     and pieces of paper with passphrases, and so on.

6           Does that give you any assurance that there isn't

7     some thumb drive or other means available for the stolen,

8     lost 712.6 bitcoin that still may be around, won't be

9     further decimated and, you know, spent?

10          MR. BROWN:  No, Your Honor.

11          And just -- Ms. Shroff's argument is a bit like

12    telling the government -- with a bank robber who, you know,

13    secreted his proceeds somewhere, that the government just

14    needs to do a better job of recovering the proceeds of bank

15    robberies.

16          The technology in this case is such that merely

17    having control over a physical Trezor device doesn't

18    preclude the defendant from reconstituting the wallets that

19    are contained on the Trezor device if they're set up with a

20    hidden wallet feature and with a passcode and seed recovery

21    phrase feature.

22          As is specified, and as the grand jury found in

23    the indictment in this case, Gary Harmon has previously done

24    just that for Trezor devices that were seized and

25    (indiscernible) from Helix; remotely used these phrases to

1    recover hidden wallets set up on those Trezor devices and

2    then moved the funds into his own wallets.

3         And just one further factual distinction between

4    this case and the Larry Harmon case.  In the Larry Harmon

5    case, the government had been able to trace Helix proceeds

6    on the blockchain to specific wallets that -- even if we

7    didn't have control over those wallets, we could see them on

8    the blockchain.  We saw some items we were able to --

9    (indiscernible).  Here --

10         THE COURT:  Mr. Brown.  Mr. Brown.  I don't know,

11   maybe it's the courthouse's telecommunications right now;

12   but could you turn your video off because I think we're also

13   losing some of your words.  Thank you.

14         MR. BROWN:  Yes, Your Honor.

15         THE COURT:  Much better.

16         MR. BROWN:  So just to wrap this up, I think that

17   the technology is such that it's just not something that we

18   can secure without having access to those -- a hidden wallet

19   which requires a seed recovery phrase, a passcode.  These

20   were -- this is information that the defendant may have

21   memorized; he may have it stored on his ProtonMail account

22   which is encrypted, and it's located overseas.  The provider

23   doesn't retain any information.  There are all sorts of

24   different -- he can have it with one of his collections of

25   new friends that he made in the past years.  You know, there

1    are many ways he could have stored this relatively simple

2    information that could potentially give him access to

3    hundreds of coins or tens of millions of dollars in a way

4    that the government simply could not even track the

5    technology and make it available to the Court.

6              MS. SHROFF:  May I say a few words?

7              THE COURT:  All right.  Thank you, Mr. Brown.

8              Ms. Shroff, I was going to call on you, if you

9    want to respond.

10             MS. SHROFF:  I do want to respond.  Thank you,

11   Your Honor.

12             Let me start with the government's

13   characterization of this process as a compromise.  This

14   isn't a compromise that -- this isn't a negotiation we're

15   having over real estate and we come to a middle ground where

16   we can agree upon a price where both people go home somewhat

17   unhappy.

18             The government's proposal for immunity has built

19   in it derivative use.  In cases such as this one, frankly,

20   derivative use is just a path -- a complete path to the

21   government being able to prove its case if it's premised

22   that Mr. Gary Harmon is guilty would actually be true.

23             By giving us that immunity they have literally

24   shifted the burden of us proving something to an

25   impossibility or a nullity, especially if the government is

1    convinced that Gary Harmon is, in fact, guilty.

2           Even if -- even if the government were to believe

3    what it has presented to the grand jury, it still would be

4    improper to say that under the Bail Reform Act a defendant

5    has to come up with or agree to some compromise, and should

6    he refuse that compromise that would somehow reflect, one,

7    poorly on him or, two, be a basis to deny him bail; I think

8    that would be improper.

9           Secondly, Your Honor, the grand jury doesn't make

10   decisions on whether or not a person is guilty.  I mean,

11   really -- do I really need to tell someone that a grand jury

12   will indict a ham sandwich; is that not actually true?

13          THE COURT:  Ms. Shroff, I don't know where you're

14   going with this.

15          Can I tell you, whatever negotiations you had with

16   the government that fell down is beside the point here.

17          So you initially had indicated that you would

18   agree to the same conditions that Larry Harmon was released

19   on -- this is what sent us down that path.  I don't need to

20   hear anymore about the negotiations and why they fell apart

21   with the government.  I am prepared just to look at this

22   case under the four corners of the Bail Reform Act and the

23   factors I have to consider.

24          So, I mean, going off on what the grand jury says

25   and doesn't say -- clearly, the grand jury has established

1    probable cause to believe that this defendant committed the

2    ten felony charges with which he is charged in the

3    indictment.

4            The government now bears a separate burden of

5    proof, by a preponderance of the evidence, to establish that

6    he poses a serious risk of flight or serious risk of

7    obstruction.

8            So, really, do not waste the Court's time anymore,

9    Ms. Shroff, with arguments that are really of little bearing

10   on what I need to decide and are a distraction.  I do not

11   need to hear anymore about whatever negotiations you and the

12   government had that fell apart.

13           Do you have anything further to say, Ms. Shroff.

14           MS. SHROFF:  Yes, Your Honor.

15           I was simply responding to the arguments made by

16   the government; I wasn't in any way starting with what

17   negotiations fell apart.

18           Going back to the traditional Bail Reform Act

19   standards, again, the question would be whether there can be

20   reasonable assurance that Mr. Harmon will return to Court.

21   I have all indications in a presumption for release case,

22   Mr. Harmon has met his burden.  He is a United States

23   citizen; he has no prior criminal history; he has been aware

24   of this arrest that has been treading down the path towards

25   him having known he was going to be arrested; and this isn't

1      a debate.  This isn't the government's only submission.

2             In the government's submission, the government is

3      the one that gave this Court the text, the texts between

4      Mr. Gary Harmon and his sister-in-law where he tells his

5      sister-in-law:  Let me know when you get me arrested, and I

6      will get myself a lawyer; not, Let me know when you are

7      going to get me arrested and I will leave the country.

8             Where is Mr. Harmon arrested?  Exactly where he

9      was; in his home state, in his hometown, in his apartment.

10            He is not a risk of flight.  Why?  Because he

11     never took any steps that would indicate to this Court that

12     he is a risk of flight.

13            As to the obstructive conduct as this Court itself

14     found, the obstructive conduct itself was limited in scope.

15     If the government is to believe there is no obstructive down

16     the road -- and again, of course, this Court can simply say

17     Gary Harmon can have no electronic device to which he has

18     access --

19            THE COURT:  Ms. Shroff, am I understanding your

20     argument correctly that the single obstructive conduct that

21     Gary Harmon is accused of doing is -- under the charge is

22     stealing basically, what, 712.6 bitcoins otherwise subject

23     to seizure and forfeiture by the government.  And since he's

24     already done that, should he spend any part of that, should

25     he further dissolve or hide or do anything else with that

1    712.6 bitcoin if he were released and have access to all the

2    of the seed recovery phrases and passphrases -- that

3    wouldn't be compounding or engaging in further obstructive

4    conduct, it's really -- that's not something that should

5    concern this Court because anything else he does with the

6    712.6 bitcoins, you know, is really not in the nature of

7    further obstructive conduct for this Court to consider.

8              Is that the thrust of your argument?

9              MS. SHROFF:  Well, Your Honor, I am not starting

10   with the premise that Mr. Gary Harmon is guilty.  The

11   premise is that Gary Harmon under the United States

12   Constitution is presumed not guilty.  So I am --

13             THE COURT:  But you keep pointing to the fact that

14   he's only charged with a single incident of obstruction --

15             MS. SHROFF:  That's correct.

16             THE COURT:  -- when the risk that the government

17   has pointed out here is that:  Given the strong

18   circumstantial evidence that he was the person who took the

19   712.6 bitcoin, and has spent a lot of it on an apartment and

20   cars and bars, and all of this other stuff detailed in the

21   government's briefing -- when he had no apparent source of

22   income to pay millions of dollars for all of those

23   activities and goods -- that if he is convicted there won't

24   be much left if the government can even find the rest of the

25   712.6 bitcoin.

1          So I am not really sure -- I mean, you are, sort

2     of, talking around the risk of further obstructive conduct

3     here that is very --

4          MS. SHROFF:  Your Honor --

5          THE COURT:  -- that is one of the key grounds for

6     detention under the Bail Reform Act.

7          MS. SHROFF:  Your Honor, this argument would be

8     very much like the argument in a fraud case if the

9     government were to say:  There is fraudulent activity that

10    we're accusing the defendant of; the fraud consists of a

11    million dollars.  We think that we have only been able to

12    recover 500,000; there is another 500,000 that is hidden out

13    there, so detain him; that would not be proper.

14         Let's use the bank robbery analogy.  Really, would

15    the government be saying that:  The bank robber has dropped

16    something; he has to return what he dropped so that he can

17    make bail.  That cannot possibly be correct under the Bail

18    Reform Act or the United States Constitution.

19         One may not assume that Mr. Gary Harmon has, in

20    fact, stolen this money; one may not assume that he has, in

21    fact, spent that money; and one may not assume that he is

22    going to disobey this Court's order and access the internet

23    if the Court tells him not to.

24         And if the Court finds that Mr. Harmon is

25    incapable of following this Court's directive, this Court

1        has an immediate and absolute remedy of remand.

2              But on the facts before it, where the indictment

3        has, in fact, only alleged one obstructive conduct and

4        because it is a case that has a presumption of release, and

5        because Mr. Harmon is presumed innocent not guilty -- and

6        innocent -- it is for all of those reasons that, yes,

7        Mr. Harmon should be released under the conditions proposed

8        by him.

9              THE COURT:  Okay.  Thank you, Ms. Shroff.

10             I am prepared to rule.

11             The Bail Reform Act requires release of a

12       defendant prior to trial unless a judicial officer

13       determines, after a hearing, that no condition or

14       combination of conditions will reasonably assure the

15       appearance of the person as required, and the safety of any

16       other person and the community.

17             The government bears the burden to establish by a

18       preponderance of the evidence that the defendant poses a

19       serious risk of flight or a serious risk of obstruction or

20       attempt to obstruct justice, or to intimidate or threaten a

21       perspective witness or show, by clear and convincing

22       evidence, that no conditions of release will assure the

23       safety of any other person and the community.

24             In determining whether any conditions of release

25       will reasonably assure the appearance of the person as

1    required and the safety of others, the Court must take into

2    account the available information concerning four factors

3    set out in 18 U.S.C. Section 3142(g).

4           The factors are:  The nature and circumstances of

5    the offense charged; the weight of the evidence against the

6    person; the history and characteristics of the person; and,

7    finally, the nature and seriousness of the danger to any

8    person in the community that would be posed by the person's

9    release.

10          I will now discuss each of the four factors and

11   find that, at this stage, these factors all weigh in favor

12   of pretrial detention for the following reasons.

13          With respect to the nature and circumstances of

14   the offense charged, the defendant is charged in a ten-count

15   indictment.  Eight of those counts charge money laundering,

16   in violation of 18 U.S.C. Section 1956(a)(1)(B)(i) carrying,

17   on each count, a maximum sentence of 20 years'

18   incarceration.

19          Count Nine charges obstruction of an official

20   proceeding, in violation of 18 U.S.C. Section 1512(c)(2),

21   which carries a maximum sentence of up to 20 years as well.

22          And Count Ten charges removal of property to

23   prevent seizure, in violation of 18 U.S.C. Section 2232(a),

24   that carries a maximum sentence of up to five years.

25          This case arises out of the prosecution of his

1    brother -- the defendant's brother, Larry Harmon -- for

2    operating the illicit dark net bitcoin money laundering and

3    money transmitting service called Helix.  Helix was a

4    bitcoin mixer or tumbler that enabled customers, for a fee,

5    to send bitcoins to designated recipients in a manner

6    designated to conceal and obfuscate the source or owner of

7    the bitcoins.

8         At the time of Larry Harmon's arrest, federal

9    agents seized a cryptocurrency device -- Trezor devices --

10   belonging to Larry Harmon which contained 16 bitcoin wallets

11   holding approximately 4,877 bitcoin, traceable to Helix.

12        This defendant, Gary Harmon, has been indicted for

13   accessing and absconding with approximately 712.6 bitcoin

14   contained in the bitcoin wallets seized by the government on

15   Larry Harmon's arrest, which was subject to forfeiture in

16   his brother's case.  These bitcoin were stolen from right

17   under the nose so-to-speak of law enforcement.

18        The government proffers that in about April 2020,

19   Gary Harmon took control of the 712.6 bitcoin knowing that

20   the property represented his brother's illegal proceeds from

21   operating the bitcoin money laundering service Helix, and

22   knowing that the property had been seized and was a part of

23   the criminal proceeding against his brother.

24        According to the government, the defendant

25   executed the bitcoin transactions after personally attending

1   court hearings before this Court in his brother's case, and

2   listening to testimony and argument about the bitcoin that

3   had been seized.  Based on this attendance at his brother's

4   hearings, the government contends that the defendant knew,

5   one, that the bitcoin was derived from illegal activity,

6   namely Helix -- the operation of Helix -- and that the

7   tumbling of bitcoin to conceal the use of bitcoin to make

8   purchases on the dark net of drugs -- illegal drugs, and

9   other illegal activity on the dark net; and two, that the

10  bitcoin was subject to seizure and forfeiture by the

11  government; and three, that this bitcoin was part of the

12  evidence in the criminal case against Larry Harmon.

13          These inferences about what this defendant knew

14  are strong since I was at those hearings where Gary Harmon

15  participated.  And I am aware of all of the discussion that

16  took place about those three things I just listed.

17          The government also has strong circumstantial

18  evidence based on four emails sent to the defendant's

19  personal Google account between April 19th and 26th, 2020,

20  from no-reply@trezor.io, reflecting use of Trezor's web

21  interface to recreate a Trezor wallet using seed recovery

22  passphrases.  Tellingly, no other messages from trezor.io

23  addresses to Gary Harmon appear at any other time.

24          Thereafter, the government observed that bitcoin

25  was transferred from the bitcoin wallets seized from Larry

1    Harmon into two different bitcoin mixers known as Wasabi

2    Wallet and ChipMixer.com.  And following this transfer of

3    bitcoin through the mixers, the government proffers that

4    defendant began depositing thousands of dollars into his

5    bank accounts in 2020 and early 2021, and spending lots of

6    money on an apartment, on a car, on clubs, on a chartered

7    airplane service, et cetera.

8              During a voluntary interview with agents on

9    July 15, 2020, the defendant was advised he was suspected of

10   transferring the 712.6 bitcoin owned by his brother and

11   subject to forfeiture in his brother's case.  According to

12   the government, the defendant denied during this interview

13   that he -- moving the bitcoin and responded, "If I took it,

14   why wouldn't I take it all?"

15             The government argues that this was a lie based on

16   the evidence that it has uncovered tying Gary Harmon to the

17   stolen 712.6 bitcoin.

18             The government argues that the defendant's ability

19   to remotely reconstitute the bitcoin wallets owned by his

20   brother, transfer the bitcoin into new, unhosted wallets,

21   and then gradually launder the bitcoin through the bitcoin

22   mixing services reflects a significant degree of

23   technological sophistication and exhibits a high level of

24   operational security.  This isn't really surprising since

25   Gary Harmon did actually work for his brother in setting up

1     other online platforms and cyber -- cryptocurrency

2     businesses.

3              The defendant is facing serious penalties in the

4     charged crime, with a maximum of 20 years on a number of the

5     charges, and 5 years on the tenth charge; and the government

6     has estimated a guideline of exposure that is very, very

7     serious.

8              Even putting aside whatever the sentencing

9     guidelines range may be applicable to Gary Harmon, it's not

10    necessary to the conclusion that the defendant does face

11    serious charges here.

12             Facing serious charges and potentially long prison

13    time is not a reason for pretrial detention however; yet one

14    of the charges here is obstruction based on allegations that

15    while evidence was seized and held in the custody of law

16    enforcement, as defendant knew from his attendance at his

17    brother's court hearings, Gary Harmon took highly-skilled

18    steps to steal part of that bitcoin; this is a bold move.

19             Law enforcement could only sit and watch on the

20    public blockchain as the bitcoin was -- disappeared.  Such a

21    bold move to frustrate law enforcement, as reflected by the

22    strength of the circumstantial evidence that the government

23    has set out in its proffer, raises serious concern about the

24    defendant's compliance with any release conditions.

25             The Court finds that the nature and circumstances

1    of the offense, particularly the obstruction charge, weigh

2    in favor of detention.

3              As to the weight of the evidence against the

4    defendant, the case against the defendant is circumstantial,

5    but it is strong.  Further examination of the items seized

6    from the defendant haven't even occurred yet, and that may

7    very well yield additional evidence.

8              Contrary to the defense position that

9    circumstantial evidence is not particularly strong here,

10   this Court disagrees.  The government has strong evidence

11   that Gary Harmon seized, transferred, and laundered the

12   missing bitcoin formerly held by his brother, seized by the

13   government, and subject to forfeiture, as outlined in the

14   government's memo at ECF No. 10.

15             Let's start with the fact that the owners of the

16   bitcoin guard the seed recovery phrases -- keys and

17   passphrases allowing access and transfer to this valuable

18   asset.  Sharing those access keys only with the most trusted

19   persons, if they show them at all -- only those trusted

20   persons would have the ability to even know what those

21   access keys were to the seized and subject to forfeiture

22   bitcoin.

23             Gary Harmon's already admitted to law enforcement

24   that Larry, his brother, gave him a USB thumb drive with

25   seed recovery keys and passphrases on it.  Gary Harmon was

1   apparently that trusted person to Larry Harmon, at least at

2   some point.

3          This defendant told law enforcement that he

4   disposed of the USB thumb drive that had seed recovery keys

5   and passphrases on it and doesn't have it anymore, and says

6   that he threw it in some -- dropped it down the toilet in

7   the gym.  But that doesn't mean that he didn't -- even if he

8   did that, he is the person who has already admitted he had a

9   USB thumb drive given to him by Larry Harmon that had seed

10  recovery keys and passphrases on it.

11         The evidence that he was the person who stole the

12  712.6 bitcoin grows only stronger with the email records

13  showing automated messages from trezor.io addresses to this

14  defendant, Gary Harmon's, personal email showing the times

15  when the Trezor bitcoin storage devices were accessed to

16  transfer the 712.6 bitcoins previously held by his brother

17  when that bitcoin -- the Trezor devices were in the custody

18  of law enforcement.

19         The evidence is strong, almost overwhelming

20  circumstantial evidence here also includes the blockchain

21  evidence showing the subsequent laundering of the 712.6

22  bitcoin through bitcoin-mixing services, and financial

23  records showing that the defendant -- after this bitcoin had

24  been stolen from law enforcement, this defendant, Gary

25  Harmon, made significant deposits in his bank accounts with

1    proceeds traceable to cryptocurrency.  It also includes not

2    only the deposits into his bank accounts, but extraordinary

3    purchases and expenditures, including a luxury apartment, a

4    car, et cetera, that the defendant made during a period

5    where he had little income other than what could possibly be

6    traced to the stolen bitcoin.

7         To the extent that the defendant contends he might

8    not have understood the 712.6 bitcoin was not his to steal

9    and that this bitcoin was evidence in a criminal case

10   against his brother and was subject to forfeiture in Larry

11   Harmon's criminal case, I have to say that would be a very

12   hard sell before this Court which -- as I said before, where

13   the proceedings against Larry Harmon were held, and these

14   points were all made expressly clear.

15        The Court agrees with the government that the

16   defendant's presence at his brother's legal proceedings show

17   that he was aware that the bitcoin stored in his brother's

18   Trezor devices had been seized by the government, that the

19   funds represented illegal proceeds from Helix, and that the

20   funds were claimed by the government in the criminal

21   prosecution against his brother as subject to forfeiture.

22        Defendant attempts to poke holes at this evidence

23   by noting that the bitcoin mixing or tumbling is not per se

24   illegal and the government's newly attempted prosecution of

25   bitcoin mixers involves a combination of unusual elements

1    including the dark net, Tor, and bitcoin that will

2    undoubtedly raise -- and I quote defendant's opposition, at

3    page 8:  Raise issues of first impression and require

4    specialized analysis and preparation for trial.  This is a

5    smoke screen argument really having little bearing on the

6    issue before the Court.

7         Of course the use of bitcoin tumblers is not per

8    se illegal; but it can be in a context where the defendant

9    is trying to conceal the source of the bitcoin that was

10   seized by the government and subject to forfeiture in an

11   ongoing criminal case.  This is the conduct that supports

12   the obstruction charge against the defendant.

13        The majority of the stolen bitcoin remains

14   unaccounted for and under the control of whoever stole it,

15   and the evidence strongly points to this defendant, Gary

16   Harmon, as the thief.  He also has the skill set to monetize

17   the bitcoin or otherwise dispose of it, further compounding

18   any obstruction that occurred in the Larry Harmon case.  It

19   also provides substantial resources for use for other

20   activity to avoid accountability in this case, including

21   flight.

22        In sum, the weight of the evidence supporting the

23   charges against the defendant is strong and supports

24   pretrial detention here.

25        Of course, as the defendant's counsel points out,

1    the defendant has no significant criminal history.  He has

2    lived in Ohio.  He has got family and friends -- short-term,

3    though they may be in that state, and in Akron.  And, if

4    released, the defendant apparently would enjoy the

5    enthusiastic support of his girlfriend, Alyssa Pisani, who

6    has been his girlfriend for about five months, and of her

7    family.

8            Based on these facts, the defense argues the

9    defendant presents no risk of flight and no further risk of

10   obstructive conduct, particularly since the defendant's

11   girlfriend is a reputable and responsible third-party

12   custodian to help ensure his compliance with his release

13   conditions while he defends the charges against him.

14           Despite the factors that generally favor pretrial

15   release, the Court agrees with the government that the

16   defendant's alleged access to tens of millions of dollars in

17   cryptocurrency has demonstrated an ability to remotely

18   access and launder bitcoin from anywhere in the world with

19   an internet connection and his alleged obstructive conduct

20   in taking bitcoin held by law enforcement and subject to

21   forfeiture, even in the midst of an ongoing criminal case

22   against his brother, shows such bold conduct that his

23   compliance with release conditions is highly questionable.

24           According to the government, through his millions

25   of dollars in cryptocurrency and knowledge of the

1    dark net -- where false documents are available for

2    purchase -- the defendant could finance his flight from

3    prosecution for the rest of his life.  This is supported by

4    the defendant's private use of a chartered private jet

5    service he paid for with bitcoin.

6          The government also explains that, despite he has

7    spent his entire life in Ohio, he lacks substantial ties to

8    the community in Akron, emphasizing that according to

9    witness accounts he is estranged from his family since the

10   bitcoin transactions at issue and the repercussions from his

11   brother's criminal case; his lack of meaningful ties to his

12   community is reflected by the letters of support submitted

13   on his behalf, which are all from friends and acquaintances

14   that have been in the defendant's immediate social circle

15   for a very short period of time, less than a year.

16          The defendant appears to suggest that all of the

17   government's concerns regarding the defendant's risk of

18   flight could be mitigated -- or his risk of further

19   dissolution of any bitcoin currency he may have stolen, as

20   alleged and charged in the indictment, can be mitigated by

21   ordering the defendant be in home detention under 24/7 GPS

22   monitoring, third-party supervision by his girlfriend, and

23   he would agree.  The Court should just trust him at his word

24   that he would agree not to have any access to the internet.

25          The release conditions the defendant proposes do

1    not mitigate significant concerns about this defendant's use

2    and access to bitcoin and potential further obstructive

3    conduct and risk of flight.

4         There are significant and obvious weaknesses in

5    the defendant's proposed third-party custodian of his

6    girlfriend and, I guess, her parents who have also been

7    suggested as third-party custodians.  The defendant wouldn't

8    live with the parents, but with his girlfriend in a condo

9    apartment which could also be subject to forfeiture.

10        The defendant's girlfriend has a full-time job,

11   and this necessarily means she would not be with the

12   defendant 100 percent of the time, increasing the risk the

13   defendant could be able to access the internet in her

14   absence during the time that he spends without third-party

15   supervision.

16        The defendant's relationship with Ms. Pisani is

17   not longstanding.  Given the fact that the defendant was

18   arrested and has been in pretrial detention for some time

19   now, it looks like they were -- they were -- they became

20   girlfriend-boyfriend only about three months or less before

21   the defendant's arrest; and they have never lived together

22   before according to the testimony of Ms. Pisani.

23        I conclude that the government's concerns about

24   the defendant's flight cannot be mitigated.  And his further

25   obstructive conduct, even with the most stringent

1    supervision conditions proposed by the defendant, and that

2    the history and characteristics skill set of this defendant

3    also weigh in favor of detention.

4         Regarding the fourth and final factor, the nature

5    and seriousness of the danger to the community that would be

6    posed by the defendant's release, the government asserts the

7    defendant poses a danger of further obstructive conduct

8    because -- given the fact -- the strong circumstantial

9    evidence showing that he did engage in the charged

10   obstructive conduct in his brother's prosecution -- as the

11   government says -- demonstrates a lack of respect for the

12   Court's authority and any release conditions it may impose.

13        Larry Harmon was released, as the defense counsel

14   points out; but Larry Harmon agreed to a number of other

15   release conditions that this defendant is not agreeing to.

16        While it's uncontested that the defendant here is

17   not charged with any crime of violence or any violent act

18   for that matter, the obstruction charge and the strong

19   evidence supporting that charge creates significant concerns

20   the defendant would be willing to engage in continued

21   similar conduct in the future and further obstruct law

22   enforcement functions and judicial proceedings.  And, for

23   this reason, the risk of the defendant -- the government --

24   the Court has absolutely no assurance that this defendant

25   would comply with any of the release conditions,

1  particularly since he may very well retain control over

2  millions of dollars in bitcoin.

3          So upon consideration of the proffered evidence

4  presented, the factors set forth in 18 U.S.C. Section

5  3142(g), and the possible release conditions set forth in

6  Section 3142(c), the Court finds that all four statutory

7  factors weigh in favor of pretrial detention, and the

8  government has met its burden by establishing by a

9  preponderance of the evidence that no condition or

10  combination of conditions will reasonably assure the

11  appearance of the defendant as required.

12          As long as the defendant with his skill set

13  retains possibly millions of dollars of cryptocurrency, the

14  Court finds that there are no combination of conditions that

15  would reasonably assure his appearance in this court, and so

16  the government's motion for pretrial detention is thereby

17  granted.

18          The defendant will be held without bond pending

19  trial.

20          All right.  We need to set up a next status

21  conference.  Since we were supposed to have a status

22  conference on September 23, what would the parties suggest

23  in terms of the next status conference in this case?

24          Ms. Shroff --

25          MR. BROWN:  Your Honor.

 1           THE COURT:  -- or Mr. Brown.

 2           MR. BROWN:  Your Honor, the government would

 3    suggest setting something out in about 30 days from now;

 4    that would allow the government to engage, sort of, in

 5    earnest in plea negotiations with the defense and to do what

 6    we can to try to clean up any remaining discovery that is

 7    still outstanding; and that discovery principally would be

 8    extractions from the defendant's electronic devices which is

 9    still outstanding.

10           The government had seized a phone -- at least one

11    phone, I think seven or eight laptops; and that that remains

12    ongoing -- that examination, as well as going through

13    whatever discovery from the Larry Harmon case needs to be

14    produced in this case.  So I think 30 days to allow further

15    discovery and discussions relating to possible resolutions

16    of this case; and we would ask for exclusion of time under

17    the Speedy Trial Act in the interest of justice to allow the

18    parties to do those things.

19           THE COURT:  Ms. Shroff.

20           Ms. Shroff, are you still there?

21           Have we lost her?  Is she still on the line?

22           THE COURTROOM DEPUTY:  She is connected.

23           THE COURT:  Ms. Shroff, I think you may be muted.

24           MS. SHROFF:  Hello.

25           THE COURT:  Yes.  Now I can hear you.

```
 1                    I can hear you now, Ms. Shroff.

 2             THE COURTROOM DEPUTY:  She's muted again.

 3             THE COURT:  You muted.  Ms. Shroff, could you

 4     unmute?

 5             THE COURTROOM DEPUTY:  She disconnected.

 6             THE COURT:  She's going to re-call -- try calling

 7     again.

 8             (Proceeding pauses to address technical

 9     difficulties.)

10             MS. SHROFF:  I apologize.  I am having a little

11     bit of trouble with my signal.

12             THE COURT:  Yes.  We can hear you now.

13             I was going to suggest Friday, October 29th, at

14     any point where we can get a slot at the D.C. jail.

15             So is October 29 convenient for you, Ms. Shroff?

16             MS. SHROFF:  Your Honor, it's a fine date for me.

17     But because Mr. Harmon is in the quarantine unit, I have

18     very limited access to him.  I am happy to work on the

19     Court's timetable.  I would prefer to have a little

20     additional time so that I have an opportunity to discuss

21     with Mr. Harmon what he wishes to do about the Court's

22     ruling on bail, review discovery --

23             THE COURT:  Ms. Shroff, I am going to interrupt

24     you for a second.

25             I am going to ask Mr. Harmon if he knows when
```

1    he'll get out of quarantine because that -- it seems to me,

2    at least, that he has been in quarantine for now at least a

3    week, so he may be coming out of quarantine.

4          Mr. Harmon, do you know when you're getting out of

5    quarantine?

6          THE DEFENDANT:  Hi, Your Honor.

7          We actually just -- we got another letter that

8    said we will be ending quarantine September 29th.  But they

9    did just come by and retest all of the inmates in this block

10   yesterday for COVID.  So if anybody tests positive, they're

11   going to push it back another two weeks as well.  So we

12   really have no definite answer when we will be out of

13   quarantine.

14         THE COURT:  I see.  Okay.  So, Ms. Shroff, I just

15   wanted to get clarification on that for you.

16         So why -- are you requesting, Ms. Shroff, a little

17   bit of additional time then or do you want to keep the

18   October 29th date and then, if you need more time, you can

19   let me know?

20         MS. SHROFF:  I would just prefer to go one more

21   week, if it's okay with the Court.

22         THE COURT:  No.  That's fine.

23         Okay.  So let's look at November 5, at 9 a.m.

24         MS. SHROFF:  That's fine, Your Honor.  Thank you.

25         MR. BROWN:  Your Honor, that's fine for the

1    government too.

2              THE COURT:  Okay, good.

3              And, of course, we are all right now struggling

4    with the D.C. jail scheduling issues, so we are going to put

5    that request in as promptly as possible; but if there is any

6    change, my courtroom deputy will let you know.

7              All right.  Is there anything further today from

8    the government?

9              MR. BROWN:  Your Honor, just the government's

10   motion to exclude time between today's date and the next

11   status hearing.

12             THE COURT:  Thank you, Mr. Brown.

13             I will exclude time under the Speedy Trial Act

14   between today and November 4th, and find that --

15   November 5th, and find that it is in the interest of justice

16   to do so, and that those interests outweigh the interests of

17   the public and Mr. Harmon in a speedy trial in order to give

18   the government time to complete production of any discovery

19   that still remains in the case including from the processing

20   of electronic storage devices seized from the defendant, to

21   give the parties time to discuss the discovery and any

22   disposition short of trial, and to give Ms. Shroff

23   sufficient time to discuss the case with Mr. Harmon.

24             Mr. Brown, is that sufficient for the Speedy Trial

25   Act exclusion findings?

```
 1                    MR. BROWN:  Yes, Your Honor.

 2                    THE COURT:  All right.

 3                    Anything further from you, Ms. Shroff?

 4                    MS. SHROFF:  No.  Thank you, Your Honor.

 5                    Have a good weekend.

 6                    THE COURT:  You too, and have a good trip back.

 7                    All right.

 8                    MS. SHROFF:  Thank you.

 9                    THE COURT:  You are all excused.

10                    MS. SHROFF:  Your Honor, would it be possible for

11       me to speak to Mr. Harmon if there is any possibility I

12       could have him in a breakout room?

13                    THE COURT:  Let me just check with Ms. Gumiel.

14       Can we put Mr. Harmon -- yes.  We will put you in a breakout

15       room.  And do you think you need five, ten minutes?

16                    MS. SHROFF:  Even five minutes would be fine, Your

17       Honor.  I am having an inordinately hard time getting time

18       to speak to him, so I very much appreciate it.

19                    THE COURT:  Yes, of course.  All right.

20                    I am leaving the courtroom so you actually will be

21       just here with my courtroom deputy, so there you go.

22                    MS. SHROFF:  Thank you.

23                    THE COURT:  Thank you.

24                    MR. BROWN:  Thank you, Your Honor.

25                    (Whereupon, the proceeding concludes, 11:54 a.m.)
```

```
 1                        *  *  *  *  *

 2                        CERTIFICATE

 3

 4          I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby

 5   certify that the foregoing constitutes a true and accurate

 6   transcript of my stenographic notes, and is a full, true,

 7   and complete transcript of the proceedings to the best of my

 8   ability.

 9

10          PLEASE NOTE:  This hearing was held via

11   videoconference and telephonically in compliance with the

12   COVID-19 pandemic stay-safer-at-home recommendations and is

13   therefore subject to the limitations associated with the use

14   of technology, including but not limited to telephone signal

15   interference, static, signal interruptions, and other

16   restrictions and limitations associated with remote court

17   reporting via telephone, speakerphone, and/or

18   videoconferencing capabilities.

19

20           This certificate shall be considered null and void

21   if the transcript is disassembled and/or photocopied in any

22   manner by any party without authorization of the signatory

23   below.

24       Dated this 30th day of September, 2021.

25       /s/ Elizabeth Saint-Loth, RPR, FCRR
         Official Court Reporter
```