# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | **Criminal No. 21-cr-433 (BAH)** |
| | : | |
| GARY HARMON, | : | |
| | : | |
| Defendant. | : | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits its Memorandum in Aid of Sentencing. The government recommends that the defendant, Gary Harmon ("Harmon" or the "defendant"), be sentenced to a term of imprisonment of at least the mid-level of the recommended sentencing range under the U.S. Sentencing Guidelines for Counts One and Two, calculated by the government to be 51 to 63 months. The government respectfully submits that such a sentence would adequately serve the interests of justice as codified in 18 U.S.C. § 3553(a). In support of this motion, and to assist the Court in fashioning an appropriate sentence, the government submits the following:

## I.   FACTUAL AND PROCEDURAL BACKGROUND

The facts of this case are summarized in the Statement of Offense filed in this case, ECF No. 46, as well as the final Presentence Investigation Report ("PSR"), ECF No. 54. The defendant brazenly stole millions of dollars of bitcoin that he knew were subject to forfeiture in the case of *United States v. Larry Harmon*, 19-cr-395 (BAH). He did this knowing the funds were the alleged proceeds of his brother's criminal cryptocurrency mixer, Helix, which serviced darknet narcotics traffickers. He did this knowing that those funds were subject to seizure and forfeiture in that case. He did this after personally attending multiple court hearings where the government explained the technical challenges it had encountered while seizing the Helix proceeds

and raised concerns that someone could unlawfully access the cryptocurrency at issue and transfer it beyond the government's reach.    And he opted to keep the misappropriated funds after this Court strongly admonished his brother regarding the missing assets.    Furthermore, after stealing the funds, the defendant engaged in a sophisticated scheme to launder the proceeds and profit from the theft.

### A.  Helix

The funds at issue were the criminal proceeds of the defendant's brother, Larry Harmon, who operated Helix, a darknet cryptocurrency mixing service.    Helix allowed customers, for a fee, to send bitcoin to designated recipients in a manner which was designed to conceal and obfuscate the source or owner of the bitcoin.    Helix laundered at least 354,468 bitcoin—the equivalent of approximately $311 million in U.S. dollars at the time of the transactions—on behalf of its customers, many of whom were connected to darknet markets selling illegal goods and services.    Helix charged a fee of approximately 2.5 percent per transaction, generating significant proceeds for Larry Harmon.    Through blockchain analysis, law enforcement identified 16 bitcoin wallets which contained approximately 4,877 bitcoin traced to Helix.

On December 3, 2019, a federal grand jury in the District of Columbia returned a sealed indictment charging Larry Harmon with Conspiracy To Launder Monetary Instruments, in violation of 18 U.S.C. § 1956(h); Operating an Unlicensed Money Transmitting Business, in violation of 18 U.S.C. § 1960(a); and Money Transmission Without a License, in violation of D.C. Code § 26-1023(c).    The indictment included a forfeiture allegation, which asserted that all proceeds of and property involved in Harmon's operation of Helix were subject to forfeiture in the District of Columbia.    Larry Harmon was arrested on February 6, 2020.    During searches

contemporaneous with the arrest, agents seized several cryptocurrency storage devices, including a Trezor hardware wallet ("Trezor One").



*Trezor One hardware wallet*

Trezor One contained the 16 bitcoin wallets identified by the government.    However, Larry Harmon had secured the funds using the "passphrase" functionality of the device.    Because the government did not have the passphrases, it could not access and transfer the funds contained on Trezor One.    *See United States v. Larry Harmon*, 19-cr-395 (BAH), ECF No. 22-1 (Decl. in Support of Gov't Mot. for Emergency Status Hearing) (Apr. 26, 2020).

The defendant personally attended his brother's detention hearing in the Northern District of Ohio on February 11, 2020.    At that hearing, IRS Special Agent Jeremiah Haynie testified that the information needed to access bitcoin can be copied in more than one place, including storage on multiple hardware devices, and storage in the form of cryptographic "seed keys"—which can be written down or even memorized. 2/11/20 Tr. at 37:13-38:8.    On cross-examination, Agent Haynie confirmed that Harmon "could also have copies of those Trezors or those hardware wallets with family, friends, places that we didn't search." *Id.* at 65:21-23.    Agent Haynie also stated that

it was likely Harmon had additional cryptocurrency storage devices that the government had not yet recovered.

On March 13, 2020, the defendant personally attended his brother's detention appeal in the U.S. District Court for the District of Columbia.   At the hearing, the government reiterated that the government still had not been able to secure the contents of seized Trezor devices.   The court ultimately ordered Larry Harmon released, with a prohibition on any cryptocurrency transactions: "NO CRYPTO-CURRENCY TRANSACTIONS TO BE CONDUCTED BY DEFENDANT." *United States v. Larry Harmon*, 19-cr-395 (BAH), ECF No. 20 (Order Setting Conditions of Release), at 2.

**B. Transfers**

After Larry Harmon was released, the defendant gained access to Larry Harmon's credentials for the wallets contained on the Trezor.   In April 2020, the defendant used those credentials to recreate eight of those wallets.   Between on or about April 19, 2020, and on or about April 24, 2020, the defendant transferred the contents of those eight wallets into new, previously unknown bitcoin wallets.   In total, the defendant transferred approximately 712.6003 bitcoin, worth approximately $4,881,532.40 at the time of the transactions.   Those transactions were visible to the government on the public blockchain.

According to text messages subsequently recovered from the defendant's phone, he messaged an associate on or about April 22, 2020—in the midst of these transfers—with the message, "Drunk and moved way to much."   The associate expressed concern about the defendant driving while intoxicated.   The defendant responded that he would not do so, adding, "I'm the only one with the passphrass."

4

From: ██████████ Me (owner)
Timestamp: 4/22/2020 12:47:05 AM(UTC+0)
Source App: Native Messages
Body:
Drunk and moved way to much …
----------------------------
From: ██████████ Me (owner)
Timestamp: 4/22/2020 12:47:11 AM(UTC+0)
Source App: Native Messages
Body:
Yep shut up
----------------------------
From: ██████████ Me (owner)
Timestamp: 4/22/2020 12:47:18 AM(UTC+0)
Source App: Native Messages
Body:
We'll talk later
----------------------------

From: ██████████
Timestamp: 4/22/2020 12:47:45
AM(UTC+0)
Source App: Native Messages
Body:
You better not drive drunk
----------------------------
From: ██████████ Me (owner)
Timestamp: 4/22/2020 12:48:25
AM(UTC+0)
Source App: Native Messages
Body:
I won't and hop to god I won't I'm the only
one with the passphrass

*Text messages recovered from defendant's phone*

Mistakenly believing that the transfers had been conducted by Larry Harmon, the government filed a Motion for an Emergency Status Hearing On the Defendant's Conditions of Release and Restraining Order to Preserve Cryptocurrency Assets for Forfeiture.  *See United States v. Larry Harmon*, 19-cr-395 (BAH), ECF No. 22 (Gov't Mot. for Emergency Status Hearing).  The government noted the movement of funds and stated its belief that "either [Larry] Harmon or a close associate acting at his direction are moving illicit proceeds from Helix in an attempt to further conceal the proceeds from the government."  *See id.*, ECF No. 22-1 (Decl. in Support of Gov't Mot. for Emergency Status Hearing).  Faced with the possibility of detention, Larry Harmon agreed to transfer the funds in the remaining eight wallets—4,168.9815353 bitcoin, worth approximately $40 million at the time—to the government for the duration of the criminal proceedings.  However, the 712.6003 bitcoin previously transferred by the defendant remained outstanding.

5

### C.  Laundering and Spending

The defendant proceeded to launder the stolen bitcoin, including through two bitcoin mixing services, Wasabi Wallet and ChipMixer.   According to text messages recovered from the defendant's phone, he contacted an associate on or about June 13, 2020 to discuss bitcoin wallets and specifically asked about "coin jam"—an apparent reference to the bitcoin mixing protocol known as "CoinJoin"—in response to which the associate recommended Wasabi Wallet.   Gary then asked whether Wasabi Wallet would keep "[n]o logs."



*Text messages recovered from defendant's phone*

Beginning in or about August 2020, federal agents monitoring the public blockchain began observing numerous small transfers of bitcoin out of the eight wallets holding the stolen funds and into Wasabi Wallet and ChipMixer.   *See* ECF No. 10 (Gov. Det'n Memo) at 10.   Between August 18, 2020 through on or about March 30, 2021, the defendant moved at least 518.98 BTC through Wasabi Wallet and ChipMixer.

During this time, the defendant's financial situation began a dramatic transformation. Bank records showed that in late 2020 and early 2021, the defendant began making thousands of dollars in cash deposits into his bank account, consistent with peer-to-peer sales of bitcoin for cash. On January 12, 2021, the defendant deposited a $52,000 check with the memo line indicating, "crypto."   He used those funds to purchase a 2018 Audi S5 automobile.

On January 30, 2021, the defendant opened an account at the virtual currency exchange Bittrex using a ProtonMail email address.   ProtonMail is an end-to-end encrypted email service based in Switzerland which markets itself as a "privacy" service and advertises that it does not collect any personal information or user IP logs.   Over a 4-day period in early February, the defendant deposited approximately 26.55 bitcoin—worth nearly $1 million at the time—into the account; shortly thereafter, he converted the majority of funds to Dogecoin, an alternative cryptocurrency.

On March 25, 2021, the defendant deposited approximately 67.62 bitcoin—worth approximately $3.5 million at the time—into an account at the cryptocurrency finance company BlockFi.   The defendant used the bulk of those funds as "loan collateral" for a $1.2 million cash loan, which he used to purchase a luxury condominium.   The defendant purchased a luxury Swiss "Bitcoin" watch.   The defendant also used the funds to commission custom work on a Lamborghini, though the car was not completed prior to the defendant's arrest.



*Chronoswiss Bitcoin watch seized from defendant's residence*



From: ▆▆▆▆▆▆▆ Gary Harmon
(owner)
Timestamp: 6/16/2021 1:37:11 PM(UTC-4)
Source App: Native Messages
Body:
This for the 5% down payment correct ?
-----------------------------
From: ▆▆▆▆▆▆▆
Timestamp: 6/16/2021 1:38:44 PM(UTC-4)
Source App: Native Messages
Body:
Yes so $30,000

*Image and text messages recovered from defendant's phone*

The defendant spent bitcoin extravagantly at nightclubs.   On one weekend in June 2021 at a Miami nightclub known for accepting bitcoin, the defendant saved a note to his phone indicating that he spent $25,000 to rent a "whale room" from 2 a.m. through 7 a.m., paying over $15,000 on a "dancer fee" and purchasing over $100,000 in single-dollar bills.   Text messages between the defendant and employees of the club from that weekend suggest the total expenditure may have in fact been significantly higher.



*Image recovered from defendant's phone*



*Photograph of text message recovered from defendant's phone*

The defendant then expressed concern in a text message to an associate that his extravagant spending would "bring to much heat to me."



From: ▓▓▓▓▓Gary Harmon (owner)
Timestamp: 6/14/2021 3:51:10 AM(UTC+0)
Source App: Native Messages
Body:
Anxiety just went thru the rough
---------------------------
From: ▓▓▓▓▓▓▓▓▓
Timestamp: 6/14/2021 3:51:21 AM(UTC+0)
Source App: Native Messages
Body:
About what?
---------------------------
From: ▓▓▓▓▓Gary Harmon (owner)
Timestamp: 6/14/2021 3:51:41 AM(UTC+0)
Source App: Native Messages
Body:
Just blowing money bring to much heat to me

*Text messages recovered from defendant's phone*

### D. Procedural History

The defendant was indicted on June 28, 2021, on 10 counts: eight counts of Money Laundering, in violation of 18 U.S.C. § 1956; one count of Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2); and one count of Removal of Property To Prevent Seizure, in violation of 18 U.S.C. § 2232(a).   The defendant was arrested on July 28, 2021, in the Northern District of Ohio, and appeared in the District of Columbia on August 13, 2021.

On March 18, 2022, the government extended a plea offer to the defendant, which was contingent on the defendant returning the stolen funds.   Due to changes in the defendant's assigned federal public defender, the government agreed to keep the offer open until July 1, 2022. The defense engaged with the government regarding alternative terms for a resolution, but the

parties were at that time unable to reach an agreement and the plea offer expired on July 1, 2022. In August and September, defense counsel engaged with the government regarding the possibility of re-opening the plea negotiations.    On October 5, 2022, the government extended a plea offer to the defendant with substantially similar terms to the original March 18, 2022 plea offer.    In November 2022, as a condition of the plea and under the protection of a proffer agreement, the defendant shared information with the government that assisted the government in recovering a significant portion of the stolen bitcoin.    On December 22, 2022, the parties appeared for a plea hearing; after a mid-hearing issue arose regarding the potential applicability of an obstruction enhancement, the hearing was continued until January 6, 2023, whereupon the defendant entered a guilty plea.

## II.  SENTENCING CALCULATION

### A.  Statutory Maximums and Mandatory Minimums

**Wire Fraud (Count One):**    A violation of Wire Fraud, in violation of 18 U.S.C. § 1343, carries a maximum sentence of 20 years of imprisonment; a fine of $250,000 or twice the pecuniary gain or loss of the offense, pursuant to 18 U.S.C. § 3571(b)(2)-(3); a term of supervised release of not more than three years, pursuant to 18 U.S.C. § 3583(b)(2); mandatory restitution under 18 U.S.C. § 3663A; and an obligation to pay any applicable interest or penalties on fines and restitution not timely made.

**Obstruction of an Official Proceeding (Count Two):**    A violation of Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2), carries a maximum sentence of 20 years of imprisonment; a fine of $250,000 or twice the pecuniary gain or loss of the offense, pursuant to 18 U.S.C. § 3571(b)(2)-(3); a term of supervised release of not more than five years,

pursuant to 18 U.S.C. § 3583(b)(1); mandatory restitution under 18 U.S.C. § 3663A; and an obligation to pay any applicable interest or penalties on fines and restitution not timely made.

The Court must also impose a $100 special assessment under 18 U.S.C. § 3013. Additionally, U.S.S.G. § 5E1.2 indicates that the Court may impose a fine that is sufficient to pay the federal government the costs of any imprisonment, term of supervised release, and period of probation.

### B. Sentencing Guidelines Calculation

### 1. Plea Agreement Calculation

Under the plea agreements in this case, the parties agreed to an offense level of at least 25 for Count One (Wire Fraud), with the government noting its intention to seek a two-point sophisticated means enhancement that would place the offense level at 27. The parties also agreed to an offense level of 17 for Count Two (Obstruction).

Count One: Wire Fraud, 18 U.S.C. § 1343

| | | |
|---|---|---|
| U.S.S.G. § 2B1.1(a)(1) | Base offense level | 7 |
| U.S.S.G. § 2B1.1(b)(1)(J) | More than $3,500,000 | +18 |
| *U.S.S.G. § 2B1.1(b)(10)* | *Sophisticated means\** | *+2\** |
| | Offense level | 27\* or 25 |
| | | |
| U.S.S.G. § 3E1.1 | Acceptance of responsibility | -3 |
| | **Adjusted offense level** | **24\* or 22** |

\*As noted in the plea agreement, the government is seeking a 2-point upward adjustment in offense level for sophisticated means pursuant to U.S.S.G. § 2B1.1(b)(10). The defendant reserved the right to oppose this enhancement.

Count Two: Obstruction of an Official Proceeding, 18 U.S.C. § 1512(c)(2)

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Base offense level | 14 |
| U.S.S.G. § 2J1.2(b)(2) | Substantial interference with administration of justice | +3 |
| | Offense level | 17 |
| U.S.S.G. § 3E1.1 | Acceptance of Responsibility | -3 |
| | **Adjusted offense level** | **14** |

Pursuant to U.S.S.G. § 3D1.2(a), Counts One and Two are grouped together because they "involve the same victim and the same act or transaction," and the applicable offense level is that of the most serious count, Count One, for a resulting offense level of 24 (under the Government's calculation) or 22 (under the Defense calculation). The defendant is in Criminal History Category I.

The Guidelines range under the government's calculation of an adjusted offense level of 24 is **51-63 months**. The Guidelines range under the defense's alternative calculation of an offense level of 22 is **41-51 months**.

### 2.  PSR Calculation

The Presentence Investigation Report (PSR) applied the two-point sophisticated means enhancement under §2B1.1(b)(1)(C), as well as a two-point enhancement for obstruction of justice pursuant to U.S.S.G. § 3C1.1. The resulting guideline calculation for the wire fraud count was as follows:

Count One: Wire Fraud, 18 U.S.C. § 1343

| U.S.S.G. § 2B1.1(a)(1) | Base offense level | 7 |
|---|---|---|
| U.S.S.G. § 2B1.1(b)(1)(J) | More than $3,500,000 | +18 |
| U.S.S.G. § 2B1.1(b)(10) | Sophisticated means* | +2 |
| U.S.S.G. § 3C1.1 | Obstruction of justice | +2 |
| | Offense level | 29 |
| | | |
| U.S.S.G. § 3E1.1 | Acceptance of responsibility | -3 |
| | **Adjusted offense level** | **26** |

The PSR grouped the counts under § 3D1.2(c), citing Application Note 3 to § 2J1.2 and Application Note 8 to § 3C1.1.  *See* PSR ¶ 59.  As with the Plea Agreement calculation, the PSR calculation applied the offense level for the count with the highest offense level, Count One (Wire Fraud), to the group.

Using the PSR calculation of an offense level of 26 and the defendant's Criminal History Category I, the Guidelines sentencing range would be **63-78 months**.

### 3. Disputed Enhancements

#### i. Sophisticated Means Enhancement

The government agrees with the PSR writer's application of the sophisticated means enhancement.   The sophisticated means enhancement is properly applied where there is "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense."   U.S.S.G. § 2B1.1 Application Note 9.   The Application Note offers several examples of what could constitute "sophisticated means," including operating a telemarking scheme across multiple jurisdictions, or hiding assets or transactions through fictitious entities, corporate shells, or offshore financial accounts.   *Id.*   Though the use of cryptocurrency, mixers, Tor, and other more recent technological advancements is not specifically addressed in the Application Note, the list is non-exhaustive.   *See United States v. Holland,* No. 21-13968, 2023

14

U.S. App. LEXIS 213, at *26 (11th Cir. Jan. 5, 2023) (unpublished) ("But the application notes do not contain an exhaustive list of the ways a defendant can use sophisticated means to conceal a crime.").

The defendant's actions are notably more sophisticated than the examples set forth in the Application Note.   The defendant used his brother's recovery seeds and passphrase in order to access the funds in his brother's wallets.   As detailed in the Indictment originally charging the defendant, ECF 1, Larry Harmon secured his funds on a Trezor-brand hardware wallet, a specialized electronic storage device designed to securely hold cryptocurrency.   Trezor wallets, like many cryptocurrency wallets, employ a hierarchical deterministic, or "HD," key generation. HD wallets rely on a master seed, from which an infinite number of private keys can be generated; this allows users to back up their full wallets using a single seed.   The seeds are commonly represented as lists of 12 or 24 words, known as seed phrases or recovery phrases.   A user setting up a new Trezor device will generate a seed phrase associated with the newly generated wallet on that device.   For enhanced security, Trezor allows users to set up "hidden wallets," which can be accessed through the use of a passphrase—often referred to as a "thirteenth word" or a "seed extension."   Each passphrase is associated with a new wallet that is built on top of the base recovery seed.   That is, using the 12-word seed phrase would create Wallet A, but using the same 12-word seed plus the passphrase "X" would create Wallet B, and using the same 12-word seed plus the passphrase "Y" would create Wallet C.   This was how Larry Harmon secured his cryptocurrency.   And while the government was initially able to access the Trezor and the contents of Wallet A, without the passphrases it was unable to access the bulk of the Helix proceeds which were in other wallets.   The defendant did not need to have a Ph.D.-level understanding of the cryptography and processes behind the key generation and seed hierarchy to commit his

scheme, but he needed to have a sufficient grounding in the core concepts to be able to do what the government at the time could not, despite expending significant efforts and resources: access the funds and move them to new wallets.

In order to access the funds in the Helix wallets, the defendant first had to reconstitute his brother's hidden wallets using the seed phrase and the passphrase.   This required the defendant to set up a compatible wallet and use this software to reconstitute his brother's wallets.   The defendant furthermore needed to set up new wallets and generate receiving addresses to receive the transferred cryptocurrency.   The defendant then needed to initiate and announce transactions to transfer the cryptocurrency from his brother's addresses—which the government was still trying to access—to his newly created addresses.   He then needed to secure the funds in the new addresses.   Using his knowledge of cryptocurrency gained from working from his brother's company and significant research, the defendant was able to successfully move and secure the cryptocurrency.

In the defense objections to the PSR, the defense contends: "The conduct Mr. Harmon engaged in to gain access to the bitcoin was not sophisticated.   He used seed phrases (a series of words that serve as a password) to obtain access to bitcoin.   While the conduct was certainly illegal, it is practically no different and no more sophisticated than obtaining a key to a safe deposit box and taking the contents of that box."   PSR at 35.   The defense understates the sophistication of using seed phrases to reconstitute a cryptocurrency wallet and surreptitiously transfer funds to a new wallet.   While physical world analogies often fall short when describing cyber incidents, the defendant's conduct is more analogous to using powerful tools to silently tunnel into a bank vault from a neighboring building and siphon out all of the funds while law enforcement was futilely trying to unlock the bank's front door.

16

To be sure, technology placed highly sophisticated tools at the defendant's fingertips that assisted him in transferring the funds, but this does not negate the sophistication of the scheme. Indeed, this is a more extreme version of the "sophisticated equipment . . . used in sophisticated ways," that this District found significant in considering the application of the sophisticated means enhancement in *United States v. McCants*, No. 02-0130 (JGP), 2006 U.S. Dist. LEXIS 78409, at *38 (D.D.C. Oct. 27, 2006), *aff'd in part, vacated on other grounds by United States v. McCants*, 554 F.3d 155, 163 (D.C. Cir. 2009).   In *McCants*, the sentencing court applied the sophisticated means enhancement to a defendant convicted of production of false identification documents, in violation of 18 U.S.C. § 1028(a)(5), where the defendant possessed device-making equipment and used multiple office locations to conduct his fraud.  *Id.* at *37-38.  The court also rejected the defendant's argument that "all [he] did was use [the equipment] as intended by the manufacturers," finding to the contrary that even knowing how to use the device-making equipment reflected "sophisticated skill."  *Id.* at 38-39.  Similarly, in this case, Mr. Harmon's knowledge and use of seed phrases and cryptocurrency wallets reflects especially complex and sophisticated conduct.

Furthermore, application of the sophisticated means enhancement does not require that the defendant have engaged in the most sophisticated scheme possible.  *See McCants*, 554 F.3d at 163 (affirming two-level sophisticated means enhancement by sentencing court while stating, "[t]hat we can imagine scenarios involving more elaborate means to avoid detection or conviction does not render the district court's resolution of the question invalid").   In considering the application of the sophisticated means enhancement under § 2T1.1—which applies specifically to tax offenses but uses virtually identical wording, defining sophistication to mean "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense," such as "hiding assets or transactions, or both, through the use of fictitious entities,

17

corporate shells, or offshore financial accounts ordinarily indicates sophisticated means," U.S.S.G. § 2T1.1, Application Note 4—other courts have similarly noted that the bar for "sophisticated means" is simply more sophisticated than average.   *See, e.g.*, *United States v. Lewis*, 93 F.3d 1075, 1082 (2d Cir. 1996) (affirming sophisticated means enhancement where, "[e]ven though this tax-evasion scheme cannot be described as singularly or uniquely sophisticated, it is more complex than the routine tax-evasion case"); *United States v. Jennings*, 711 F.3d 1144, 1147-48 (9th Cir. 2013) (affirming sophisticated means enhancement where defendant disguised funds through payment to a business account using the defendant's true name but a misleading corporate name); *United States v. O'Doherty*, 643 F.3d 209, 220 (7th Cir. 2011) (affirming sophisticated means enhancement based on defendant's use of corporations to avoid reporting direct income, noting that "conduct less sophisticated than the exemplary list provided in the application note may still warrant application of the enhancement"); *United States v. Fife*, 471 F.3d 750, 754 (7th Cir. 2006) (affirming sophisticated means enhancement and explaining that "[t]he sophisticated means enhancement does not require a brilliant scheme, just one that displays a greater level of planning or concealment than the usual tax evasion case").

Furthermore, the defense in its objection to the PSR does not directly address the sophistication involved in *concealing* the offense, which under the Guidelines is an appropriate basis for applying the sophisticated means enhancement in addition to any sophistication in the *execution* of the offense.   *See* U.S.S.G. § 2B1.1 Application Note 9 (sophisticated means may pertain to "the execution or concealment of an offense").   As explained above, the defendant did not spend the funds directly from the wallets he created when initially stealing the funds.   Rather, he went to considerable lengths to attempt to "clean" the funds before using them on personal purchases.   He exercised considerable and calculated restraint, allowing the funds to remain

18

dormant in the addresses to which he first transferred them for months.   During this period, the defendant continued living frugally in a shared apartment, despite having access to millions of dollars of cryptocurrency.   Presumably recognizing that spending large amounts of cryptocurrency too soon would draw unwanted attention, the defendant waited nearly four months before beginning to move the funds to addresses from which he would eventually spend them. And even then, he was slow and calculating in his movements, cleaning the funds over time before spending them.   He began using an encrypted ProtonMail email service.   And he engaged in additional laundering of the illicit bitcoin proceeds—such as exchanging bitcoin for Dogecoin, selling the bitcoin for cash, and using his bitcoin as pseudo-collateral for a cash loan to purchase luxury real estate (severing any direct link between the illegal bitcoin and the funds used to purchase the luxury asset).

As one significant example, the defendant used the cryptocurrency mixing services Wasabi Wallet and Chipmixer in order to distance his own spending from the stolen funds and conceal his involvement in the wire fraud.   In the case of ChipMixer, a custodial mixer, the defendant sent his funds to a third-party service to launder the funds and then remit them to new addresses set up by the defendant, in an effort to break the link of the transactions on the blockchain.   The defendant thus had to set up multiple cryptocurrency addresses for use in his scheme, and manage the flow of funds to avoid inadvertently linking his pre-mixed funds to his post-mixed funds.   The effect is comparable to running funds through multiple bank accounts not tied to the defendant's true name, similar to the conduct envisioned in the Application Note for the sophisticated means enhancement.   *See* U.S.S.G. § 2B1.1 Application Note 9.   At the time the defendant laundered the funds, ChipMixer operated primarily as a Tor hidden service and was regarded as a go-to platform for sophisticated criminals and nation-state actors seeking to launder large amounts of

cryptocurrency.   The ChipMixer website has since been subsequently seized in a separate law enforcement operation and the mixer operator charged with money laundering and operating an unlicensed money transmitting business.   *See United States v. Minh Quoc Nguyen*, No. 23-mj-528 (E.D. Pa. Mar. 14, 2023), ECF No. 1 (Criminal Compl.).   In using ChipMixer, the defendant selected a mixer with an infamous clientele, as the service was also used to launder the proceeds of numerous ransomware variants, cryptocurrency stolen by North Korean cyber actors, and purchases by the Russian General Staff Main Intelligence Directorate (GRU).   *See id.*   The defendant's use of this technologically advanced laundering service supports the application of the sophisticated means enhancement.   *Cf. United States v. Igboba*, 964 F.3d 501, 511 (6th Cir. 2020) (upholding application of a sophisticated means enhancement where the defendant used Tor and the darknet, rejecting defense arguments that the offense was not sophisticated because the defendant "relied on software and internet procedures available to the general public."); *United States v. Ealy*, 682 F. App'x 432, 438 (6th Cir. 2017) (upholding the application of the sophisticated means enhancement where a defendant used a VPN and purchased identity information through an 'anonymous' electronic 'black market financial network.'").

Finally, this Court should consider the sophistication of the defendant's overall scheme, rather than any single act.   "In assessing whether sophisticated means were used, a court is to consider the totality of the scheme." *United States v. Beverley*, 775 F. App'x 468, 476 (11th Cir. 2019) (unpublished) (cleaned up) (applying enhancement where defendant routed financial payments out of escrow accounts to conceal the payments as legitimate business expenses).   "The sophisticated-means enhancement applies where the entirety of a scheme constitutes sophisticated means, even if every individual action is not sophisticated." *United States v. White*, 850 F.3d 667, 675 (4th Cir. 2017) (internal quotations omitted).   "A sentencing court should consider the

cumulative impact of the criminal conduct, for the total scheme may be sophisticated in the way all the steps were linked together." *United States v. Jinwright*, 683 F.3d 471, 486 (4th Cir. 2012) (cleaned up) (applying sophisticated means enhancement under 2T1.1).   Here, each step in the defendant's scheme reflects especially complex and intricate conduct: reconstituting his brother's bitcoin wallets using seed phrase and passphrase functions; generating new wallets from his location in Ohio to receive the stolen funds; initiating transactions to transfer the cryptocurrency from his brother's addresses; allowing the funds to lay dormant for months before incrementally laundering them; using online mixers; converting bitcoin into Dogecoin and engaging in other laundering techniques to camouflage his illicit wealth.   When viewed in its entirety, the defendant's course of conduct is certainly more sophisticated than the average wire fraud scheme.

### ii.   Obstruction Enhancement

The potential application of the 2-point obstruction of justice enhancement pursuant to U.S.S.G. § 3C1.1 was raised in both the PSR and in the defendant's first plea hearing.   As noted in the government's objections to the draft PSR and during the plea hearing, the government has closely reviewed the text of the applicable Guidelines and agrees with defense counsel that the 2-point adjustment for obstruction of justice under U.S.S.G. §3C1.1 should not apply to this case. The obstruction enhancement applies where the defendant obstructed or impeded the administration of justice "with respect to the investigation, prosecution, or sentencing of the instant offense of conviction."   U.S.S.G. § 3C1.1.   As applied to the defendant, the enhancement would apply if defendant attempted to obstruct the investigation of his *own* offense—*i.e.*, the wire fraud committed when he fraudulently removed 712.6003 BTC from the Trezor storage device that had been seized by law enforcement in connection with the prosecution of the defendant's brother, Larry Harmon.   Rather, as described in the Statement of Offense (ECF No. 46, ¶¶ 30-31) and the

final PSR (¶¶ 45-47), the defendant's obstructive conduct was principally aimed at a separate proceeding, the ongoing criminal prosecution and criminal forfeiture proceeding against Larry Harmon.   Accordingly, the defendant did not obstruct "the investigation, prosecution, or sentencing *of the instant offense of conviction*."   U.S.S.G. § 3C1.1 (emphasis added).   While the defendant did tell agents in a voluntary interview pre-arrest that he had flushed a thumb drive containing partial seed phrases down a toilet, *see* ECF No. 41 (Superseding Information), ¶ 18(d), this statement did not have any impact on the government's investigation.

This approach to the obstruction enhancement is consistent with the government's view that the +3 enhancement under U.S.S.G. § 2J1.2(b)(2) applies to Count Two for substantial interference with the administration of justice.   Among other things, the defendant's theft of the 712.6003 BTC caused suspicion to fall on his brother, Larry Harmon, who had recently been released from pretrial detention, and prompted the government's request for an emergency status hearing related to Larry Harmon's compliance with his conditions of release.   The theft also resulted in the loss of 712.6003 BTC from the pool of forfeitable assets in the criminal forfeiture proceeding in Larry Harmon's case.   These harms are all related to the second proceeding—the Larry Harmon prosecution—and not to the defendant's wire fraud scheme.

As the Sentencing Commission has recognized: "Some offenses that may be charged in multiple-count indictments are so closely intertwined with other offenses that conviction for them ordinarily would not warrant increasing the guideline range.   For example, embezzling money from a bank and falsifying the related records, although legally distinct offenses, represent essentially the same type of wrongful conduct with the same ultimate harm, so that it would be more appropriate to treat them as a single offense for purposes of sentencing."   U.S.S.G. Ch. 3, Part D, Introductory Cmt.; *see also United States v. Need*, 262 F.3d 85, 91 (1st Cir. 2001)

("Another objective of the guidelines' grouping rules is to limit the effect of prosecutorial choices in the design of the indictment which, by charging multiple offenses intend to exact (or threaten) greater punishment but which, nevertheless, may be fairly characterized with fewer counts and thus punishable by a less severe sentence."). The same principle applies here. The defendant's wire fraud and obstruction schemes, though encompassing legally distinct elements, are based on the same wrongful conduct—stealing the 712.6003 BTC from Trezor storage device seized in the Larry Harmon case. Accordingly, under the grouping rules, the defendant's wire fraud and obstruction offenses should be grouped under § 3D1.2(a) because the two counts "involve the same victim and the same act or transaction."

The PSR's analysis appears to be based on the assumption that the obstruction count should be viewed as an aggravating factor in the defendant's wire fraud scheme. Thus, the PSR cites Application Note 3 to § 2J1.2, which applies where the defendant is convicted of obstruction as well as a second, "underlying" offense "that is the *object* of the obstruction" (emphasis added); and to Application Note 8 to § 3C1.1, which applies where the defendant is convicted of obstruction as well as a second, "underlying" offense that is "the offense with respect to which the obstructive conduct occurred." But these application notes do not apply because, as noted above, the defendant's conduct resulted in the obstruction of a different proceeding—the prosecution of the defendant's brother, Larry Harmon, and associated criminal forfeiture proceedings—rather than obstruction related to his wire fraud scheme. Further, because these application notes do not apply, they do not compel grouping under § 3D1.2(c) as opposed to § 3D1.2(a).

23

## III.  <u>SENTENCING RECOMMENDATION</u>

### A.  Sentencing Factors

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the Sentencing Guidelines are no longer mandatory.   However, the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and "should be the starting point and the initial benchmark" in determining a defendant's sentence. *United States v. Gall*, 552 U.S. 38, 46, 49 (2007). Accordingly, this Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."   *Id.* at 49.

Next, the Court should consider all of the applicable factors set forth in 18 U.S.C. § 3553(a).   *Id.* at 49-50.   The Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in § 3553(a).   *United States v. Rita*, 551 U.S. 338, 347-351 (2007).   The § 3553(a) factors include, *inter alia*:   (1) the nature and circumstances of the offense and the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (2) the history and characteristics of the defendant; (3) the need for the sentence imposed to afford adequate deterrence to criminal conduct and protect the public from further crimes of the defendant; (4) and the need to avoid unwarranted sentence disparities.   *See* 18 U.S.C. § 3553(a)(1)-(7).

### B.  Sentencing Recommendation

The government recommends that the Court sentence the defendant to at least the middle of the Guidelines range of 51 to 63 months.   Such a sentence would reflect the seriousness of the

defendant's conduct, promote respect for the law, and afford specific and general deterrence, and would be reasonable and appropriate in light of the factors set forth in 18 U.S.C. § 3553(a).

The defendant's Guidelines range under the plea agreement is substantially lower than what he would have faced if he had gone to trial on the original ten-count indictment.   As the government noted in its detention memorandum, ECF No. 10 at 18-19, the government estimated that the defendant could have faced up to 235 months of imprisonment if he had been convicted at trial, given the dollar value of the multiple money laundering counts.   The government was confident in its evidence and the strong likelihood of success at trial, but nonetheless sought to keep the plea open with favorable terms for the defendant.   This highly favorable plea reflected the government's consideration of the 18 U.S.C. § 3553(a) factors in attempting to craft an appropriate resolution, as well as the defendant's assistance in recovering the stolen funds.

    **1.   The Nature and Circumstances of the Offense, and the Need for the Sentence To Reflect the Seriousness of the Offense, To Promote Respect for the Law, and To Provide Just Punishment;**

As detailed above, the defendant's crimes were serious and significant, and they demonstrated a brazen disregard for the authority of this Court.   The defendant sat in the gallery of not one but two extended court hearings in which the Court, the government, and his brother's defense counsel discussed at length the issues surrounding the possible transfer of cryptocurrency from the Helix wallets.   The hearing in this Court included specific discussion about Trezor devices, seed recovery phrases, and hidden wallets. *See* 3/13/20 Tr. at 17-19, 22-23. Counsel for the government stated: "These are illegal proceeds from Helix, and we have not been able to secure those assets. Until we can secure them and transfer them to a government wallet, those are available for [Larry Harmon] or his family members to transfer them . . . ."   *Id.* at 19.   The defendant

understood the serious attention being given to the issue of securing the funds contained on the Trezor seized from his brother.

The defendant's actions in this case cannot be dismissed as a momentary lapse of judgment or a crime of opportunity.  The theft of the cryptocurrency itself required planning and sophisticated execution, and the defendant did not stop there.   The defendant sat on the cryptocurrency for months, with ample time to return the funds—whether by coming clean to the government directly, relaying the funds through his brother or his brother's attorney, or by anonymously remitting the assets to the government.   Instead, when government agents interviewed the defendant regarding the missing funds, he told them, "if I took it, why wouldn't I take it all," and stated that he received a thumb drive from his brother containing partial recovery seed phrases and had flushed the thumb drive down a toilet.   ECF No. 10, at 9-10.   He proceeded to launder the funds through two different bitcoin mixing platforms, and then burn through the funds by, among other exploits, "making it rain" at adult entertainment venues, submerging himself in a bathtub full of cash, and commissioning a custom Lamborghini.

That said, the defendant has assisted the government in recovering the outstanding cryptocurrency assets which were stolen and had not been spent.   This includes approximately 417.3903 bitcoin that were seized after the defendant spoke with law enforcement in late 2022. The defendant's decision to assist law enforcement in recovering the stolen assets is significant and should be weighed in the defendant's favor when applying the 3553(a) factors to a sentencing calculation.   The government also noticed a positive change in the defendant's demeanor in his interactions with the government surrounding the transfer of funds in comparison to earlier interactions during his brother's case.

On balance, the nature and circumstances of the defendant's crimes and the need to promote respect for the law supports a serious term of imprisonment within the Guidelines range.

### 2.   The History and Characteristics of the Defendant

The defendant has no prior criminal history and, ill-advised personal drug abuse aside, appears to have been a largely law-abiding citizen prior to involvement in his brother's case. According to the PSR, the defendant is "skilled in computer programming, coding, Java Script, and website design," though he did not complete college due to his self-reported focus on social activities over academics.   PSR ¶¶ 114-117.   The defendant also had the benefit of family involvement and support prior to the offense.   This makes the defendant's decisions here all the more unfortunate—while his personal situation was not without challenges, he had many doors open to him and did not have to follow his brother's unexpected path to becoming a convicted felon.

Although the government is not aware of any mitigating circumstances, the defendant's lack of prior criminal history and acceptance of responsibility, including his cooperation in recovering the stolen funds, should weigh in his favor.

### 3.   The Need for the Sentence To Afford Adequate Deterrence; and To Protect the Public from Further Crimes of the Defendant

On the surface, the facts of this case seem unique.   However, the core conduct at issue—transferring cryptocurrency beyond the government's reach during the pendency of a criminal case—is a growing and serious concern.   With the rising use of cryptocurrency in a variety of criminal schemes, including large-dollar frauds, the government is arresting and prosecuting individuals who have amassed significant illicit caches of cryptocurrency.   At the same time, criminals have become highly sophisticated in their methods of securing their cryptocurrency assets: concealing their private keys, secreting their hardware wallets in obscure locations, storing funds on complicit

offshore platforms, and taking advantage of security features such as the Trezor passphrase function at issue in this case, to thwart seizure by law enforcement.   In cases around the country, including in other cases before this Court, defendants are being arrested and arraigned while tens or even hundreds of millions of dollars of funds—often victim funds—remain unsecured.   It is imperative that this Court send a strong message to those defendants, to their co-conspirators, and to unscrupulous associates, that interfering with the government's efforts to secure those funds will lead to serious consequences, including significant jail time.

The sentence imposed in this case should be structured to discourage others from reprising the defendant's theft.   General deterrence is a "crucial factor in sentencing decisions for economic" crimes.   *United States v. Morgan*, No. 13-6025, 635 F. App'x 423, 450 (10th Cir. Nov. 6, 2015) (unpublished).   The legislative history of section 3553 documents Congress's emphasis on general deterrence in white-collar crime.   *See* S. REP. 98-225, 76, 1984 U.S.C.C.A.N. 3182, 3259 (need to deter others is "particularly important in the area of white collar crime").   "Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotations and citation omitted).

A guidelines sentence will also provide specific deterrence for the defendant.   It is noteworthy that the defendant did not have a criminal history prior to this offense.   Immediately after the initial cryptocurrency transfers in April 2020, the defendant appeared to simply hold the cryptocurrency, not moving it for months.   But during that time, the defendant developed an ill-fated plan to conceal the assets from law enforcement, moving the money through cryptocurrency mixers—the same type of service that his brother was arrested for operating.   Once he believed

he was free from government scrutiny, he rapidly descended into an alarming new lifestyle—one with new "friends" who accompanied him on expensive trips centered on ostentatious displays of the defendant's newfound illicit wealth.   While it is unlikely that the defendant will have another opportunity to misappropriate millions of dollars of cryptocurrency, there is unfortunately no shortage of opportunities for would-be fraudsters in the cryptocurrency arena, and a period of incarceration may further disabuse the defendant of any inclination to dishonestly pursue the glamorous life his criminality temporarily afforded.

### 4.  The Need To Avoid Unwarranted Sentencing Disparities

The principal method to avoid unwarranted sentencing disparities is to adhere to the range recommended by the Sentencing Guidelines, which are intended to standardize sentencing practices across federal courts.   *See Gall v. United States*, 552 U.S. 38, 54 (2007) ("Since the District Judge correctly calculated and carefully reviewed the Guidelines range, he necessarily gave significant weight and consideration to the need to avoid unwarranted disparities."); *United States v. Otunyo*, --- F.4th ----, 2023 U.S. App. LEXIS 7650, at 23-24 (D.C. Cir. 2023) ("The best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly.") (quoting *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009)).   The government is unaware of any factually analogous wire fraud or obstruction case involving a similar level of technical sophistication in the theft of millions of dollars' worth of cryptocurrency, or reflecting similar defiance of Court authority in a separate criminal prosecution and forfeiture proceeding.   The government respectfully submits that a sentence within the Guidelines range would appropriately guard against unwarranted sentencing disparities.

### C.   Forfeiture and Restitution

The superseding information alleged the forfeiture of any property, real or personable, which constitutes or is derived from proceeds traceable to Counts One and Two, including a list of specific identified properties.   Such property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).   Pursuant to his plea agreement, the defendant agreed to forfeit such property, and consented ot the entry of a forfeiture money judgment in the amount of $4,881,532.40, which is equal to the value of the bitcoin at the time that it was stolen.   On January 6, 2023, this Court entered a Preliminary Order of Forfeiture, ECF No. 49, including the entry of a forfeiture money judgment in the amount of $4,881,532.40 against the defendant.   Any proceeds from the forfeiture of the specific identified properties will be credited toward the money judgment.

The government is not seeking restitution because the forfeiture order will be sufficient to compensate any victim loss in this case.   Specifically, liquidation of the specific properties listed in the Preliminary Order of Forfeiture is anticipated to net more than the $4,881,532.40 forfeiture money judgment and fully satisfy any loss.   Further, at the time of the defendant's theft, the precise ownership over the stolen bitcoin remained in flux.   The stolen bitcoin represented criminal proceeds of the Helix mixer which had been stored on the Trezor One device, were seized pursuant to a search warrant, and were subject to criminal forfeiture in the *United States v. Larry Harmon* prosecution.   During the pendency of that proceeding, the government had (and continues to have) an ownership interest in the Helix proceeds by virtue of the relation-back doctrine codified at 21 U.S.C. § 853(c), which provides that title to forfeited property "vests in the United States upon the commission of the act giving rise to forfeiture . . . ."   The government's title, however, is not perfected until the completion of the criminal forfeiture process and

30

adjudication of any third-party claims.  *See* 21 U.S.C. § 853(n)(7); *United States v. Moser*, 586 F.3d 1089, 1095 (8th Cir. 2009) ("Still, the government does not possess clear title to the seized property until after the conclusion of § 853(n) proceedings (or until after the posting of notice in the absence of any petitions).").  The subsequent forfeiture proceedings in this case, including notice and adjudication of any possible third-party claims to the specific properties subject to forfeiture, will be sufficient to fully resolve ownership over the stolen funds and (as noted above) compensate any losses.

## CONCLUSION

For the foregoing reasons, the information reflected in the PSR, and the record in this case, the United States respectfully requests that the defendant be sentenced to a period in the middle of the 51-63 month range.   In addition, the United States respectfully requests the entry of the Preliminary Order of Forfeiture and imposition of a forfeiture money judgment in the amount of $4,881,532.40.

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

BY:     */s/ Christopher B. Brown*
        Christopher B. Brown, D.C. Bar No. 1008763
        Assistant United States Attorney
        U.S. Attorney's Office for the District of Columbia
        601 D Street, N.W.
        Washington, D.C. 20530
        (202) 252-7153
        Christopher.Brown6@usdoj.gov

        */s/ C. Alden Pelker*
        C. Alden Pelker, Maryland Bar
        Senior Counsel, U.S. Department of Justice
        Computer Crime & Intellectual Property Section
        1301 New York Ave., N.W., Suite 600
        Washington, D.C. 20005
        (202) 616-5007
        Catherine.Pelker@usdoj.gov

32