**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **No. 21-433-BAH** |
| **v.** | ) | |
| | ) | |
| **GARY JAMES HARMON,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**DEFENDANT'S SENTENCING MEMORANDUM**

Gary Harmon will be before the Court for sentencing on April 27 after accepting responsibility for taking a portion of the cryptocurrency that had been seized for forfeiture by the government as part of its prosecution of his brother Larry Harmon. He has never before been convicted of a crime, but he pled guilty to these felony offenses because he recognizes that his conduct was wrong and that his actions have consequences.  Mr. Harmon has already paid a heavy price for his conduct: He has spent the past 21 months living under unusually harsh conditions at three jails in Ohio, Oklahoma, and Washington, D.C., and at a federal prison in Pennsylvania. He has used this difficult period to think about what led him to engage in this conduct and how he will live his life upon release. Mr. Harmon has also done everything he can to return all proceeds of the theft. He met with prosecutors and agents and helped them to recover the vast majority of the cryptocurrency and he has agreed to forfeit items purchased with the purloined cryptocurrency. Because bitcoin increased in value in the last two years, the returned cryptocurrency is now worth more to the government than the total amount taken from Larry Harmon's wallets at the time of the theft.  Mr. Harmon is trying to right the wrong that brings him before this Court. Following

1

service of this sentence he will return to the law-abiding life he lived prior to this incident.

In this sentencing memorandum the defense will start by addressing two objections to the sentencing guidelines calculation in the Presentence Investigation Report ("PSR"). First, both the government and the defense object to the proposed application of a two-level obstruction enhancement under U.S.S.G. § 3C1.1. Second, the defense objects to application of "sophisticated means" enhancement under § 2B1.1(b)(10)(C). The defense contends that the adjusted offense level is 22 and that the applicable advisory guideline range is 41-51 months. The defense will then address the sentencing factors under 18 U.S.C. § 3553(a) and explain why application of those factors suggests that a sentence of 36 months' incarceration with three years of supervised release to follow is sufficient and not greater than necessary. Finally, the defense will briefly set forth an objection to special conditions of release proposed by United States Probation involving monitoring of computers used by Mr. Harmon.

## PROCEDURAL BACKGROUND

Mr. Harmon was arrested on July 28, 2021 in the Northern District of Ohio. He was detained and has remained in continuous custody since the date of his arrest. On January 6, 2023 Mr. Harmon entered a guilty plea to a two-count Superseding Information charging him with wire fraud in violation of 18 U.S.C. § 1343 and obstruction of an official proceeding in violation of 18 U.S.C. § 1512(c)(2).

## ARGUMENT

### I.   Calculation of the Sentencing Guidelines

The defense contends that the offense level should be calculated under U.S.S.G. § 2B1.1 as follows:

Base Offense Level:                          7

Loss between $3.5 and $9.5 million:  +18

Acceptance of Responsibility:           -3____

**Total Adjusted Offense Level:       22**

Because Mr. Harmon has no prior criminal convictions and thus fits within criminal history category I, the advisory guideline range should be 41-51 months.

United States Probation proposes adding two separate enhancements – one pursuant to § 3C1.1 related to the obstruction count and one pursuant to § 2B1.1(b)(10)(C) related to alleged use of "sophisticated means" – which would increase the total adjusted offense level to 26 and result in an advisory guideline range of 63-78 months. The government and the defense are in agreement about one of these two issues: The parties agree that the § 3C1.1 increase is inapplicable in this case and that the total adjusted offense level should be at most 24, which would result in an advisory guideline range of 51-63 months. The government maintains that the "sophisticated means" enhancement under § 2B1.1(b)(10)(C) should be applied and the plea agreement left that issue open for argument at sentencing. The defense will address each issue in turn.

### A.     The parties agree that the Presentence Investigation Report incorrectly applies a two-level enhancement under U.S.S.G. § 3C1.1

At paragraphs 54, 59, and 65 of the PSR, United States Probation suggests that the two counts of conviction should be grouped pursuant to § 3D1.2(c) and a two-level obstruction increase referenced in U.S.S.G. § 3C1.1 should be applied here. This adjustment was not included in the plea agreement and both the government and the defense agree that it does not apply here. The government will be separately objecting to application of this enhancement.

Section 3C1.1 provides that an increase of two levels should be applied where the obstruction conduct was aimed at obstructing or impeding *the underlying charge in this case*, not

where, as here, a defendant has been convicted of obstructing a *separate prosecution*:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice *with respect to the investigation, prosecution, or sentencing of the instant offense of conviction*, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by **2** levels.

U.S.S.G. § 3C1.1 (emphasis added).  Probation takes the position that the conduct that forms the basis for the obstruction of an official proceeding charge in Count Two warrants a two-level enhancement under § 3C1.1.  Yet the Count Two obstruction conduct does not qualify for that enhancement because the enhancement addresses conduct aimed at obstructing a defendant's own case. Here, the obstruction charge in Count Two is based upon the theory that Mr. Harmon's theft of seized bitcoin obstructed a *different* proceeding – the criminal prosecution and criminal forfeiture proceeding in *United States v. Larry Harmon.* The wire fraud and obstruction schemes charged here are part of the same conduct: taking the 712.6 bitcoin that had been seized as part of Larry Harmon's case.  The Count Two obstruction charge is simply a different way of describing the same conduct charged in Count One rather than an aggravating factor of Count One.

For the same reason, the parties agree that the two counts group under § 3D1.2(a) rather than § 3D1.2(c), as contemplated in the PSR at ¶ 59.  Grouping under § 3D1.2(c) would occur "[w]hen one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts."  U.S.S.G. § 3D1.2(c). As set forth above, Count Two is not a specific offense characteristic in, nor adjustment to, the guideline for Count One.  A close reading of Application Note 8 to § 3C1.1 demonstrates why grouping under § 3D1.2(c) is inappropriate here.  That Application Note reads:

> If the defendant is convicted both of an obstruction offense (*e.g.*, 18 U.S.C. § 3146 (Penalty for failure to appear); 18 U.S.C. § 1621 (Perjury generally)) and an underlying offense (the offense with respect to which the obstructive conduct occurred), the count for the obstruction offense will be grouped with the count for

the underlying offense under subsection (c) of §3D1.2 (Groups of Closely Related Counts). The offense level for that group of closely related counts will be the offense level for the underlying offense increased by the 2-level adjustment specified by this section, or the offense level for the obstruction offense, whichever is greater.

Again, here the underlying offense – the wire fraud count in Count One – is not the offense to which the obstructive conduct charged in Count Two occurred.[1] The obstructive conduct occurred with respect to a separate proceeding: the prosecution and forfeiture proceedings of Larry Harmon. The two charges group under § 3D1.2(a) because, as the government explained in its objection to the draft PSR: "The defendant's wire fraud and obstruction schemes, though encompassing legally distinct elements, are based on the same wrongful conduct – stealing the 712.6003 BTC from Trezor storage device seized in defendant Larry Harmon's case." The two counts "involve the same victim and the same act or transaction," so fit squarely within § 3D1.2(a).

This is consistent with the intent of the Sentencing Commission, articulated in the Introductory Commentary to § 3D:

> Some offenses that may be charged in multiple-count indictments are so closely intertwined with other offenses that conviction for them ordinarily would not warrant increasing the guideline range. For example, embezzling money from a bank and falsifying the related records, although legally distinct offenses, represent essentially the same type of wrongful conduct with the same ultimate harm, so that it would be more appropriate to treat them as a single offense for purposes of sentencing. . . . In order to limit the significance of the formal charging decision and to prevent multiple punishment for substantially identical offense conduct, this Part provides rules for grouping offenses together. Convictions on multiple counts do not result in a sentence enhancement unless they represent additional conduct that is not otherwise accounted for by the guidelines. In essence, counts that are grouped together are treated as constituting a single offense for purposes of the guidelines.

---

[1] In its response to the parties' objections on this point, United States Probation relies on the fact that Application Note 8 applies where a defendant is convicted of both an obstruction offense and an underlying offense. PSR, Addendum. Probation overlooks the parenthetical in Note 8, which makes clear that the "underlying offense" must be the "offense with respect to which the obstructive conduct occurred," rather than any other offense.

U.S.S.G. § 3D, Introductory Commentary.  As the government has acknowledged, the wire fraud and obstruction offenses here are based upon the same offense conduct.  Accordingly, the parties agree that the two-level enhancement should not be applied here.

**B.  The two-level "sophisticated means" enhancement under U.S.S.G. § 2B1.1(b)(10)(C) should not be applied**

The defense objects to application of the two-level sophisticated means enhancement under § 2B1.1(b)(10)(C) because the conduct Mr. Harmon engaged in to gain access to the bitcoin was not sophisticated.  The "sophisticated means" enhancement applies where:  "the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means."  U.S.S.G. § 2B1.1(b)(10)(C).  Application Note 9 to § 2B1.1 provides that:

> For purposes of subsection (b)(10)(C), "***sophisticated means***" means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

U.S.S.G. § 2B1.1, Application Note 9.  Mr. Harmon's conduct was not "especially complex or especially intricate" such that a 2-level enhancement (amounting to a guideline range increase of 10-12 months) is warranted.

The PSR justifies application of this enhancement by pointing first to the fact that Mr. Harmon used a "recovery seed phrase," which United States Probation refers to as "a technologically sophisticated security feature," to access the seized bitcoin wallets.  Bitcoin wallets are often described as a place to store bitcoin (much like a physical wallet), but they are in fact a place to store the digital credentials that permit a user to access and spend bitcoin holdings. While it is true that cryptocurrency and cryptocurrency wallets are a relatively new technology and

unfamiliar to many, accessing a cryptocurrency wallet is not in fact a technologically sophisticated task.  All that is required is knowledge of a set of words, just as one would use a password to access an online bank account. The only difference is that the seed phrases involve sets of 12 or more words, rather than a group of numbers and letters. Mr. Harmon used these credentials to access the bitcoin. While the conduct was certainly illegal, it is practically no different and no more sophisticated than using a password to access the contents of a bank account or obtaining a key to a safe deposit box and taking the contents of that box.

The PSR also points to Mr. Harmon's use of bitcoin mixing services to conceal his involvement in the theft of the bitcoin. Cryptocurrency mixing services pool together cryptocurrency funds from multiple sources, then split them back out and send them to destination addresses. The process makes it more difficult to trace the cryptocurrency to its original owner. Practically speaking, a user of a cryptocurrency mixing service does nothing more than to go to a website, submit an amount of cryptocurrency, and agree to pay a fee. This does not involve "especially complex or especially intricate" conduct. *See United States v. Hulse*, 989 F.Supp.2d 1224, 1226 (M.D. Ala. 2013) ("The guideline is clear: It is not enough for the means used in a scheme to be "complex" or "intricate"; rather, the means must be "especially" so. The definition of "especially" includes "exceptionally" and "particularly." Webster's Third New International Dictionary (1986). That is, the level of complexity or intricacy must set that particular scheme apart from ordinary schemes, and even ordinarily complex or intricate schemes."). As the Court in *Hulse* explained:

> The reasoning behind this heightened requirement is obvious. The essence of fraud involves deceit or deception. *See* Black's Law Dictionary (9th ed. 2009) (fraud involves a "knowing misrepresentation of the truth or concealment of a material fact"). More likely than not, *some* complexity will always be required to carry out such deceit. If the only requirement to apply this enhancement were *some* complexity, nearly every fraud would qualify. Therefore, to assure that

this guideline does not result in a defendant being punished twice for fraud, the drafters of the guidelines restricted the enhancement to only those schemes that are *especially* complex or intricate.

*Id.* at 1226-7.

Mr. Harmon's use of bitcoin mixers in this case does not rise to the level required to meet the high bar of being "*especially*" complex or intricate such that this significant enhancement should be applied. His conduct was no different than run-of-mill efforts by criminal defendants to avoid detection by law enforcement and was less sophisticated than the conduct of defendants where courts have applied the enhancement. *Compare United States v. Otunyo*, 2023 WL 2718958 (D.C. Cir. March 31, 2023) (affirming this Court's application of § 2B1.1(b)(10)(C) enhancement where defendant concealed funds by creating fictitious entities, shell corporations, and several layers of layered transactions); *United States v. Meadows*, 866 F.3d 913, 918 (8th Cir. 2017) (affirming application of § 2B1.1(b)(10)(C) enhancement where defendant's conduct lasted seven years and involved defrauding exorbitant amount of money from large number of people by lying to investors, making Ponzi payments to appease them, making improper use of tax and investment forms, and forging statistics); *United States v. Ghaddar*, 678 F.3d 600, 601-2 (7th Cir. 2012) (affirming application of § 2B1.1(b)(10)(C) enhancement where defendant directed employees to separate out currency receipts, withheld those funds from corporate bank accounts, concealed magnitude of sales by using currency, secreted money into foreign accounts, used multiple deposits to avoid reporting requirements, and washed money through bank accounts of relatives and associates).  Adding a year to Mr. Harmon's sentence based upon his conduct here would be inconsistent with the purpose of the "sophisticated means" enhancement and would overstate the seriousness of the offense.

In sum, neither the § 3C1.1 nor the § 2B1.1(b)(10)(C) enhancements should be applied

8

here. The total adjusted offense level, taking into account Mr. Harmon's acceptance of responsibility, should be 22, resulting in an advisory guideline range of 41-51 months.

## II.     A Sentence of 36 Months is Sufficient and Not Greater Than Necessary to Comply with the Purposes of Sentencing set forth in 18 U.S.C. § 3553(a)

The defense contends that a sentence of 36 months' incarceration followed by 3 years of supervised release, a slight downward variance from the applicable guideline range, is appropriate here. The primary directive in § 3553(a) is that the Court must impose a sentence that is "sufficient, *but not greater than necessary*, to comply with" the purposes of sentencing. *See* 18 U.S.C. § 3553(a) (emphasis added). What follows is a detailed review of the relevant § 3553(a) factors.

### A.     Mr. Harmon's history and characteristics

Gary Harmon, now 31 years old, was born and raised in Ohio and was living there at the time of his arrest in this case. He grew up in a single-parent household following his parents' divorce when he was only two years old. He and his sister went to live with their mother while his older brother Larry went with their father. Because he was so young at the time, Mr. Harmon has no recollection of how the decision about which sibling would go with which parent was made. He has been told that his older brother was given a choice by the court and that he chose to live with their father. Mr. Harmon recalls being sent to his father's home every other weekend. They did not have a close bond because they spent so little time together but have developed a closer relationship in recent years.

Mr. Harmon graduated from high school and attended Baldwin Wallace Community College in 2010 before enrolling at Kent State University, which he attended from 2011 to 2013 and focused on exercise science. While in school he worked as a stocker at an Under Armour retail store. Mr. Harmon started working full time before finishing all the credits necessary to complete his college degree. He first found work as a stone countertop installer at SEStone and stayed at the

company for two years installing stone countertops in residences and commercial buildings. He then worked in sales and marketing for a company in Cleveland for two years. In 2016, Mr. Harmon moved to Phoenix, where he started a marketing company that dissolved after one year because it failed to generate profits.

Before long Mr. Harmon's older brother Larry offered him a customer service job with his company back in Ohio. Larry is eight years older than Mr. Harmon and had started a company called Coin Ninja, a business created to promote wider use of cryptocurrency and to help individuals who were new to the use of cryptocurrency. Mr. Harmon did not have sophisticated programming skills, so he did not advance far within the company or earn significant amounts of money. He earned approximately $70,000 per year in 2018 and 2019. The company ceased operations after the arrest of Larry Harmon in February of 2020.

### B.    Nature and circumstances of the offense

Larry Harmon was indicted on December 3, 2019 and charged with crimes related to his operation of a business called Helix that served as a bitcoin mixer which enabled customers to send bitcoins to recipients without revealing the source or owner of the bitcoins. *United States v. Larry Harmon*, No. 19-395-BAH.  The government identified 16 bitcoin wallets containing approximately 4,877 bitcoin that Larry Harmon had generated as fees and proceeds from his operation of Helix. Pursuant to the forfeiture allegation in Larry Harmon's indictment, the bitcoin in those 16 wallets were subject to criminal forfeiture. Although the government took possession of devices including a Trezor storage device which contained information that may have allowed agents to take possession of the bitcoin, the government was not able to secure the contents of those wallets because they were not aware of the credentials necessary to access them.

In April of 2020, Mr. Harmon used credentials from his brother to access the contents of 8

of the 16 wallets. Of the 4,877 bitcoin subject to forfeiture, Mr. Harmon accessed 712.6 – or just over 14% of the bitcoin.[2] Mr. Harmon used a portion of those bitcoin in the ensuing months to, among other things, purchase a car, go on a trip to Miami where he visited a nightclub and spent lavishly, and to obtain a loan from a company called Blockfi secured by approximately 66 bitcoin with which he purchased a Cleveland condominium. He went to nightclubs in Ohio, drank heavily, and used drugs. Much of the money he spent was drawn from the loan he received from Blockfi.

Mr. Harmon recognizes that his conduct was immature, unlawful, and inexcusable and he has done everything in his power to accept responsibility and make the government whole. First, Mr. Harmon met with prosecutors and agents, provided them with all seed phrases known to him, and walked them through how to access all remaining bitcoin.  Agents were able to seize a total of 579 bitcoin as well as two other types of cryptocurrency based upon the information provided by Mr. Harmon.  The total value of that returned cryptocurrency was $12,344,177.40.  At the time the 712 bitcoin were taken by Mr. Harmon, their value was $4,881,532.40.  In other words, despite the fact that Mr. Harmon used a small portion of the bitcoin before they were returned, because the dollar value of bitcoin increased dramatically in recent years, the returned bitcoin had almost triple the dollar value of the 712 bitcoin Mr. Harmon initially took from the seized bitcoin wallets. Moreover, Mr. Harmon has agreed to forfeit all other proceeds of his crime. Specifically, the condominium in Cleveland, the automobile, $284,879.88 from his bank accounts, 68.42 bitcoin seized from Mr. Harmon's BlockFi account, and a watch.[3] Other than funds he spent on non-

---

[2] As will be explained herein, more than 647 of those 712.6 bitcoin are being returned to the government.
[3] The PSR suggests some confusion about Huntington Bank accounts linked to Mr. Harmon.  The defense believes that these accounts are the same accounts the contents of which are being forfeited as part of this plea agreement.  Mr. Harmon listed those accounts in his financial disclosure form in an effort to be fully transparent and estimated the balances therein at the time of his arrest. To the extent there is any outstanding question about funds in Huntington Bank that may not be subject to the forfeiture agreement, the defense is amenable to meeting with the government to address

physical items, Mr. Harmon has arranged for the return of everything that he removed from the seized bitcoin wallets in this case. When he is released from prison Mr. Harmon will have no assets.

The guidelines do not take into account the fact that the overwhelming majority of the bitcoin Mr. Harmon took from his brother's wallets are being turned over to the government as part of the plea agreement in this case. The guidelines would be the same if Mr. Harmon had refused to turn over the remaining bitcoin in an effort to save it for his use upon completion of his sentence or if he had spent it all already.  This is among the reasons that a downward variance is appropriate here. If the Court were only to take into account the value of the bitcoin that are not being returned, the loss amount would be closer to $450,000 and the § 2B1.1 loss amount increase would be 12 rather than 18.[4]   The resulting total adjusted offense level would be 16 and the sentencing range would be 21-27 months.

### C.    Need to reflect the seriousness of the offense and provide deterrence

Mr. Harmon has endured extremely harsh conditions during the course of his pretrial detention in this case.  For a man who had never before seen the inside of a jail cell, his experiences during the past 21 months have served more than enough deterrent purpose – no further incarceration is necessary to drive home the message that he can never again break the law.

After his arrest Mr. Harmon spent approximately 12 days in a local jail in Ohio.  Inmates were provided no socks and no underwear by the facility. He was then transported through Oklahoma, where he spent 2 days before being flown to the D.C. Jail. At the facility in Oklahoma, Mr. Harmon was kept in a large room with approximately 30 people.  There was one shower and

---

any concerns.
[4] This method of calculating loss would still not account for the value of the condominium and the automobile, which are both being forfeited to the government and together are likely valued at over this $450,000 amount.

one toilet to be shared by all 30 men.  During his trip to Washington, D.C. Mr. Harmon was walked through the public areas of the Oklahoma City and Dallas airports by the Marshals in chains.  As one would expect, the experience was humiliating.

Mr. Harmon spent approximately three months at the D.C. Jail. For the first 19 days in intake he had only one hour outside the cell he shared with a cellmate. That hour could come at any time: it could be as early as 3:00 or 4:00 in the morning, at 9:00 a.m., 1:00 p.m. or any other time determined by staff on duty. During that hour Mr. Harmon rushed to make phone calls to family and friends and bathe. He received one hot meal per day; breakfast was cold. Juice was provided in plastic bags. To make matters worse, Mr. Harmon contracted shingles.  Mr. Harmon was seen by mental health staff at the jail, who noted that he was depressed, anxious, feeling hopeless, and experiencing persistent sleep disturbance. PSR, ¶ 102. He was afraid for his life because he was receiving death threats from other inmates at the jail, and he was not being given recreational time or regular showers. *Id*. He was prescribed Mirtazapine for his depression and anxiety.  When Mr. Harmon was finally moved out of intake, he moved to a unit at the jail where he had a brief period of being permitted to be out of his cell for 5 hours per day, but the institution quickly switched back to 23 hours in the cell and 1 hour out due to COVID-19 restrictions. One such period of being in his cell 23 hours per day lasted approximately six weeks. These conditions of confinement are akin to solitary confinement and are typically reserved for those with very serious criminal histories or who have engaged in significant misconduct within the facility.  For one period of two weeks at the D.C. Jail, Mr. Harmon's toilet leaked unsanitary liquid onto the floor of his cell. Rodents and cockroaches ran in and out of the cell regularly.

On November 9, 2021 Mr. Harmon was transported to the Bureau of Prisons facility in Lewisburg, Pennsylvania where some federal pretrial detainees were moved after an inspection by

U.S. Marshals revealed what Mr. Harmon already knew from first-hand experience: conditions at the D.C. Jail were unacceptable. U.S.P. Lewisburg is not a pretrial detention facility; it is a medium security federal prison. For the first two weeks of his time at Lewisburg Mr. Harmon was on quarantine lockdown, in his cell 24 hours per day.  Not long after that he and other inmates were put on 24 hour lockdown for another 18 days after one or more inmates tested positive for COVID-19.  They had another stint of 24/7 lockdown for approximately 8 days when an incident at a Texas facility led the BOP to lock down all facilities.  Aside from the repeated and lengthy stretches of solitary confinement, other factors made existence at the prison especially difficult. When the heat was turned on at the facility it was often so hot that detainees were forced to wrap blankets around pipes in their cells in an effort to limit the heat being conducted into their cramped quarters. When the heat was turned off, they were uncomfortably cold.  In addition, Lewisburg is a four-hour drive from Washington, D.C. so his contact with counsel was limited.  Most visits necessarily occurred on video or over the telephone. Mr. Harmon was already far from home in Ohio, so he did not have visits from family or friends. He was diagnosed with major depressive disorder by staff at the prison. PSR, ¶ 103.

Mr. Harmon was accustomed to being outside and engaging in physical exercise, so the conditions at Lewisburg were especially difficult for him. For the first year that he spent at the facility, he and others were only permitted to exercise for one hour per day inside a small cage. Meanwhile, they could see sentenced inmates exercising outdoors on a yard.  After a full year, Mr. Harmon and other inmates were suddenly and inexplicably permitted to exercise in the yard. Detainees were told that a new warden at the facility was surprised to learn that pretrial detainees were only being permitted short stints in a cage for exercise and the policy was eliminated on the spot.  While it was a relief to finally be permitted to exercise in the yard as opposed to briefly in a

small cage, Mr. Harmon was left to wonder why the policy was in place for an entire year while he was there. He was only able to take advantage of this change for about a month before he was moved to a fourth facility.  Mr. Harmon was moved to the Alexandria Jail four months ago and he remains there now. He is again experiencing lockdowns, this time related to staff shortages. Inmates have been locked down for as much as three or four days at a time, particularly on weekends, because there is not enough staff to supervise the inmate population.

Mr. Harmon has used the time in custody to reflect upon his actions and how he will live his life going forward.  His letter to the Court demonstrates that he has absorbed the magnitude of his lapse in judgment.  He writes that his actions were selfish and reckless and that he is ashamed of his conduct:

> After the last 20 months in jail I have come to realize just how bad and immature my actions were.  I wish I could say this happened the moment I got arrested but that would be a lie.  At first I was angry and resentful.  I have finally let those feelings go and know I am the only one to blame for my actions.  During my time I have done a lot of self-reflecting and understand I need to change my ways to make sure I never end up incarcerated ever again.

Letter of Gary Harmon, attached at Exhibit 1. Upon release from custody, Mr. Harmon plans to live with his father in Kent, Ohio while he gets on his feet.  Mr. Harmon's father has a bedroom set up for him.  He reports in his letter to the Court that: "Gary has always been helpful to me in maintaining my small family farm.  It was my grandparents'.  Gary helped me cut fallen trees, split wood and mow.  As I am getting older I could really use his help more and more." Letter of Larry Harmon, attached as Exhibit 2.

**D.    Need for treatment**

Mr. Harmon was using alcohol and drugs heavily during the time of the offense conduct in this case. He drank alcohol and smoked marijuana daily. On weekends he drank excessively and used cocaine, ecstasy, and hallucinogens. His trip to Miami, where he spent large sums at a

nightclub, was fueled by cocaine, ecstasy, and alcohol. Mr. Harmon recognizes that alcohol and drug use contributed to his lack of judgment during the period of the charged conduct. He believes that participation in substance abuse treatment while he serves the remainder of his sentence would help to prepare him for his new life and asks that the Court recommend that he participate in the Residential Drug Abuse Treatment Program.

### E.   Avoiding disparities

This case is relatively unique; it is difficult to locate cases with facts that are on all fours. But although the currency involved in this offense was bitcoin, the conduct here is not far removed from conduct in fraud cases this court sees frequently. Thus it is useful to consider sentences in cases involving theft and defendants' expenditure of stolen funds for their own personal benefit:

- Unlike many fraud defendants, Mr. Harmon did not take and use funds that were intended for charitable organizations.

  _United States v. Everett Lipscomb_, No. 12-050-BAH

  Mr. Lipscomb was an active participant in a scheme to embezzle and launder nearly $400,000 in USAID funds meant to address pressing global health issues, such as HIV/AIDS in developing countries. Mr. Lipscomb incorporated a front/shell company, set up bank accounts with fraudulent and deceptive names to receive the proceeds, and created a new email account to serve as a false identity in embezzlement-related correspondence. The government sought a sentence of 21 months, followed by three years of supervised release, and restitution in the amount of $386,279.76. This court imposed a sentence of 15 months of incarceration, 24 months of supervised release, and restitution in the amount of $386,279.76.

_United States v. Byron Fogan,_ No. 15-0153-RJL

Mr. Fogan, a lawyer, was the executive director of a non-profit foundation that made financial donations to non-profit and charitable organizations that worked in educational development, innovation in science and technology, the promotion of arts and culture, developing families and strong communities, and the promotion of environmental awareness and protection. Over more than two years Mr. Fogan stole more than one million dollars from the foundation and spent it at casinos and adult entertainment establishments. The government sought a sentence of 27 months and 3 years of supervised release.  The Court sentenced him to 21 months incarceration and 36 months of supervised release.

- Mr. Harmon did not operate a fraud scheme that stole funds from innocent victims.

_United States v. Tyrone Grandberry,_ No. 18-372-PLF

Mr. Grandberry fraudulently persuaded investors to entrust him with their money, then spent, transferred, and dissipated millions of their dollars for his own personal benefit, using a series of shell companies, bank accounts, forgeries, and lies to string victims along for years, defrauding new victims to fund refunds for old victims. He stole at least $3,622,185 from unwitting investors. The government sought a sentence of 60 months incarceration and 3 years supervised release.  The Court imposed a sentence of 24 months and 3 years of supervised release.

_United States v. Kessey Durand_, No. 19-CR-00070-BAH

Mr. Durand, while working at the Pension Benefit Guaranty Corporation, changed or attempted to change the direct deposit instructions for 21 pension plan participants so that those payments would be sent to bank accounts he controlled. Mr. Durand was able to acquire $40,000, but tried to acquire up to $107,000. The government recommended that

Mr. Durand be sentenced to 21 months of incarceration and to 3 years of supervised release. This Court sentenced Mr. Durand to a period of 15 months of incarceration followed by 36 months of supervised release.

_United States v. Emmette Brown_, No. 14-CR-00157-BAH

Mr. Brown used a complicated scheme to take control of and sell the home of a Washington, D.C. resident without that person's permission while that person was out of the country.  In total, Mr. Brown was able to pocket at least $178,038 of the victim's money through the fraudulent acquisition and sale of their home. The government sought a sentence of 21 months of incarceration and 3 years of supervised release. This Court sentenced Mr. Brown to 16 months of incarceration and 36 months of supervised release.

- Mr. Harmon did not operate a sophisticated fraud scheme involving repeated acts, multiple victims, and millions of dollars in actual losses

_United States v. Jamar Skeete_, No. 21-472-JDB

Mr. Skeete personally facilitated more than $1.8 million in business e-mail compromise schemes over a two-year period, including establishing fraudulent shell company accounts using a stolen identity and using those accounts to receive and launder proceeds from the fraudulent scheme. Among the victims were a municipality in Michigan and a company owning senior care facilities. The government sought a sentence of 78 months incarceration and 3 years of supervised release. The Court imposed a sentence of 56 months incarceration and 3 years of supervised release.

_United States v. Emeka Ndukwu,_ No. 17-246-TJK

Mr. Ndukwu was described by the government as a "professional money launderer" who laundered the proceeds of multiple fraud schemes that victimized companies around the

18

world. Mr. Edukwu took part in a scheme that stole almost $1 million from multiple victims and reaped the benefit of the fraud, including purchasing a Mercedes for his wife and building a mansion for himself in Nigeria. Mr. Ndukwu participated in the conspiracy for more than four years. The government sought a sentence of 57 months imprisonment and 3 years of supervised release. The Court sentenced Mr. Ndukwu to 48 months of incarceration and 3 years of supervised release.

Mr. Harmon's conduct was certainly serious and worthy of punishment, but when it is compared with conduct and circumstances in other fraud cases sentenced in this District, the 36 month sentence proposed by the defense is certainly reasonable and would avoid unwarranted sentencing disparities.

### III.    Objections to Proposed Special Conditions of Supervised Release

The Sentencing Recommendation prepared by United States Probation includes three suggested special conditions of supervised release related to monitoring of Mr. Harmon's computer use to which the defense objects. ECF No. 55, p. 5. The first requires Mr. Harmon to submit his computers or other electronic devices to a search when a probation officer has reasonable suspicion that the computer or electronic device contains evidence of a condition of supervised release. The second requires Mr. Harmon to allow a probation officer to install computer monitoring software on any computer he uses. The third requires Mr. Harmon to allow his probation officer to conduct periodic unannounced searches of any computer subject to computer monitoring to determine whether the monitoring software is functioning effectively and whether there have been attempts to circumvent the monitoring software after its installation.

A sentencing court may order any condition of supervised release "it considers to be appropriate," to the extent the condition is "reasonably related" to the nature and circumstances of

the offense and the history and characteristics of the defendant, and to the need to deter crime, to protect the public from further crimes of the defendant, and to provide needed training, medical care, or other correctional treatment to the defendant. 18 U.S.C. § 3583(d)(1). The condition also must entail "no greater deprivation of liberty than is reasonably necessary" to provide adequate deterrence, to protect the public, and to meet the defendant's vocational and medical needs. *Id.* § 3583(d)(2). *See United States v. Love*, 593 F.3d 1, 11 (D.C. Cir. 2010).

The D.C. Circuit has affirmed application of computer search conditions in child pornography and child sexual exploitation cases in which the internet was used to seek out victims. *See e.g.*, *United States v. Legg*, 713 F.3d 1129, 1133 (D.C. Cir. 2013). There is no comparable acceptance of reflexive use of computer monitoring conditions in fraud cases in which computers were used in the commission of the offense. The conditions proposed by United States Probation impose a greater deprivation of liberty than is reasonably necessary. The fact that a computer was used in this case – the first criminal conviction of this defendant – does not justify installation of intrusive monitoring software on any computer Mr. Harmon uses.

## CONCLUSION

For the foregoing reasons and such others as may be presented at the sentencing hearing, the defense respectfully requests that the Court impose a sentence of 36 months incarceration, 3 years of supervised release, and forfeiture as contemplated in the negotiated plea agreement.  Mr. Harmon exercised extremely poor judgment during the period of the charged conduct, but he has demonstrated that he has turned a new page by accepting responsibility for his conduct and returning most of the purloined cryptocurrency.  The last 21 months have been extremely difficult for Mr. Harmon, some of which were spent in local jails operating under COVID restrictions and staff shortages, and the rest of which were spent at a medium security federal prison several hours

from here. No goal of sentencing identified in § 3553(a) would be advanced by imposing a sentence here that would result in his spending much more time in prison. The 36 month sentence proposed by the defense is sufficient and not greater than necessary.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/

_____

Ned Smock
Assistant Federal Public Defender
Office of the Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
 (202) 208-7500