```
                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA

   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
 UNITED STATES OF AMERICA,        )  Criminal Action
                                  )  No. 21-433
 vs.                              )
                                  )
 GARY JAMES HARMON,               )  April 27, 2023
                                  )  9:44 a.m.
               Defendant.         )  Washington, D.C.
   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

**TRANSCRIPT OF SENTENCING HEARING**
**BEFORE THE HONORABLE BERYL A. HOWELL,**
**UNITED STATES DISTRICT COURT JUDGE**


<u>**APPEARANCES**</u>:

FOR THE UNITED STATES:
                        CHRISTOPHER B. BROWN
                        C. ALDEN PELKER
                        DOJ-U.S. Attorney's Office
                        For the District of Columbia
                        601 D Street, NW
                        Washington, DC 20530
                        (202) 252-7153
                        Email: christopher.brown6@usdoj.gov

FOR THE DEFENDANT:
                        EDWARD SMOCK
                        Office of the Federal Public Defender
                        District of Columbia
                        625 Indiana Avenue, NW
                        Washington, DC 20004
                        (202) 208-7500
                        Email: ned_smock@fd.org


ALSO PRESENT:      HANA FIELD, U.S. Probation


Court Reporter:    Elizabeth Saint-Loth, RPR, FCRR
                   Official Court Reporter


                Proceedings reported by machine shorthand.
          Transcript produced by computer-aided transcription.

1                    **P R O C E E D I N G S**

2                    THE COURTROOM DEPUTY:  Matter before the Court,

3       Criminal Case No. 21-433, United States of America versus

4       Gary James Harmon.

5                    Your Honor, for the record, Probation Officer

6       Hana Field is appearing remotely.

7                    Counsel, please come forward and state your names

8       for the record, starting with the government.

9                    MS. PELKER:  Good morning, Your Honor.

10      Alden Pelker for the United States.

11                   THE COURT:  Yes, Good morning.

12                   MR. BROWN:  Good morning.

13      Chris Brown, AUSA, for the United States.

14                   THE COURT:  Yes.  Good morning.

15                   MR. SMOCK:  Good morning, Your Honor.

16      Ned Smock for Mr. Harmon.

17                   THE COURT:  Yes.  Good morning, Mr. Smock.

18                   Good morning, Mr. Harmon.

19                   THE DEFENDANT:  Good morning, Your Honor.

20                   THE COURT:  All right.  So we're here this morning

21      for Mr. Gary Harmon's sentencing on his plea of guilty on

22      January 6, 2023, to wire fraud in violation of 18 U.S.C.

23      Section 1343, and obstruction of an official proceeding in

24      violation of 18 U.S.C. Section 1512(c)(2).

25                   I am going to begin this sentencing hearing this

1    morning the same way I do all of them, by reviewing the

2    materials I have reviewed in connection with sentencing here

3    today.

4            So I have certainly received and reviewed the

5    Presentence Investigation Report and the sentencing

6    recommendation from the probation office, docketed at

7    ECFs 54 and 55.

8            I have also reviewed the sentencing memo submitted

9    by the government docketed at ECF 56; and the sentencing

10   memo submitted on behalf of Mr. Harmon docketed at ECF 57,

11   along with a letter from the defendant, at 57-1, and other

12   letters from his family docketed at ECF -- one friend also,

13   docketed at ECF 57-2.

14           Does the government have all of those documents?

15           MS. PELKER:  Yes, Your Honor.

16           THE COURT:  And am I missing anything from the

17   government?

18           MS. PELKER:  I don't believe so, Your Honor.

19           THE COURT:  Okay.  Mr. Smock, do I have everything

20   from the defense?

21           MR. SMOCK:  You do.

22           THE COURT:  And have you received all of those

23   documents?

24           MR. SMOCK:  I have.  Thank you.

25           THE COURT:  Okay.  Mr. Harmon, let me just tell

4

```
1         you that this -- you can stand right where you are.
2                   I like to tell defendants, particularly those like
3         you who have no prior criminal history, how this sentencing
4         hearing is going to proceed this morning so you know what is
5         coming up.
6                   My sentencing hearings are conducted in four
7         steps.  At the first step I will determine whether the
8         government or your lawyer on your behalf has any objections
9         to any factual statements set out in the Presentence
10        Investigation Report, which you will sometimes hear me or
11        the lawyers refer to as the "PSR" for short; that's what
12        we're talking about.
13                  At the second step, I will determine how the
14        advisory guidelines apply in your case.  And if there are
15        any objections to how the guidelines apply, I will hear
16        those objections and resolve those then.
17                  At the third step, I will hear from the government
18        first, then I will hear from your counsel, and then I will
19        hear directly from you, if you wish to speak to me.  I have
20        read your letter.
21                  At the last step, I will explain the reason for
22        the sentence I am imposing and then impose sentence.
23                  Do you understand how this is going to go for the
24        next hour or so?
25                  THE WITNESS:  Yes, Your Honor.
```

1          THE COURT:  Okay.  Good.  Thank you.

2          You may be seated.

3          THE DEFENDANT:  Thank you.

4          THE COURT:  All right.  Step one, the final

5     presentence report and sentencing recommendation filed on

6     March 10th, 2023, have been reviewed.  And I understand that

7     the government may have objections to some of the

8     guideline -- a guideline determination in the PSR.

9          But does the government have any objection to any

10    of the factual portions of the PSR?

11         MS. PELKER:  No, Your Honor.

12         There was a previous misunderstanding about the

13    Huntington Bank account that we've --

14         THE COURT:  I'm sorry.  I can't understand you.

15         MS. PELKER:  No, Your Honor.

16         There was a previous misunderstanding about a

17    Huntington Bank account that was referenced, but we have

18    worked it out with the defense.  We have no objections to

19    the facts in the PSR.

20         THE COURT:  Okay.  Thank you.

21         Mr. Smock, have you and your client read and

22    discussed the Presentence Investigation Report?

23         MR. SMOCK:  We have, Your Honor.

24         THE COURT:  And I understand that the defendant

25    has asserted two objections to the guideline calculation,

```
1      but does the -- which I will address at the next part of the
2      hearing.  But do you have any objections to any of the
3      factual statements in the PSR?
4              MR. SMOCK:  No, Your Honor.
5              THE COURT:  Okay.  Thank you.
6              Mr. Harmon, you can stand right where you are.
7              Are you fully satisfied with your attorney in this
8      case?
9              THE DEFENDANT:  I am, Your Honor.
10             THE COURT:  And do you feel that you have had
11     enough time to talk to Mr. Smock about the Presentence
12     Investigation Report, the sentencing recommendation from the
13     probation office, and the other documents submitted in
14     connection with your sentencing?
15             THE DEFENDANT:  Yes, I have.
16             THE COURT:  Okay.  Thank you.  You may be seated.
17             All right.  Hearing no objection to the factual
18     parts of the PSR, I will accept those as undisputed and as
19     my findings of fact at sentencing.
20             Now, we're at step two where we will determine how
21     the guidelines apply to your case.
22             Both of your convictions on Counts 1 and 2 are
23     subject to the Federal Sentencing Guidelines.  I am going to
24     start with the defendant's criminal history, to which I
25     understand neither party has any objection.
```

```
 1                 The PSR found that Mr. Harmon has no prior

 2      convictions; as a result, his criminal history score is

 3      zero, putting him in Criminal History Category I of the

 4      Sentencing Table.

 5                 The government has no objection to that, does it?

 6                 MS. PELKER:  No, Your Honor.

 7                 THE COURT:  Mr. Smock, you have no objection to

 8      that?

 9                 MR. SMOCK:  No, Your Honor.

10                 THE COURT:  All right.  So as to the guideline

11      determinations, I think both parties object to the PSRs

12      two-offense-level enhancement for obstruction under the

13      guideline at Section 3C1.1 and also, relatedly, object to

14      the PSR's grouping of Counts 1 and 2 under the guideline at

15      3D1.2(c), rather than grouping them under 3D1.2(a).

16                 And then the defendant also has an objection to

17      the two-offense-level enhancement for an offense involving

18      sophisticated means under the specific offense

19      characteristic at 2B1.1(b)(10)(C).

20                 Is that pretty much the summary of the objections

21      I have to resolve today from the government?

22                 MS. PELKER:  Yes, Your Honor.

23                 THE COURT:  And, Mr. Smock?

24                 MR. SMOCK:  Yes, Your Honor.

25                 THE COURT:  All right.  So I am going to deal with
```

1    the objections separately, starting with the parties' joint

2    objection to the two-offense-level enhancement under

3    Section 3C1.1 and the grouping under 3D1.2(c), as set out in

4    the PSR.

5           And as I understand it, the parties take issue

6    with this because the defendant did not obstruct the

7    government's investigation into his own criminal conduct and

8    so -- in the parties' view, this enhancement at 3C1.1 does

9    not apply here.

10           I am ready to rule on that.  I understand the

11    parties' objections based on their papers.

12           Does the government want to supplement in any way?

13           MS. PELKER:  No, Your Honor.  We're happy to

14    address any questions the Court has.

15           THE COURT:  I don't have any questions.

16           MR. SMOCK:  No, Your Honor.

17           THE COURT:  All right.  Okay.  The PSR -- I am

18    prepared to rule on this.

19           The PSR applied a two-offense-level enhancement

20    under the guideline at 3C1.1 for obstruction of justice

21    stating that defendant -- and I quote from the PSR at

22    paragraph 65, "Willfully obstructed or impeded or attempted

23    to obstruct or impede the administration of justice with

24    respect to the investigation, prosecution, or sentencing of

25    the instant offense of conviction and the obstructive

1     conduct related to defendant's offense of conviction, and

2     any relevant conduct or closely related offense.

3          I agree with the parties that this enhancement

4     does not apply to defendant's guideline calculation because

5     his obstructive conduct underlying Count 2 of the

6     Information obstructed and impeded the government's

7     investigation and prosecution of Larry Harmon, not Gary

8     Harmon, and was -- and obstructed Larry Harmon's

9     investigation and prosecution, not the defendant's own

10    commission of wire fraud, as charged in Count 1.  Thus, the

11    obstructive conduct was not with respect to the instant

12    substantive offense of conviction and, therefore, the

13    parties' objection to the PSR, at paragraphs 54 and 65,

14    which added two offense levels, is sustained.  No offense

15    level under the guideline at 3C1.1 applies.

16         The defendant's objection to the two-offense-level

17    enhancement under the SOC -- and "SOC" is just shorthand for

18    specific offense characteristic, Mr. Harmon.  That's a long

19    phrase, so you will hear people refer to it as an "SOC."

20         Okay.  So the SOC at Section 2B1.1(b)(10)(C) --

21    and as I understand your objection, Mr. Smock, this

22    offense -- this two-offense-level SOC was added for the wire

23    fraud offense involving sophisticated means, and you argue

24    that the use of recovery seed phrases to remotely access a

25    Trezor device's hidden wallets does not amount to

1    sophisticated means, in sum.

2              So do you want to step forward?

3              Do you want to address your argument here?

4              MR. SMOCK:  Yes, please.

5              I think one -- one thing I'd just like to start

6    with is just a recognition that cryptocurrency, bitcoin, and

7    the like, are new to many of us, and was certainly new to me

8    as I took on this case.

9              So, for example, just reading --

10             THE COURT:  I have had some education because of

11   Larry Harmon's prior case.

12             MR. SMOCK:  And I have read some of your writings

13   on that, and so I recognize that and appreciate that.

14             In reading some of the government's filings and

15   other information about bitcoin, I think one can get

16   confused in light of just the nature of the technology.  I

17   am getting older, and I think there is a little bit of a

18   concern that just getting confused about the technology

19   might lead one to believe that conduct is sophisticated.

20             And what I would encourage the Court to do is

21   focus on what the actual conduct was.  So going step by

22   step, if you look at accessing the bitcoin -- you know, the

23   government provides a page of describing how Trezor devices

24   work and reconstituting wallets, et cetera.

25             But as you sort of get down to brass tacks about

1    what that is, it means that Mr. Harmon essentially had seed

2    phrases, which is just sort of a list of words in order, and

3    used it to access the bitcoin.  And that's -- that was

4    totally illegal, that's why he has been in jail for two

5    years now and is facing sentencing today.  But the question

6    for the Court is whether that is really "sophisticated."

7              In our view, it really is not any different than

8    having an ATM code and accessing money in a bank.  You know,

9    we -- I will talk about this more as we talk about the

10   3553(a) factors.  But as the Court is well aware, Mr. Harmon

11   has given the government access, and they have now been able

12   to reclaim most of this cryptocurrency.  I was in the

13   meeting where that occurred; and it really involves,

14   basically, giving a list of words.

15             So our view is that that is really no different

16   than what you would normally do in accessing a bank account.

17   It's simply a different way that it's done.

18             THE COURT:  Well, you have focused on, in some

19   ways, sort of the simplest part of the theft of the bitcoin,

20   which is using the seed recovery passphrases to recreate the

21   wallets.  But that was just only one small part of what he

22   did because then he laundered those stolen bitcoins, once

23   they had been re-created, restored, put in hidden wallets;

24   he then laundered them through other mixers.

25             So you are just focusing on, like, step one of a

1    multiple-step process, aren't you?

2              MR. SMOCK:  I was getting there.

3              THE COURT:  Oh, you were.

4              MR. SMOCK:  I am happy to address those things as

5    well.

6              THE COURT:  All right.

7              MR. SMOCK:  So then I --

8              THE COURT:  I appreciate your -- I appreciate your

9    comment that those of us who don't deal regularly with

10   cryptocurrency, certainly, you know -- and bitcoin -- we

11   shouldn't just be intimidated by something we don't know and

12   then call it sophisticated and unknowable and overly

13   complicated, warranting the two-offense-level enhancement.

14             I totally agree with you.  We have to have enough

15   self-knowledge to be reflective on how technology is passing

16   us by a bit.

17             But -- and if this were just using a couple of

18   passphrases, you know, I think I maybe would be more open to

19   your argument, but it's all the things that happened

20   afterwards.

21             MR. SMOCK:  So let me address that.

22             With respect to the mixing services, you know, I

23   think what's important to acknowledge is that, again, this

24   is significantly different than a person --

25             THE COURT:  Are all of those mixing services on

1    the dark net?

2                 MR. SMOCK:  I don't know the answer to that --

3                 THE COURT:  Mr. Gary Harmon says no.  He might be

4    the expert in the room, but I'll -- I'll ask the government

5    to address that -- later, on their time.

6                 I'm not interrupting you.

7                 MR. SMOCK:  Okay.  And I honestly don't know the

8    answer to that question off hand.

9                 What I do know is that putting bitcoin into a

10   mixer is not a complicated thing.  It's essentially logging

11   onto a website and paying a fee, and it occurs.  You know,

12   setting up a different wallet in which those funds would go

13   to is not a complicated thing.

14                And so this conduct is not something that is

15   especially complex.  I think what I wanted to ask the Court

16   to focus on is the fact that any case involving fraud is

17   going to involve some efforts to conceal.  The conduct that

18   is described here is not especially complex, is not, in any

19   way, more complex than your average fraud scheme.

20                And that's why I think it's important -- when

21   we're talking about bitcoin and then thinking about how

22   sophisticated means enhancements have been applied in

23   non-bitcoin cases -- you look at those cases in which this

24   Court has applied the enhancement.

25                I think you were upheld just this year in a case

1    in which you found sophisticated means; this is the *Otunyo*

2    case that I cited.  These are things where people are

3    creating fictitious entities, shell corporations, layers of

4    transactions, et cetera.

5              THE COURT:  And isn't using bitcoin mixers sort of

6    like using a shell company --

7              MR. SMOCK:  Well, it --

8              THE COURT:  -- that sort of hide the -- its

9    multiple steps of concealment?

10             MR. SMOCK:  There is no denying that a bitcoin

11   mixer is aimed at, you know, hiding the source of funds.

12   But that is one thing that the government is pointing at,

13   specifically with respect to the mixing service.  It's not

14   multiple repeated steps involving, you know, creating

15   different bank accounts, doing things overseas -- all of the

16   facts that I cited in the cases where courts have applied

17   sophisticated means enhancements.

18             And another thing I would point to is, to the

19   extent one is thinking that Mr. Harmon's conduct is

20   "sophisticated," the government rightly points to some of

21   his conduct.  And, sure, there was a period during which he

22   did not access those funds, but nothing he did was in any

23   way a sophisticated way of concealing.

24             I mean, the government has --

25             THE COURT:  I would not consider -- just so the

1    record is clear -- sitting on stolen funds, doing nothing

2    with them, a sophisticated means to conceal a fraud, that --

3    and I don't think the government was offering that as its

4    support for application of the sophisticated means

5    enhancement.

6           MR. SMOCK:  I appreciate that.  You know --

7           THE COURT:  But the government can correct me if

8    I'm wrong on that.

9           MR. SMOCK:  The conduct, thereafter, it was by no

10   means hidden and, in fact, quickly resulted in his arrest.

11          So this isn't a person who was engaged in

12   sophisticated conduct beyond, you know, what the Court has

13   described, which is certainly not especially sophisticated,

14   which -- we're talking about, you know, numbers here of

15   plus two, et cetera.

16          But what it means practically for Mr. Harmon would

17   be a guideline range that is, you know, as much as a year

18   more in prison.  So what we're asking the Court to take into

19   account is that this conduct in practice was no more

20   sophisticated than what one sees in normal fraud cases, and

21   it certainly doesn't warrant an extra year or so in prison

22   practically.

23          THE COURT:  Thank you.

24          Does the government want to respond?

25          MS. PELKER:  Yes, Your Honor.

1            We certainly appreciate Mr. Smock's argument that

2      the availability of some of these technically sophisticated

3      tools put in the hands of otherwise potentially

4      unsophisticated actors allows them and affords them more

5      opportunities to do what may appear to be more sophisticated

6      activities.  And simply the use of cryptocurrency in and of

7      itself, depending on the situation, may not give rise to an

8      appropriate sophisticated means enhancement.  But that's not

9      what we have here and that's not why the government is

10     arguing for a sophisticated means enhancement.

11           We have the defendant, first, using those recovery

12     seeds to reconstitute the wallet.  He transfers them out

13     which entails setting up a series of new wallets.  It's true

14     that that can now be done with a click of a button, but he

15     does that over and over again.  He is able to reconstitute

16     the wallets, transfer the funds out; and then he starts to

17     do research to determine what is going to be the most

18     effective way to move these funds and conceal them.  He

19     looks at what are the services that are not going to keep

20     any sort of logs.  He finds two of the most effective mixing

21     services that are being sought by criminals, particularly

22     ChipMixer.

23           And to answer the government -- the Court's

24     question.  So Wasabi Wallet is a software wallet that you

25     can run.  You can access it using Tor, but you do not need

1    to be on the dark web to be using it.  ChipMixer had a

2    CLEAR net portal that allowed users to find out information

3    about ChipMixer, but operated primarily as a darknet.onion

4    [sic] cite in order to launder the funds through.

5              There were two fairly different mixing services as

6    far as the different -- the way that they were set up and

7    how they functioned.  And I think it's interesting that the

8    defendant did, in fact, seek out two different mixing

9    platforms as an effort to really add elaborate layers to his

10   laundering activity.

11             THE COURT:  So the Wasabi mixing service is not on

12   the dark net, but -- what was the other one again?

13             MS. PELKER:  ChipMixer.

14             THE COURT:  Gyb -- G-Y-B?

15             MS. PELKER:  C-H-I-P, chip.

16             THE COURT:  ChipMixer.  Right.

17             I didn't understand you.  Is that on the dark net

18   or not?

19             You said it is accessible by Tor?

20             MS. PELKER:  It is accessible by Tor.  It has --

21   it's called a CLEAR net portal -- or had, it's since been

22   taken down by law enforcement.

23             But you could go to it --

24             THE COURT:  ChipMixer has been taken down by law

25   enforcement?

1          MS. PELKER:  Yes, Your Honor.

2          So that was fairly recent following -- so it

3     postdates the defendant's laundering activity.

4          THE COURT:  Okay.

5          MS. PELKER:  The examples that are set out in the

6     sophisticated means enhancement are intended to be

7     non-exhaustive, but I think are still instructive here where

8     you look at the types of activity that it's clear that this

9     guidelines enhancement was attempting to address.

10          And while cryptocurrency was not envisioned the

11     last time that this was updated, the sort of layering of

12     funds, the sort of using different platforms to engage in a

13     sort of sophisticated laundering I think is the exact type

14     of activity that would warrant a sophisticated means

15     enhancement.

16          I think that individually there are a number of

17     different steps that anywhere along the way with the

18     execution and the concealment could constitute, on their

19     own, sophisticated means.  But certainly taken in the

20     totality and looked at the totality of the scheme, we think

21     that this warrants a sophisticated means enhancement.

22          THE COURT:  Okay.  Thank you.

23          Mr. Smock, do you want to respond or -- you don't

24     have to.

25          MR. SMOCK:  No.  I don't have anything further.

1          THE COURT:  All right.

2          All right.  I am prepared to rule on this

3    particular SOC.

4          The defendant objects to the Presentence

5    Investigation Report's addition of a two-offense-level

6    enhancement for use of sophisticated means under

7    2B1.1(b)(10)(C).  And that guideline instructs that the two

8    offense level should apply if the offense otherwise involved

9    sophisticated means and the defendant intentionally engaged

10   in or caused the conduct constituting sophisticated means.

11         The commentary at Note 9 further defines

12   "sophisticated means" as -- with the following words:  That

13   it is an especially complex or especially intricate offense

14   conduct pertaining to the execution or concealment of an

15   offense.

16         The note then provides examples of sophisticated

17   means that fall within the definition including, and I

18   quote:  A telemarketing scheme locating the main office of

19   the scheme in one jurisdiction but locating soliciting

20   operations in another jurisdiction.  It also describes

21   "sophisticated means" as hiding assets for transactions or

22   both through the use of fictitious entities, corporate

23   shells, or offshore financial accounts also ordinarily

24   indicates sophisticated means.

25         So, in some ways, this enhancement for

1    sophisticated means is not really that hard to satisfy in

2    terms of the definition here, and defendant's conduct fits

3    within the definition of sophisticated means.

4         He used recovery seeds to recover the bitcoin

5    wallet.  And he did that in order to transfer the bitcoin to

6    new wallets that he had also created, which is akin to

7    creating a fictitious entity for the sole purpose of moving

8    funds covertly, falling within the scope of the definition

9    in the guideline commentary.

10        Then he concealed his conduct, which is also akin

11   to hiding assets or transactions, by using two different

12   mixers of bitcoin which are intended to hide the source of

13   the original bitcoin and, basically, launder it and wash it

14   of the source.

15        This conduct is similarly sophisticated to the

16   criminal conduct deemed sophisticated in *U.S. v. McCants*,

17   which is a D.C. Circuit case from 2009, where the

18   D.C. Circuit found that the defendant's conduct committed in

19   multiple states involving concealment of tools used in the

20   criminal conduct hidden in storage units rented under an

21   alias and using an allegedly legitimate business to conceal

22   his conduct from law enforcement, all amounted to

23   sophisticated means.

24        We have this defendant stealing the bitcoin,

25   transferring it to hidden wallets that he had otherwise

1   created.  And then, before actually using and spending any

2   of the bitcoin, he then laundered it to hide the source.

3   Even though this real world context -- physical world

4   context set out in McCants, is -- the real world context set

5   out in *McCants* is a little bit different from this sort of

6   cyber world; the intent and the means used were intended to

7   effectuate the same kind of activity.

8         The defendant transferred the bitcoins from the

9   Trezor device, concealed his efforts with

10  identity-concealing bitcoin mixing technology.  In a

11  voluntary interview with law enforcement about the missing

12  funds claimed his innocence asking:  If I took it, why

13  wouldn't I take it all?

14        He clearly used a bunch of different means to

15  effectuate this fraud and the deception.  The Circuit

16  explained in *McCants*:  We can image scenarios involving more

17  elaborate means to avoid detection or conviction, but it

18  doesn't render the district court's resolution of the

19  question invalid.

20        Just as here, this is -- there are people for whom

21  all of the steps that Mr. Harmon took could be very easy and

22  parceled down into its individual components.  I can credit

23  that people who know how to operate with bitcoin know how to

24  recover -- use seed recovery passphrases; they know how to

25  create wallets; they know how to use bitcoin mixers.

1          But looking at the totality of this offense

2    conduct here, even if only one of those steps had been taken

3    standing along might not be a sophisticated means.  Taken

4    all together, this certainly constitutes a whole number of

5    steps to conceal the source of the bitcoin and to --

6    sophisticated means to steal the bitcoin.

7          So the defendant's objection is overruled.

8          The two-level enhancement for use of sophisticated

9    means under the guideline SOC at 2B1.1(b)(10)(C) applies to

10   the wire fraud in Count -- wire fraud charge in Count 1.

11         And so with those objections resolved, I will

12   review how the guidelines apply in this case.

13         Counts 1 and 2 are grouped together under the

14   guideline at 3D1.2(a) for the purpose of calculating the

15   relevant offense level since both charges involve the same

16   victim, the same acts or transactions, so that the offense

17   level applicable to the group is driven by the count that

18   results in the highest offense level; here, that is Count 1,

19   te wire fraud count.

20         The guideline at 2B1.1 applies to the wire fraud

21   charge, and that guideline provides a base-offense level of

22   7 under 2B1.1(a)(1)(A) and (B).

23         Eighteen offense levels are added for the specific

24   offense characteristic of loss of more than 3.5 million

25   under the guideline at 2B1.1(b)(1)(J).  Two offense levels

1    are added for use of sophisticated means under

2    2B1.1(b)(10)(C).  And then three offense levels are

3    subtracted under the guideline at 3E1.1(a) for his

4    acceptance of responsibility, resulting in a total offense

5    level of 24, which in combination -- okay.

6           Let me just finish this so the guideline

7    determination is complete.

8           By comparison to the total offense level of 24,

9    the guideline 2J1.1 applies to the Count 2 obstruction

10   charge, which has a base-offense level of 14 under

11   Section 2J1.2(a), plus an additional three offense levels

12   under the SOC for substantial interference with the

13   administration of justice under 2J1.2(b)(2), minus three for

14   acceptance of responsibility, which results in a total

15   offense level of 14, demonstrating that the wire fraud count

16   with a total offense level of 24 is the driving offense

17   level under the grouping of these two counts.

18          And a total offense level of 24 for the wire fraud

19   count, combined with Mr. Gary Harmon's criminal history

20   category of 1, results in an advisory sentencing range of 51

21   to 63 months.

22          Any period of imprisonment must be followed by one

23   to three years of supervised release, a fine range of 25,000

24   to $250,000, and a special assessment of $100 that applies

25   to each count, for a total of $200.

1          Are there any objections not already noted on the

2     record about this guideline determination from the

3     government?

4          MS. PELKER:  No, Your Honor.

5          THE COURT:  And, Mr. Smock?

6          MR. SMOCK:  No, Your Honor.

7          THE COURT:  All right.  We're now at step three of

8     the sentencing hearing where I hear, first, from the

9     government, then from Mr. Smock, and then from you,

10    Mr. Harmon, if you wish to speak to me.

11         Let me just lay out, as I usually do, the

12    recommendations that have been provided to the Court.

13         The government recommends that Mr. Harmon be

14    sentenced to a term of imprisonment at least at the midlevel

15    of the recommended sentencing range.  The probation office

16    recommends 63 months incarceration, two years of supervised

17    release, and the mandatory $200 special assessment.  The

18    defendant recommends 36 months of incarceration, which would

19    be a slight downward variance, both under the sentencing

20    range that the defense recommended, but certainly under this

21    applicable guideline range of 51 to 63 months.

22         All right.  With that, let me hear from the

23    government about its recommendation.

24         MS. PELKER:  Yes, Your Honor.

25         The Court is very familiar with the facts of this

1    case.  We won't belabor them, but I do want to highlight a

2    few points.

3            This was a very serious crime involving millions

4    of dollars' worth of cryptocurrency.

5            It was two years ago that the defendant sat in

6    this very courthouse, after attending a hearing also in

7    Ohio, hearing arguments about his brother's case and hearing

8    arguments specifically about the cryptocurrency that he went

9    on to steal, hearing the government express their concerns

10    and hearing this Court admonish his brother about not doing

11    any sort of cryptocurrency transactions.

12            It was very shortly after that hearing that the

13    defendant began moving his funds in brazen disregard for the

14    authority of this Court.  This was not a situation where the

15    defendant got caught up in the moment and took advantage of

16    an opportunity and then realized that he had done something

17    wrong and returned the funds immediately.

18            He then launched a yearlong effort to launder

19    these funds through a variety of different steps, thinking

20    through and calculating his plan at each step along the way,

21    to ensure that he wouldn't get caught.

22            He then decided to go on his spending spree and

23    spent the bitcoin on himself and on his new friends, getting

24    a new car, a condo, a watch, trips to the club where he was

25    spending upwards of $100,000 in a single evening, all while

1    knowing that those funds were subject to the jurisdiction of

2    this Court and that the government was seeking to recover

3    them and forfeit them in his brother's case.

4           To the defendant's credit, he did eventually take

5    responsibility and assisted the government in recovering the

6    funds, and that is absolutely significant and noteworthy.

7    And for what it's worth, I credit the sincerity in the

8    defendant's letter attached to his sentencing submission.

9           We have noticed a real difference in his demeanor.

10   And I do hope that this has been a turning point for

11   Mr. Harmon and that we aren't going to have further issues

12   with him down the line.

13          I think that the reason -- the assistance and his

14   current posture is why we're here arguing about a guideline

15   sentence in the 5-year range, rather than one in the 20-year

16   range, which is what he would have faced if he had been

17   convicted at trial on the original charges.

18          There was a significant difference in the

19   guidelines range for what he would have faced on the money

20   laundering counts to what he's facing today.  And he is

21   getting that benefit, in part, because he's accepted

22   responsibility and did provide that assistance.  He is

23   significantly benefiting from the plea and his cooperation

24   already.

25          THE COURT:  Can I just ask you about the

1    cooperation?

2              MS. PELKER:  Yes, Your Honor.

3              THE COURT:  The government says that, you know,

4    the defendant assisted in recovering 417.3903 bitcoin that

5    was taken.  And defense counsel argues that the defendant

6    helped the government recover, and I'm quoting:  A total

7    579 bitcoin, as well as two other types of cryptocurrency.

8    He says that in the defendant's memo at page 11.

9              So I'm just looking at numbers here.

10             Could you just explain where defense counsel is

11   getting the number of 579 and the other types of

12   cryptocurrency that may be referred to there, if you know?

13             MS. PELKER:  Let me try and find the exact

14   breakdown of the bitcoin.

15             As far as the other types of cryptocurrency, there

16   is Dogecoin and -- thank you.

17             Dogecoin and Ethereum in smaller amounts.

18             We do have --

19             THE COURT:  That have -- and those other types of

20   cryptocurrency were -- originated with the stolen bitcoin

21   that he turned into those other types of cryptocurrency?

22             MS. PELKER:  Yes.  That's right, Your Honor.

23             He used the stolen bitcoin, converted it to

24   Dogecoin, and a small amount of Eth [sic].

25             And he did -- and we did not mean to not credit

1    anything the defendant had provided to the government.  He

2    did assist us to recover the Dogecoin and the Eth, as well

3    as two different transfers, one of 417 bitcoin from his

4    iPhone and 161 bitcoin from seed words that he had provided.

5            THE COURT:  So it was a total of 570 -- so the

6    defense memo was correct?

7            MS. PELKER:  I believe that's correct, Your Honor.

8            THE COURT:  Okay.

9            MS. PELKER:  And I apologize if we misstated the

10   number that he assisted in recovering.  We absolutely credit

11   that this is substantial -- significant assistance.

12           THE COURT:  Okay.  And how much is that -- the

13   recovered bitcoin -- worth now, if you know?

14           Because I think in some of the briefing -- whether

15   it was the government's briefing or the defense briefing,

16   they said it was worth a certain amount at the time of the

17   seizure by the government and is now worth much more.

18           What are those numbers?

19           MS. PELKER:  So the total amount of assets that we

20   have now recovered, which include also bitcoin that the

21   government had recovered prior to the defendant's

22   assistance, as well as bank accounts and assets, is just

23   under $20 million as of the trading price yesterday.  That

24   includes both what the defendant had assisted us in

25   recovering and then a smaller subset of funds that we had

1    recovered without his assistance and prior to his

2    assistance.

3             I am doing rough math in my head right now.  I

4    believe we're looking at approximately 16 million worth of

5    bitcoin that he assisted us in recovering at today's trading

6    value, maybe 15.

7             THE COURT:  Okay.

8             MS. PELKER:  We can get those exact numbers for

9    the Court, if they're helpful.

10            THE COURT:  It's all right.

11            MS. PELKER:  Again, significant assistance, and

12   we -- it's why the defendant is here in his current posture

13   today.

14            Defense counsel did raise several examples of

15   other cases of what the defense contends is similarly

16   situated defendants regarding potential sentencing

17   disparities.

18            We'd note that the way to avoid sentencing

19   disparities is to sentence within the guidelines.

20            Speaking generally, we think that there are a

21   number of distinguishable points for many of the cases that

22   the defense cites.  We're happy to address any of the

23   Court's questions if there is any specific case the Court

24   would like to discuss.

25            THE COURT:  Well, why don't you tell me how you

1        distinguish them.

2               MS. PELKER:  Generally, most of these cases have

3        significantly lower dollar values is what we're looking at,

4        across the board, as a common distinguishing factor.  The

5        loss figures are just substantial lower, down to $40,000 at

6        the lowest, and even under 2 million for the highest.  We're

7        looking at much lower dollar figures.

8               And each one of the defendants in the cases cited

9        had different 3553(a) factors; there were often very early

10       resolutions including pre-indictment resolutions.  And in

11       two of the cases cited, the ultimate sentence was in the

12       general range of what we are asking for here, still with

13       much smaller dollar amounts, in the 1 million amount and

14       $1.8 million amount.

15              I do want to speak to the point that the

16       government noted in its sentencing memo regarding the need

17       for general deterrence here.

18              In cases around the country and in this court,

19       defendants are arrested and arraigned while tens or even

20       hundreds of millions of dollars remain outstanding.  That's

21       a challenge that's coming up increasingly in these

22       cryptocurrency cases where the government is facing this

23       challenge of needing to disrupt ongoing crime that's

24       victimizing victims, while also trying to determine the best

25       way to recover the funds the victims may have already lost.

1              And it's imperative that this Court and others

2       send a strong message to those defendants, to their

3       associates, and the public that interfering with the

4       government's and Court's efforts to secure funds will lead

5       to serious consequences, including significant jail time.

6              THE COURT:  And how about interfering with another

7       pending criminal case where I was confronted with the

8       potential of revoking pretrial release for Mr. Larry Harmon

9       until the government figured out it wasn't Larry Harmon

10      actually who was dissipating the seized assets, but his

11      brother.  That would have been a real injustice to

12      Larry Harmon had I revoked his pretrial release.

13             MS. PELKER:  Yes, Your Honor.

14             We did want to speak briefly on the defense

15      objection to the release conditions regarding computer

16      monitoring.

17             THE COURT:  And I was going to ask you about that.

18             Does the government have examples of computer

19      monitoring in fraud cases such as this one involving cases

20      of cybersecurity or cryptocurrency?

21             MS. PELKER:  We do them fairly regularly in

22      cybercrime cases, which does still involve a computer that's

23      being used to commit the offense.  I recognize that that is

24      different.

25             THE COURT:  It's standard in child pornography or

1   child distribution cases, but this is quite different from

2   that.

3          MS. PELKER:  It is, although we do have a computer

4   as a significant instrumentality and really an integral one

5   in the commission of this offense.

6          We also would point out that the language that was

7   proposed in the PSR, and subject to potential amendment down

8   the line, really is quite flexible and leaves a fair amount

9   of discretion to probation as far as the best way for them

10  to craft any sort of searches and monitoring.

11         And to the extent that it becomes in any way an

12  onerous burden or an issue with monitoring of computers

13  related to employment, it's very easy to come back and amend

14  those conditions or craft something that's going to address

15  the defendant's particular circumstance.  It's difficult to

16  predict what exactly that is going to be after a potential

17  period of incarceration, however long that is the Court

18  decides.

19         But here we have a case where the defendant did

20  use his computer and electronic devices to commit an offense

21  and was really reliant on the computers themselves and the

22  sophistication of the technology in order to be able to

23  commit the offense.  And so we think that some degree of

24  monitoring -- or at least giving probation the option for

25  some degree of monitoring is appropriate.

1              THE COURT:  All right.

2              MS. PELKER:  Mr. Brown is much better at math than

3      I am.

4              The total of the surrendered cryptocurrency that

5      Mr. Harmon gave us today is now worth just over 20 million,

6      so updated figures.

7              THE COURT:  Thank you.

8              Mr. Smock.

9              MR. SMOCK:  Your Honor, just sort of closing the

10     loop on that.

11             I am not sure that it was totally clear, but the

12     plea agreement and the statement of facts indicates that the

13     value of the entire amount of cryptocurrency that was taken,

14     which was something like 14 percent of the total that was

15     seized from Larry Harmon -- the value of the stolen currency

16     at that time was about 4.9 million.  So in terms of the

17     value of what has been returned at -- because of the

18     fluctuating value of cryptocurrency, it's multiple times

19     more valuable than the total amount that had been taken.

20             THE COURT:  I think, as Mr. Brown said, it's worth

21     now over 20 million.

22             MR. SMOCK:  Correct.

23             So, Your Honor, I want to address the 3553(a)

24     factors.  But first -- before doing that, I just want to

25     acknowledge that Mr. Harmon's father, Larry Harmon, is

1    present in court, having come here from Ohio to support his

2    son.  Your Honor read his letter, I am sure.

3              With respect to Mr. Harmon's history and

4    characteristics -- and I intend to sort of go through the

5    3553(a) factors but I am happy to address the Court's

6    questions at any time.

7              You know, he's born and raised in Ohio.  He

8    graduated from high school.  He was raised essentially in a

9    single-parent household.  He has since, as one can tell from

10   the fact that his father is here -- he and his father are

11   actually quite close.  He has been employed his entire adult

12   life and, as the Court has noted, has no criminal history

13   whatsoever.

14             THE COURT:  Well, the PSR noted that Mr. Gary

15   Harmon is estranged from his mother.

16             Is that still the case?

17             MR. SMOCK:  I believe that is still the case.

18   Mr. Harmon, of course, would, you know, like to re-establish

19   that relationship.  Our hope is that this process, what has

20   happened as part of this case, is one step in that

21   direction.

22             THE COURT:  And is that because -- is he estranged

23   from his mother because he put Larry Harmon's pretrial

24   release at risk?

25             MR. SMOCK:  I haven't spoken to his mother, so I

1     can't comment on that.  I think the Court would safely

2     assume that that was part of the reason.

3                 THE COURT:  Okay.

4                 MR. SMOCK:  And I can tell the Court that --

5     assuming that's true, that is something that Mr. Harmon has

6     been putting a lot of thought into and takes that very

7     seriously; and I say that genuinely having spoken to him

8     about it.

9                 One thing I would mention -- and I didn't bring

10    this up in the sentencing memorandum, I talked to the

11    government about it this morning.  I am not mentioning this

12    as an effort to seek a departure.  But one thing I think the

13    Court is aware of probably better than me is that the

14    sentencing commission has approved an amendment to the

15    guidelines under 4C1.1 creating a new downward departure of

16    two levels for people who have no criminal history

17    whatsoever.

18                We're not seeking a departure on that basis, I

19    think it doesn't yet apply.  But I think it's worth noting,

20    in the Court's evaluation of the reasonable sentence under

21    3553(a), that the sentencing commission has recognized that

22    when a person has no criminal history points and none of the

23    provisions which might disqualify Mr. Harmon apply here,

24    that he would otherwise be entitled to two levels lower

25    given his lack of criminal history, and that would -- were

1    that the case, even given the Court's application of the

2    sophisticated means enhancement, the guideline's range would

3    be 41 to 51 months.

4           Our view is that our recommendation of 36 months

5    which is, as the Court noted, a request for a downward

6    variance -- but not a dramatic one -- is certainly

7    appropriate here.  When one talks about the nature and

8    circumstances of the offense, the government addressed it in

9    detail.  We don't have significant disputes with it.

10          I mean, Mr. Harmon came to this court and accepted

11   responsibility; and you saw from his letter that he

12   acknowledges that what he did was dead wrong.

13          I heard what the Court said, and I know that

14   Mr. Harmon heard what the Court said, about the concern

15   about subjecting his brother to, you know, harm as a result

16   of this, and that's something that he has thought a great

17   deal about and contemplated, essentially, why he would have

18   done that.  He takes that seriously, and that's precisely

19   the reason that we're talking about a sentence for three

20   years in prison for someone with no criminal history

21   whatsoever.

22          THE COURT:  Well, it is -- for a judge with the

23   power over somebody's liberty, it's chilling to think that I

24   might have come close to revoking a pretrial release for a

25   defendant because he was the one with all of the passwords,

1    he was the one with the -- knew where the -- you know, all

2    the bitcoin was.  He was the one who could have moved all of

3    the bitcoin, how close I came to revoking pretrial release

4    based on conduct that was not that particular defendant's.

5              MR. SMOCK:  And that's understood.  You are not

6    going to hear an argument from us on that point.

7              Again, that's why Mr. Harmon has endured really

8    harsh circumstances and certainly will receive a sentence

9    that results in him spending some more time in prison.

10             He appreciates that, and that's the reason that he

11   has turned a corner and accepted responsibility and isn't

12   making excuses for his conduct; and I think that's what one

13   would hope of a person in his shoes.

14             I think when you look at his conduct since that

15   time, his meeting with the agents in providing the

16   information to allow them to recover a large portion of

17   this cryptocurrency, it is a significant step.

18             And I noted in the sentencing memorandum and just

19   wanted to reemphasize, you know, under the guidelines there

20   is no provision for recognition of that significant conduct.

21   We would be here with the exact same guideline range had he

22   decided to simply try to keep that -- those funds and use

23   them many years down the line, and he did not do that.  So I

24   think there is some recognition necessary under 3553(a) for

25   that conduct on his part that isn't otherwise provided for

1    in the guidelines.

2            He has no funds and won't have any funds --

3            THE COURT:  But that's why there are guidelines

4    ranges, to determine where within a particular guideline

5    range a defendant should be sentenced.

6            So recognition of the -- despite the significant

7    harm to a criminal proceeding that was going on, plus the

8    harm to the government and under the noses of the

9    government -- basically stealing bitcoin under their noses

10   when they had no mechanism to stop it, other than to run to

11   Court to seek to revoke the pretrial release conditions of a

12   defendant who the government knew had control over it is

13   such aggravating conduct that he did remediate by,

14   ultimately, talking and assisting the government in

15   recovering the stolen bitcoin.  But if he had not done that,

16   the government would be looking for either -- would have

17   either given him a very different plea offer in this case or

18   would have been asking for something at the highest end of

19   the guidelines, as opposed to a midpoint of the guidelines.

20           So some of the remediation efforts that Mr. Gary

21   Harmon took or appropriately considered where within the

22   guideline range to sentence him, not necessarily a downward

23   variance.

24           MR. SMOCK:  I understand the Court's point.  I

25   think that what I would say is that, you know, this is a

1    situation wherein the funds that were returned are valued at

2    such a higher amount that, in terms of the funds -- if you

3    look at the value of the amount that was not returned

4    because it was spent, it's -- at the time of the crime, it

5    was valued at something like $450,000.  So that guidelines

6    range itself would already be significantly lower than what

7    we're talking about.

8           And when you talk about comparison cases -- you

9    know, and this gets back to bitcoin and just how varied that

10   value is, I think there is some grounds for arguing that,

11   you know, when you are looking at comparison cases, this

12   very value of bitcoin, and talking about values in the

13   millions of dollars, is not a truly fair comparison.

14          When you think about those comparison cases that

15   the defense provided, you are looking at people who engaged

16   in schemes that victimized people repeatedly.  You know,

17   Mr. Harmon's conduct was no doubt bad.  But when you are

18   thinking about it in comparison with people who got

19   sentences in the range of two or three years who engaged in

20   repeated conduct that, you know, drained the retirement

21   funds of innocent people, we're in a different situation

22   here.

23          And certainly the Court is correct in noting what

24   happened related to these court proceedings.  But when you

25   are thinking about comparing cases, I think 36 months in

1        comparison with those cases is certainly reasonable.

2                I think the other thing that the Court notes is

3        the seriousness of the offense; and I think that gets to the

4        question of whether the recommended sentence that the

5        defense has proposed is consistent with the seriousness of

6        the offense.

7                I have provided a great deal of information about

8        the conditions that Mr. Harmon has endured.  I think -- I am

9        not going to repeat all of them here, but I think it is

10       significant for the Court to consider.  And it's sometimes

11       easy to forget that, as Mr. Harmon sits here today, he has

12       already been in at least four different facilities with

13       really difficult conditions for 21 months.

14               He was in a U.S. prison in Lewisburg for more than

15       a year.  I was only able to see him in person I think once

16       or twice; we visited on video.  You know, during much of the

17       time he has been in custody of the D.C. jail where -- you

18       saw that he was diagnosed with depression based on the

19       conditions there.  He was in, essentially, solitary

20       confinement, which are conditions that are reserved for

21       folks who have actually typically engaged in illegal conduct

22       within the facility, and none of that occurred for

23       Mr. Harmon.

24               So he has endured conditions thus far in the last

25       21 months far more harsh than what you would normally see

1    from a person sitting before you at sentencing, and I think

2    that's another reason why our proposed sentence of 36 months

3    is more than sufficient under 3553(a) to account for the

4    seriousness of the conduct.

5           Again, Mr. Harmon isn't a person who has been in

6    jail many times throughout in his life.  And I can tell the

7    Court having met with him many times now in Alexandria that

8    this is not a cakewalk for him; and you saw that in his

9    records from the jail and the diagnosis and the concerns

10   that staff there had about what he was experiencing.  So

11   that's another thing that I think this Court can take into

12   account.

13          The other thing that I would -- I think we have

14   touched on a little bit, and I have seen it -- and I think

15   the Court saw it in his letter, and you will see it when you

16   speak to Mr. Harmon -- is that he has absorbed the

17   seriousness of this conduct.  I think Mr. Harmon correctly

18   and accurately stated that it has not been an overnight

19   process.  And I think he acknowledges that, as he has been

20   in custody and has been sort of absorbing this, he has

21   turned everything around.  That goes to the question of

22   whether there is a need for a sentence of more than three

23   years to deter his conduct, and I think it's a genuine turn

24   for the better.

25          The other thing I would say with respect to the

1    government's arguments about deterrence -- and I appreciate

2    their arguments about the need to send a message, that's

3    something that this Court obviously is concerned with.

4            I don't think it would be fair to say that a

5    person with no criminal history in the community

6    contemplating engaging in this conduct would read about

7    someone with no criminal history spending three years in

8    prison and think, I am emboldened to engage in this conduct.

9            For folks who have never been in custody, the idea

10   of prosecution, the idea of any time in custody is a far

11   greater deterrent than hearing a 48-month sentence as

12   opposed to a 36-month sentence, and I think that is

13   something that the Court should also take into account.

14           The final thing I would point out -- and I can

15   also just talk about the objection to the computer

16   monitoring condition -- the need for treatment is another

17   thing I think that this Court should take into account.  You

18   know, Mr. Harmon's conduct was immature; it was irrational,

19   frankly.  In many ways it was -- you know, his

20   decision-making was clouded by a great deal of drinking, a

21   great deal of drug use, and we have never proposed that

22   that's an excuse for his actions, but it certainly is

23   something that the Court should take into account in

24   determining what an appropriate sentence is.

25           He would like treatment.  He would like a

1    recommendation for the RDAP program.  He thinks it's

2    appropriate to have ongoing treatment when he's out of

3    custody, and so that's one of our requests.

4         THE COURT:  Okay.  I will recommend the RDAP

5    program.

6         MR. SMOCK:  Thank you.

7         I think -- just the last thing I would say, I

8    think I made the point about the need for the computer

9    monitoring.  And I think the Court is correct that one does

10   see it frequently, in fact, probably all the time in child

11   pornography cases.  But I couldn't find examples of cases in

12   which it's typically imposed in cases involving fraud simply

13   because a computer was involved, and so that's the reason

14   that we raised that objection.

15        THE COURT:  No.  I appreciate that you did because

16   I am not -- I am not planning on imposing the computer

17   monitoring and search provisions on this defendant.  I

18   think -- I appreciate the government's view that he did use

19   the computer to execute the theft and then concealment of

20   the stolen bitcoin and, I guess, other cryptocurrency, but

21   it just seems of a different nature than the child

22   pornography -- child pornography distribution, possession

23   context, which is usually using the computer over

24   significant periods of time.  I am not planning on imposing

25   those computer monitoring and search provisions,

1    particularly since any job Mr. Harmon gets after he leaves

2    prison will likely involve, for any employer, the use of a

3    computer.  And I think that that would make it -- most

4    employers would not want to have automatic review of a

5    work-related computer because of the defendant's supervision

6    status, so I am not planning on imposing those conditions.

7         MR. SMOCK:  So I think that's the extent of the

8    argument I wanted to make.  I think, just generally, we're

9    seeking a fairly modest variance from the guidelines range.

10   And given all of the factors that I have described under

11   3553 I think a sentence of 36 months would be sufficient but

12   not greater than necessary.

13        THE COURT:  Thank you, Mr. Smock.

14        You can stay right there.

15        Mr. Harmon, you can step forward.  This is your

16   opportunity to speak to me, if you wish.

17        Yes.  You can step forward to the microphone.

18        THE DEFENDANT:  Thank you, Your Honor, for

19   allowing me to speak here today.

20        I know there's been a lot of negative things said

21   about me, I am definitely not denying that.

22        When I first got arrested, I sat and I tried to

23   justify every possible excuse I could come up with to make

24   sure I was the hero of this whole story.  It took me a

25   while, but I have come to realize, like, there was no

1    justification.  There is no excuse.

2         At first I didn't see the seriousness in my crime,

3    and now I have.

4         A couple -- a couple of months ago I saw something

5    that really scared the life out of me.  I have seen a lot of

6    unique stuff since being incarcerated.  But the thing that

7    scared me the most is I saw a man go home and three days

8    later he returned to jail; and that honestly scared the life

9    out of me, for how quick and easy it is to come back to

10   jail.

11        Since then, I have taken numerous steps -- more --

12   to help myself.  I have been going to therapy once or twice

13   a week, and I believe I have made great strides.  I believe

14   I know myself a lot better than I have ever known myself.  I

15   have come to understand why I do the things I do.  I realize

16   I need to change the way I think, I need to change the way I

17   act to make sure I never end up in prison again.

18        This has been a real eye-opener; but I want you to

19   know I haven't just sat around and wasted my time.  I truly

20   have worked on myself to become a better individual so that,

21   whenever I do reenter society, I will not be a liability but

22   I will be a benefit to everyone around me.

23        I promise you, I will not engage in any activity

24   that can potentially put me anywhere behind bars or locked

25   up ever again.  This is something that I do not wish to ever

1    go through again.  This is something I can't wait to put

2    past me and move forward and show that I am not the person

3    that is described in this paperwork anymore.  I am not that

4    person, and I have grown.  I want to keep growing and I want

5    to be able to be an example for people to say, hey, you can

6    change; it's possible.

7              Thank you, Your Honor.

8              THE COURT:  Thank you, Mr. Harmon.

9              You can stay right where you are, actually.  I am

10   now going to explain the sentence I am about to impose and

11   impose sentence.

12             So after determining how the sentencing guidelines

13   apply in your case, considering the sentencing memoranda,

14   the arguments made by counsel today, hearing you,

15   Mr. Harmon, having already read your letter, I must now

16   consider the factors that are set out by Congress in

17   18 U.S.C. Section 3553(a) to ensure I impose a sentence

18   that's sufficient but not greater than necessary to comply

19   with the purposes of sentencing.  Those purposes that are

20   set out in the statute include:  The need for the sentence

21   imposed to reflect the seriousness of the offense, promote

22   respect for the law, provide just punishment for the

23   offense, deter criminal conduct, protect the public from

24   future crimes by you, and promote rehabilitation.

25             So in addition to the guidelines and policy

1    statements, I have to specifically consider the nature and

2    circumstances of your offense conduct; your history and

3    characteristics; the types of sentences available; the need

4    to avoid unwarranted sentence disparities among defendants

5    with similar criminal history who have committed similar

6    offense conduct; and the need to provide restitution to

7    victims of the offense.

8          This is not the type of offense that has an

9    identifiable victim warranting restitution, so I need not

10   address the restitution factor any further.

11         With respect to the nature of the offense, you did

12   engage in conduct that thwarted a government investigation

13   of your brother, Larry Harmon, when you stole bitcoin,

14   cryptocurrency, in accounts that were held by your brother

15   and subject to forfeiture by the government.

16         You stole this bitcoin that was earned through

17   your brother's administration of a dark net money

18   transmitting and laundering operation called Helix.  While

19   investigating your brother, the government identified 16

20   bitcoin wallets that had been traced to Helix, these are

21   digital wallets that hold bitcoin; and the government used

22   all of the bitcoin that's on a public ledger on the

23   blockchain -- and the government used the blockchain

24   analysis to identify these 16 wallets containing all of this

25   bitcoin.

 1          Larry Harmon's indictment contained a forfeiture

 2   allegation stating that the bitcoin held in those 16 wallets

 3   were subject to criminal forfeiture as property involved in

 4   Larry Harmon's criminal offenses.  And you heard about this

 5   both at the time of your brother's arrest in Ohio on

 6   February 6, 2020, when search warrants were executed at your

 7   brother's properties in Ohio, Belize, and the Northern

 8   District of California, where law enforcement seized

 9   cryptocurrency storage devices, including a Trezor device

10   that was sort of hidden under a table at one of his

11   properties.  And these storage devices, this Trezor device,

12   stores bitcoin wallets and those contents are accessible

13   through physical access to the device, as well as remote

14   access; and it's this latter method that is relevant to your

15   own criminal conduct here.

16          To gain remote access to the Trezor device's

17   contents, an individual may use a new Trezor device or

18   similar application to re-create wallets stored on the

19   original device by using the recovery seed phrase, which is

20   a unique sequence of 12 to 24 words generated in the Trezor

21   device upon its setup.  By entering the required seed phrase

22   in a new Trezor device, an individual can recreate the data

23   constituting the same bitcoin wallets from the remote

24   original Trezor device.

25          The Trezor devices also permit and allow for

1   another security feature of creation of hidden wallets that

2   are only visible and accessible on the device by entering an

3   additional passphrase.  And this Trezor device seized from

4   your brother also had this hidden wallet feature barring law

5   enforcement from being able to recover any bitcoin from that

6   device, including from the 16 bitcoin wallets.

7          Law enforcement seized the Trezor device, kept it

8   in a very secure evidence locker, but disclosed to the Court

9   at the hearing for your brother on February 11th, 2020, that

10  it couldn't access the contents of those Trezor devices

11  seized from your brother.  Then, weeks later, on March 13,

12  2020, your brother appeared before this Court for a public

13  detention hearing.  The government again disclosed that it

14  was unable to access the bitcoin on the Trezor -- seized

15  Trezor device.

16         You attended both of those hearings; you learned

17  of the government's seizure of the Trezor device.  You knew

18  about the forfeiture allegation in your brother's case and

19  that the government was trying to get access to this

20  bitcoin.  And this Court released Larry Harmon on pretrial

21  release at his detention hearing subject to very strict

22  conditions of supervision.

23         And then, with the knowledge that you had and the

24  skill that you had, you chose to do what the government

25  couldn't do, which you accessed remotely the seized bitcoin

1    on the Trezor device while fully aware of the government's

2    forfeiture allegation, efforts to seize the bitcoin; and you

3    then stole bitcoin from the Trezor using Larry Harmon's

4    treasure recovery seed phrase and you re-created eight of

5    the hidden bitcoin wallets stored on the seized Trezor

6    device in law enforcement's custody.

7          And then, between April 19th and 24th, 2020, you

8    wire transferred the contents of those original eight seized

9    wallets into your eight re-created wallets.

10         The government, as I said before, could watch

11   these transactions happening on the public blockchain but

12   could do nothing to stop the completion of these transfers.

13   And over those five days, between April 19 and April 24th,

14   you transferred over $4 million worth of bitcoin from the

15   Trezor devices still sitting in the government's custody.

16         And after transferring the bitcoin, you sat on the

17   money, you didn't spend it because that would have been an

18   unexplained bitcoin.  Meanwhile, while you were sitting

19   there holding onto the stolen bitcoin, the government

20   requested an emergency status hearing in your brother's

21   case, which took place before this Court on April 28, 2020,

22   where your brother got very close to having his pretrial

23   release revoked as the only person that we knew who could

24   have been stealing bitcoin out from under the noses of the

25   government, law enforcement, holding the Trezor device.

1          I didn't revoke your brother's pretrial release,

2     although it was a very close call.

3          Approximately four months after illegally

4     transferring the bitcoin, you laundered the stolen bitcoin

5     through two online bitcoin mixing services after you had

6     figured out that those might be the most discrete bitcoin

7     mixing services to hide the sources of the bitcoin in ways

8     you thought might not be detectable, and then you bought --

9     you blew through the money.

10          You spent hundreds of thousands of dollars at

11    nightclubs, a luxury condo, a Swiss watch, an Audi sports

12    car, a customized Lamborghini, and I have actually seen

13    pictures of you sitting in a whole tub full of cash, which

14    was quite the memorable photograph, Mr. Harmon.

15          You were interviewed by law enforcement about the

16    missing bitcoin transferred out of the eight wallets, and

17    you insisted you did nothing wrong.  You lied to the FBI,

18    which itself is another criminal offense for which you have

19    not been charged, and said that you had flushed down the

20    toilet a USB thumb drive that had partial recovery seed

21    phrases on it.  And you actually told the FBI if you were

22    going to take the bitcoin, why wouldn't you take it all as

23    opposed to just part of it.

24          This was a pretty complicated scheme, actually, to

25    steal -- use the information you learned at the detention

1    hearings for your brother, steal the bitcoin, launder this

2    bitcoin through the mixing services, sit on it for a while,

3    and then spend it -- a lot of it, although not all of it,

4    taking money in the government's custody.

5              This was very serious criminal conduct that, as I

6    said, is more serious than your general fraud, to my mind,

7    because you were interfering with a judicial proceeding

8    involving criminal charges against another defendant; and

9    you put that other defendant, your brother's liberty, at

10   stake in a very close call.  It's a fraud on the Court, too.

11             Regarding your history and your characteristics,

12   you have no past convictions or prior arrests.  You may not

13   have had the easiest childhood, but you did have your

14   family's support.  You continue to have the family's support

15   of your father.  And I do hope that you are able to mend the

16   estrangement you have with the other members of your family

17   through your offense conduct because I agree with the

18   government and your counsel that your -- both your letter

19   and your statement to the Court indicate to me that you have

20   matured a lot since the first time you appeared in front of

21   me, and certainly from the times you were sitting in the

22   gallery watching criminal proceedings in front of me and

23   engaged in this offense conduct.

24             I want you to know that I think this Court and the

25   government, certainly your counsel, all want you to live up

1     to the promises you have made to the Court and to yourself

2     and, certainly, your family does, too, that you are going to

3     do better and you are going to work on yourself so you never

4     find yourself in this situation again.

5           I read every letter submitted to the Court on

6     behalf of defendants who stand before me for sentencing.

7     Your father indicated in his letter that you gave into

8     temptation, you know, because there was just so much money

9     that you could access, and certainly this experience has

10    taught you the consequences of just giving into temptation.

11    And I think your recognition that you may need additional

12    help to ensure that you stay on a straight path is a mature

13    judgment on your part.  And we -- everybody is going to be

14    rooting for you, that you never stand in a court of law

15    again after this experience.

16          The need for the sentence imposed to deter

17    criminal conduct and protect the public from further crimes

18    by this defendant are critical considerations for any

19    sentencing judge.  This factor is especially important in a

20    case involving the theft of millions of dollars of assets

21    that are subject to forfeiture and being held in the

22    government's custody, obstruction of a government

23    investigation in another criminal case that, essentially,

24    worked a fraud on the Court, and this was -- showed a brazen

25    disrespect of the justice system and use of information

1      gathered while a public spectator at court hearings to

2      assist in defying an order of the court that had authorized

3      the seizure of the assets -- not just of this Court, but the

4      Northern District of Ohio.

5              Your crimes have serious implications.  And I

6      appreciate fully the government's view that general

7      deterrence is critical in this case, that fraud using

8      cryptocurrency is still fraud; that fraud that affects

9      judicial decision-making in a criminal case requires a

10     significant sentence.  Therefore, I do think that the

11     government's recommendation of a sentence at the midpoint of

12     the guidelines is certainly not an unreasonable

13     recommendation.

14             At the same time, I do think that your remorse for

15     what you did, the increased maturity that you have shown

16     over the course of this case and, most importantly, your

17     owning up to the government about your fraudulent theft of

18     the bitcoin in the government's custody and providing

19     assistance to the government in recovering those bitcoin

20     assets deserves credit.  For this reason, I intend to impose

21     a sentence at the low end of the sentencing range that

22     applies to you.

23             Given the fraud on the Court that occurred in the

24     course of your offense conduct, I think no downward

25     variance, as your counsel has requested, is either

1   appropriate or warranted.

2           As to the types of the sentences available, the

3   guidelines advise or recommend a period of incarceration,

4   with your guideline range falling in Zone D of the

5   Sentencing Table, and I do think that that is amply

6   reasonable given the offense conduct in this case.

7           Regarding the need to avoid unwarranted sentence

8   disparities, the government listed no comparators but,

9   instead, asked for a guideline range sentence which, as I

10  have said, is -- given the brazen actions taken here that

11  disrupted the administration of justice in another criminal

12  case, I think is -- makes this -- the fraud offense conduct

13  here fairly unique compared to any other comparable fraud

14  case.

15          And of the seven comparator cases that the

16  defendant has submitted to support a downward variance, none

17  of those comparators, as I've said, involve the same type of

18  disruption to an ongoing criminal case that this case

19  involved and has such aggravating conduct that nothing but a

20  within guideline range sentence is warranted.

21          Also, in fraud cases, comparators are difficult

22  because fraud amounts very greatly and sentences turn on the

23  specific offense conduct at issue and, most importantly, the

24  fraud loss varies from one case to another.

25          The amount of the loss serves as a proxy measure

1    for the seriousness of the offense conduct and the

2    defendant's relative culpability, and is a principal factor

3    in determining the offense level under the guideline, as the

4    guideline commentary to 2B1.1 explains.  And almost all of

5    the comparators cited by the defendant involve loss amounts

6    at a fraction of the defendant's -- of the loss amount in

7    this defendant's case.  They also involve very different

8    personal characteristics.

9           *Granbury*, for example, who was sentenced to 24

10   months incarceration, with a downward variance for fraud

11   resulting in approximately $4.1 million worth of loss, may

12   have been because the defendant was the sole breadwinner

13   with small dependant children, which are very different

14   personal characteristics than this defendant.

15          Two cases cited by the defendant, *Skeete and*

16   *Ndukwu*, also involved sophisticated schemes.  And *Skeete* was

17   sentenced to 56 months incarceration and *Ndukwu* was

18   sentenced to 48 months incarceration despite their loss

19   amounts being less than this defendant's.

20          Those comparators do not persuade this Court that

21   a within guideline sentence, at the low end of the range

22   that I intend to impose, create any unwarranted disparity.

23          So pursuant to the Sentencing Reform Act of 1984

24   and in consideration of the provisions of 18 U.S.C.

25   Section 3553, as well as the advisory sentencing guidelines,

1    it's the judgment of the Court that you, Gary James Harmon,

2    are hereby committed to the custody of the Bureau of Prisons

3    for a term of 51 months, which is four years and three

4    months, which consists of concurrent terms of 51 months as

5    to each of Counts 1 and 2.

6            You will be given credit for the time served in

7    pretrial detention since July 28, 2021.  You are further

8    sentenced to serve a concurrent 36 or -- three-year term of

9    supervised release on each count, in addition -- which will

10   run concurrently.

11           In addition, you are ordered to pay a total

12   special assessment of $200 in accordance with 18 U.S.C.

13   Section 3013.

14           While on supervision, you shall abide by the

15   following mandatory conditions, as well as all discretionary

16   conditions recommended by the probation office in Part D,

17   sentencing options of the presentence report, which are

18   imposed to establish the basic expectations for your conduct

19   while on supervision.

20           The mandatory conditions include:

21           One, you must not commit another federal, state,

22   or local crime.

23           Two, you must not unlawfully possess a controlled

24   substance, which includes marijuana, no matter what the

25   local or state law is where you reside.  You must refrain

1    from any unlawful use of a controlled substance.  You must

2    submit to one drug test within 15 days of placement on

3    supervision, and at least two periodic drug tests

4    thereafter, as determined by the Court.  You must cooperate

5    in the collection of DNA as directed by the probation

6    officer.

7           You shall comply with the following special

8    conditions:

9           Substance abuse treatment, you must participate in

10   an inpatient and/or outpatient substance abuse treatment

11   program, and follow the rules and regulations of that

12   program.  The probation officer will supervise your

13   participation in the program regarding the provider,

14   location, modality, duration, intensity, et cetera.

15          You must also submit to substance abuse testing to

16   determine if you have used a prohibited substance and must

17   not attempt to obstruct or tamper with the testing methods.

18   You must also participate in an inpatient or outpatient

19   alcohol abuse treatment program and follow the rules and

20   regulations of that program.  And the probation officer will

21   supervise your participation in the program regarding the

22   provider, location, modality, duration, intensity,

23   et cetera.

24          The Court finds you do not have the ability to pay

25   a fine and, therefore, waives imposition of a fine in this

1    case.  Any financial obligations are immediately payable to

2    the Clerk of the Court for the U.S. District Court,

3    333 Constitution Avenue Northwest, Washington, D.C., 20001.

4            Within 30 days of any change of address, you shall

5    notify the Clerk of the Court of the change until such time

6    as the financial obligation is paid in full.

7            The probation officer shall release the

8    Presentence Investigation Report to all appropriate

9    agencies, which includes the U.S. Probation Office in the

10   approved district of residence in order to execute the

11   sentence of the Court.  Treatment agencies shall return the

12   presentence report to the probation office upon the

13   defendant's completion or termination from treatment.

14           Pursuant to Rule 32.2(a) of the Federal Rules of

15   Criminal Procedure, you, Gary James Harmon, are hereby

16   ordered to forfeit any property, real or personal, involved

17   in the offense, and any property traceable thereto; a

18   forfeiture money judgment on the following specific

19   property:  The real property located at 3705 Clinton Avenue,

20   Unit 5, Cleveland, Ohio 44413, more particularly described

21   as situated in the City of Cleveland, County of Cuyahoga,

22   and State of Ohio, and known as being Unit 5 in the Nikolai,

23   a residential condominium development of part of original

24   Brooklyn Township, Lot 51, as shown by the plat recorded as

25   instrument number 202104120417 of Cuyahoga County records,

1    and further described by the declaration of Condominium

2    Ownership and Bylaws as recorded in instrument number

3    202104120416 [sic] of Cuyahoga County records, as may be

4    amended from time to time.

5            Two, one 2018 Audi S5, with VIN number

6    WAUB4CF5XJA034330.

7            Three, $284,879.88 seized from Huntington National

8    Bank account numbers 03598804579 and 025932370929 in the

9    name of Gary Harmon.

10           Approximately 68.42 in bitcoin, after required

11   fees seized, from BlockFi account

12   ACT_FITKUJU05DVZBYFTXAKRCBKI in the name of Gary Harmon.

13           And to the extent that it is necessary to have the

14   capitals and lower caps -- Mr. Harmon, is that necessary for

15   this? -- to make it clear which are large caps or which are

16   lower caps?

17           THE DEFENDANT:  No.

18           THE COURT:  No, it's not.  Is it?

19           MS. PELKER:  We think it's fine.

20           THE COURT:  I will have the -- it's necessary to

21   tell which are caps?

22           MS. PELKER:  I don't believe for the BlockFi

23   account.  For the bitcoin addresses, it would be.

24           THE COURT:  Okay.  For purposes of the record,

25   since the J and C -- since my oral giving of the sentence

1    controls over anything on the record, I am going to make it

2    clear for the record that the J and C will reflect any lower

3    and capital case numbers in that account.

4            Next, one Chronoswiss bitcoin watch seized from

5    3705 Clinton Avenue, Unit 5, Cleveland, Ohio 44113.

6            Approximately 161.60735183 in bitcoin, after

7    required fees, seized from wallets reconstituted using seed

8    words.

9            Approximately, 17,404,400.64428636 in Dogecoin,

10   D-O-G-E, after required fees, seized from wallets

11   reconstituting seed words.

12           And approximately, 2.141987205 in Ethereum, E-T-H,

13   after required fees, seized from wallets reconstituted using

14   seed words.

15           And approximately, 417.3903 in bitcoin, after

16   required fees, seized from wallets recovered from an iPhone

17   recovered from 3705 Clinton Avenue, Unit 5, Cleveland, Ohio

18   44113.

19           Mr. Harmon, you can appeal your conviction to the

20   U.S. Court of Appeals for the D.C. Circuit if you believe

21   your guilty plea was somehow unlawful or involuntary or if

22   there is some other fundamental defect in the proceedings

23   that was not waived in your plea agreement.

24           Under some circumstances, a defendant also has the

25   right to appeal the sentence to the D.C. Circuit; a

1     defendant may waive that right as part of a plea agreement,

2     however, and you have entered into a plea agreement which

3     waives some of your rights to appeal the sentence itself.

4     Such waivers are generally enforceable; but if you believe

5     the waiver itself is not valid, you can present that theory

6     to the Appellate Court.

7              Pursuant to 28 U.S.C. Section 2255, you also have

8     the right to challenge the conviction entered or sentence

9     imposed to the extent permitted by that statute and your

10    plea agreement.

11             Any notice of appeal must be filed within 14 days

12    of the entry of judgment, or within 14 days of the filing of

13    the notice of appeal by the government.

14             If you are unable to afford the cost of an appeal,

15    you may request permission from the Court to file an appeal

16    without cost to you.  On appeal, you may also apply for

17    court-appointed counsel.

18             You may be seated.

19             Are there any objections to the sentence imposed

20    not already noted on the record from the government?

21             MS. PELKER:  No, Your Honor.

22             THE COURT:  And, Mr. Smock?

23             MR. SMOCK:  No, Your Honor.

24             THE COURT:  All right.  Is there anything else we

25    need to address today from the government?

```
1              MS. PELKER:  No, Your Honor.

2              THE COURT:  And, Mr. Smock, I have already -- I

3    will make the recommendation to the Bureau of Prisons that

4    Mr. Harmon be permitted to participate in the RDAP program.

5              And were there other BOP programs that you would

6    like for me to recommend that he participate in?

7              MR. SMOCK:  Your Honor, I made inquiries -- he is

8    especially interested in coding, given his background.  I

9    have made inquiries as to whether there are existing known

10   programs; I don't think that there are.  I guess what I

11   would --

12             THE COURT:  On pages 27 through 28 of the PSR,

13   probation has recommended a number of different programs.

14             Do you have any objection to me recommending that

15   he participate in the Federal Prisons Industries program,

16   the Occupational Educational Program, the Challenge Program,

17   the Drug Abuse Education Program, Nonresidential Drug Abuse

18   Program?

19             RDAP, I have already recommended.

20             MR. SMOCK:  No objection to that.

21             THE COURT:  Okay.  I will recommend that

22   Mr. Harmon be considered for participation in all of those

23   programs that our probation office has recommended.

24             MR. SMOCK:  Thank you.

25             I would ask that you make a recommendation that he
```

64

```
1    be housed at the facility in Morgantown, West Virginia, or a
2    facility as close as possible to Akron, Ohio.  I believe
3    that Morgantown is actually among the closest already.
4              But to the extent you can have it as a backup --
5              THE COURT:  To Akron?
6              MR. SMOCK:  Akron, Ohio.
7              THE COURT:  Okay.  I will make that
8    recommendation.
9              MR. SMOCK:  Thank you.
10             THE COURT:  I am sure Mr. Smock has explained to
11   you, Mr. Harmon, that I can make recommendations to the
12   Bureau of Prisons of which facility you will be designated
13   to serve your term of imprisonment.  I can't direct them to
14   do that, but I will make the recommendation.  Sometimes they
15   listen.
16             THE DEFENDANT:  Thank you.
17             THE COURT:  All right.  If there is nothing
18   further, you are excused.
19             Anything further from the government?
20             MS. PELKER:  No, Your Honor.
21             THE COURT:  Anything further, Mr. Smock?
22             MR. SMOCK:  No, Your Honor.
23             THE COURT:  All right.  You're excused.
24             (Whereupon, the proceeding concludes, 11:20 a.m.)
25
```

## **CERTIFICATE**

I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby certify that the foregoing constitutes a true and accurate transcript of my stenographic notes, and is a full, true, and complete transcript of the proceedings to the best of my ability.

This certificate shall be considered null and void if the transcript is disassembled and/or photocopied in any manner by any party without authorization of the signatory below.


Dated this 31st day of May, 2023.

/s/ Elizabeth Saint-Loth, RPR, FCRR
Official Court Reporter